1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
3  CATHERINE J. KOWALEWSKI (216665)
   655 West Broadway, Suite 1900
4  San Diego, CA 92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)
   darrenr@rgrdlaw.com
6  davew@rgrdlaw.com
   katek@rgrdlaw.com
7
   Attorneys for Plaintiff
8
   [Additional counsel appear on signature page.]
9
                 UNITED STATES DISTRICT COURT
10
               CENTRAL DISTRICT OF CALIFORNIA
11
                      SOUTHERN DIVISION
12
   JOHN K. NORTON, Individually and  )   **VIA FAX**
13 on Behalf of All Others Similarly  )
   Situated,                          )   No.  **SACV12- 1623 DMG (FMOx)**
14                                    )
                         Plaintiff,   )   CLASS ACTION
15                                    )
           vs.                        )   COMPLAINT FOR VIOLATION OF
16                                    )   THE FEDERAL SECURITIES LAWS
   QUESTCOR PHARMACEUTICALS,          )
17 INC., DON M. BAILEY, MICHAEL H.    )
   MULROY, STEPHEN L. CARTT and       )
18 DAVID YOUNG,                       )
                                      )
19                       Defendants.  )
                                      )   DEMAND FOR JURY TRIAL
20 ─────────────────────────────────  )
21
22
23
24
25
26
27
28

**JURISDICTION AND VENUE**

1.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

3.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

4.      Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") maintains its principal executive offices at 1300 North Kellogg Drive, Suite D, Anaheim, California 92807. Certain of the acts and conduct complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in this District.

5.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**INTRODUCTION**

6.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Questcor common stock between April 26, 2011 and September 21, 2012, inclusive (the "Class Period"), against Questcor and certain of its officers and/or directors for violations of the 1934 Act. These claims are asserted against Questcor and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

7.    Questcor is a biopharmaceutical company.  The Company's primary product is H.P. Acthar Gel (Repository Corticotropin Injection) ("Acthar"), an injectable drug that is approved by the U. S. Food and Drug Administration ("FDA") for the treatment of 19 indications, including multiple scelorosis ("MS"), a condition of the central nervous system; nephrotic syndrome, a kidney condition; and infantile spasms, an epileptic condition affecting babies.

8.    Specifically, throughout the Class Period, defendants violated the federal securities laws by disseminating false and misleading statements to the investing public about the effectiveness of Acthar as a treatment for MS and nephrotic syndrome, making it impossible for shareholders to gain a meaningful or realistic understanding of the drug's prospects and market success.  As a result of defendants' false statements, Questcor's stock traded at artificially inflated prices during the Class Period, reaching a high of $57.64 per share on July 9, 2012.

9.    On September 19, 2012, Citron Research ("Citron") reported that Aetna Inc. ("Aetna"), one of the nation's largest insurers, had recently revised its policy concerning Acthar, which would severely limit coverage of Questcor's primary drug. Aetna had engaged in a review of the 19 indications for which the FDA had approved Acthar.  Based upon its findings, Aetna determined that clinical research supported only one of the 19 indications.  In Aetna's clinical policy bulletin issued in connection with its review, Aetna reported that studies suggested that the drug is only "medically necessary" for West syndrome, a rare condition that causes infantile spasms, and not for other indications, such as MS, that are treated with steroids.  Typically, Aetna only reimburses for drugs when they are deemed medically necessary.  According to an Aetna spokesperson, "'Our previous position was that this was a last-resort treatment. . . .  We now state that it is not medically necessary because there is no clinical evidence that the drug is more effective than steroids.'"

10.    On this news, Questcor's stock plummeted $24.17 per share to close at $26.35 per share on September 19, 2012, a one-day decline of 48% on high volume.

1     11.    Then, on September 24, 2012, Questcor announced in a Form 8-K filed
2  with the SEC that the U.S. government had initiated an investigation into the
3  Company's promotional practices.

4     12.    After this news, Questcor's stock dropped $11.05 per share to close at
5  $19.08 per share on September 24, 2012, a one-day decline of 37% on high volume.

6     13.    The true facts, which were known by the defendants but concealed from
7  the investing public during the Class Period, were as follows:

8          (a)    Questcor lacked clinical evidence to support the use of Acthar for
9  indications other than infantile spasms.

10         (b)    Questcor had engaged in questionable tactics to promote the sale
11  and use of Acthar in the treatment of MS and nephrotic syndrome.

12         (c)    Questcor lacked a reasonable basis to make positive statements
13  about the Company or its outlook, including statements about the effectiveness of and
14  potential market growth for Acthar.

15     14.    As a result of defendants' false statements, Questcor stock traded at
16  artificially inflated levels during the Class Period.   However, after the above
17  revelations seeped into the market, the Company's shares were hammered by massive
18  sales, sending them down 67% from their Class Period high.

19                                **PARTIES**

20     15.    Plaintiff John K. Norton purchased the common stock of Questcor during
21  the Class Period as set forth in the certification attached hereto and was damaged as
22  the result of defendants' wrongdoing as alleged in this complaint.

23     16.    Defendant Questcor is a biopharmaceutical company.

24     17.    Defendant Don M. Bailey ("Bailey") is, and at all relevant times was, the
25  Company's Chief Executive Officer ("CEO"), President and a director.  During the
26  Class Period, defendant Bailey sold 440,000 shares of his Questcor stock for proceeds
27  of over $17.7 million.

28

18.     Defendant Michael H. Mulroy ("Mulroy") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO"), Senior Vice President and General Counsel.

19.     Defendant Stephen L. Cartt ("Cartt") is, and at all relevant times was, the Company's Chief Operating Officer ("COO"). During the Class Period, defendant Cartt sold 505,509 shares of his Questcor stock for proceeds of over $16.2 million

20.     Defendant David Young ("Young") is, and at all relevant times was, the Company's Chief Scientific Officer. During the Class Period, defendant Young sold 175,124 shares of his Questcor stock for proceeds of nearly $7.1 million.

21.     The defendants named above in ¶¶17-20 are referred to herein as the "Individual Defendants."

22.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Questcor's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

23.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Questcor. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Questcor common stock was a success, as it: (i) deceived the investing public regarding

1   Questcor's prospects and business; (ii) artificially inflated the price of Questcor

2   common stock; (iii) caused plaintiff and other members of the Class to purchase

3   Questcor common stock at inflated prices; and (iv) permitted the officer and directors

4   of Questcor to sell over 3.1 million shares of their Questcor stock at artificially

5   inflated prices for proceeds of over $107.4 million.

6                                           **BACKGROUND**

7           24.    Questcor is a single product company, with Acthar accounting for nearly

8   all of its revenue.  Acthar, a highly specialized, low-volume, premium-priced drug,

9   was originally approved by the FDA in 1952.  The injectable hormone has a broad

10  label, as it has been approved by the FDA for use in 19 indications.  Acthar is a first-

11  line treatment for infantile spasms, a rare, terrible seizure disorder that affects around

12  1,500 babies a year in the U.S.  Acthar was approved for the treatment of MS relapse

13  in 1978.  It was used extensively as a treatment for MS in the 1970s, but was largely

14  abandoned in the 1980s after corticosteroids came on the market, as the powerful

15  steroids proved to be a superior alternative to Acthar.

16          25.    Questcor acquired the rights to Acthar in 2001 for $100,000.  At the time,

17  Acthar was almost exclusively being used to treat infantile spasms.  In 2007, Questcor

18  filed an application with the FDA to obtain orphan drug status for Acthar for the

19  treatment of infantile spasms.  The FDA grants orphan status to a drug that treats a

20  disease affecting fewer than 200,000 people.  Orphan status provides a company with

21  seven years of marketing exclusivity.  At the same time the Company filed its

22  application with the FDA, Questcor raised the price of Acthar from $1,650 per vial to

23  $23,000 per vial, a literally overnight increase of over 1300%.  As a result of the

24  significant price increase, 2007 was the first year in the history of the drug that Acthar

25  made money.  The FDA approved Questcor's orphan drug status application in

26  October 2010.

27          26.    Soon after the Company enacted the tremendous price hike, Questcor

28  embarked on an aggressive strategy to transform Acthar into a blockbuster drug.

1  Questcor's sole strategic goal was to promote Acthar and expand the use of the drug
2  for other indications, initially focusing on using Acthar for the treatment of MS
3  beginning at the end of 2007, followed by nephrotic syndrome in the first quarter of
4  2011.  Questcor markets Acthar as a second line treatment for MS after patients are
5  not responsive to steroids and markets Acthar as a first-line treatment for nephrotic
6  syndrome.

7        27.   As a result of Questcor's new strategy, the Company has grown
8  tremendously, with its net sales increasing from $49.8 million in 2007 to $218.2
9  million in 2011.  The main source of the Company's growth is the use of Acthar in the
10  treatment of MS and nephrotic syndrome.  Currently, infantile spasms, the condition
11  for which it received orphan drug status, accounts for only 6%-10% of the Company's
12  revenues.

13      **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**
        **ISSUED DURING THE CLASS PERIOD**
14
15      28.   On April 26, 2011, Questcor issued a press release announcing its first
16  quarter 2011 financial results.  The Company reported net income of $11.2 million, or
17  $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first

18  quarter of 2011.  The release stated in part:

19        "Our strategy to expand the sales force is clearly paying off," said
20        Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions
21        are up sharply from last quarter. March was a particularly strong month
22        and this momentum has continued so far in April.  We believe that
23        Acthar is filling an increasingly important role in the treatment of
24        exacerbations associated with MS and, looking forward, we expect to
25        continue to grow sales in this important therapeutic area."

26        Mr. Bailey added, "We are also encouraged by the early positive
27        results from our small, dedicated nephrology sales team, which initiated
28        selling efforts at the beginning of March. The number of nephrologists

1    who are using Acthar to treat patients with nephrotic syndrome is

2    increasing."

3        29.    After issuing its first quarter 2011 financial results on April 26, 2011,

4    Questcor hosted a conference call for analysts, media representatives and investors.

5    During the call, defendants reiterated the record financial results reported in the

6    Company's press release and defendant Mulroy discussed the Company's financial

7    performance in depth.   Defendants Bailey and Cartt further presented prepared

8    statements at the conference call and represented as follows:

9        [BAILEY:]  In summary, we are off to a very good start this year

10       as we continue to execute our straightforward strategy to sell more

11       Acthar.  Our decision to expand the MS sales force is clearly paying off.

12       Also, our nephrotic syndrome sales force is having some early success.

13                            *       *       *

14       We believe this MS sales performance reflects the strong,

15       underlying demand for Acthar. This growth in demand is being driven by

16       the increasing productivity of our expanded sales force. We believe net

17       sales in the MS market are now about 60% of total Acthar net sales.

18                            *       *       *

19       [CARTT:] Our expanded promotional activities directed to

20       neurologists generated significant growth in Acthar prescriptions for MS

21       during the first quarter. During the quarter we shipped a record 508 paid

22       Acthar prescriptions for the treatment of MS relapses. This was an

23       increase of 120% over the year ago period and 44% over the previous

24       quarter. We believe this performance is a strong signal that the sales

25       force expansion has gained traction in the MS market at a faster rate than

26       we expected.

27                            *       *       *

28

1      Our promotional efforts are increasingly focused on two main
2      goals. One, convincing an increasing number of prescribers about the
3      benefits of using Acthar with their patients and two, helping doctors,
4      nurses and others in their medical practice become more effective at
5      identifying potential Acthar patients.

6                                    *        *        *

7      In addition to increased promotion by our sales reps, Acthar sales
8      are benefiting from our sponsored physician speaker programs.  In these
9      programs existing Acthar prescribers present to small groups of
10     physicians their experiences using Acthar and the published efficacy and
11     safety data for Acthar in MS relapses.

12     When combined with followup sales calls, these programs appear
13     to be a key driver of our sales growth. Recently we've been significantly
14     increasing the number of speaker programs being conducted and expect
15     to continue doing so in the future.

16     30.    On July 26, 2011, Questcor issued a press release announcing its second
17     quarter 2011 financial results.  The Company reported net income of $13.9 million, or
18     $0.21 diluted EPS, and net sales of $46.0 million for the second quarter of 2011.  The
19     release stated in part:

20     "Clearly, Questcor had a terrific quarter," said Don M. Bailey,
21     President and CEO of Questcor.  "Our focus on expanding the use of
22     Acthar in the treatment of MS exacerbations drove our record second
23     quarter financial performance.   Importantly, in spite of the rapid
24     expansion in the use of Acthar for MS exacerbations, we believe that the
25     prescriber base can continue to grow.  Accordingly, growing MS sales
26     remains our number one priority.  Also, following our early success in
27     nephrotic syndrome, we are immediately and substantially expanding our
28     nephrology selling effort."

31.     After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call for analysts, media representatives and investors. During the call, defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

> [CARTT:]   During the quarter we shipped a record 751 paid Acthar prescription for the treatment of MS relapses. This was an increase of 147% over the year-ago period, and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected. In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.

*     *     *

> So, let's summarize. We are very pleased with the robust MS prescription growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.

*     *     *

> [BAILEY:]  Our go-forward plan is extremely simple and remains to sell more Acthar. That is, gross sales in each of our key markets, MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow. We

- 9 -

are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.

Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts. We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

32.     On October 25, 2011, Questcor issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of 2011.  The release stated in part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar.  We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st.  Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

33.    After issuing its third quarter 2011 financial results on October 25, 2011, Questcor hosted a conference call for analysts, media representatives and investors. During the call, defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.   Defendants Bailey and Cartt further presented prepared statements at the conference call and represented as follows:

> [CARTT:]    [W]e shipped 886 paid Acthar prescription for the treatment of MS relapses during the third quarter of 2011.This was an increase of 174% over the year-ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.
>
> *          *          *
>
> Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the annual meeting of the America Society of Nephrology, or ASN, held this year in Philadelphia. These abstracts are available on ASN's website, www.asn-online.org.The new data provides further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.
>
> We believe availability of this data provides further evidence for the direction [sic] action of Acthar on kidney disease. Importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging understanding of the apparent immune-modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

34.   On January 11, 2011, *TheStreetSweeper.org*, a website noted for unearthing corporate fraud in public companies, announced that it had initiated a short position in Questcor. *StreetSweeper* further reported that it intended to issue the first article in a two-part investigative series about Questcor in the following week. According to *StreetSweeper*:

> The first article raises serious questions about the aggressive marketing practices that [Questcor] has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug while the second story further examines QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

35.   Thereafter, Questcor went to extensive lengths to refute the claims raised by *StreetSweeper.org* and defend the Company's business practices.  As a result, Questcor's stock continued to be artificially inflated.

36.   On January 11, 2012, Questcor issued a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in part:

> Questcor Pharmaceuticals, Inc. today announced it became aware that an investor blog is preparing to issue a report regarding the Company's marketing and business practices.  Questcor issued the following statement:

> The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor

attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

37.     On February 22, 2012, Questcor issued a press release announcing its fourth quarter and full year 2011 financial results. The Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million for the fourth quarter of 2011. Additionally, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million for fiscal year 2011. The release stated in part:

> "Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

38.     After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Questcor hosted a conference call for analysts, media representatives and investors. During the call, defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:]  As we look ahead to 2012 and beyond, we believe we can sustainably grow our Business due to three key factors. First, Acthar provides benefits to many difficult to treat patients not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small. And third, we have assembled an excellent, experienced commercial team to pursue our growth plan. Our focus remains on helping patients with serious, difficult to treat medical conditions.

*     *     *

A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbations or relapses, particularly in those patients not well served by steroids, which are generally considered first line therapy by most neurologists.  This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS. In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010.  This is a 167% year-over-year increase. There were several factors behind this growth – positive patient outcome; increasing awareness among neurologists about how best to incorporate Acthar into their practices; continued excellent Acthar insurance coverage for MS relapses; and the increase in productivity of our MS commercial team – all combined to generate this growth.

*     *     *

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable. We are expanding the Organization and associated infrastructure to address

the significant growth opportunities in front of us. At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

39.    On April 24, 2012, Questcor issued a press release announcing its first quarter 2012 financial results.  The Company reported net income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million for the first quarter of 2012.  The release stated in part:

"While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor.  "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

40.    After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call for analysts, media representatives and investors. During the call, defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:]  Questcor's unconventional but simple business model continues to produce excellent financial results. Shift files, net sales and earnings were all up well over 100% year-over-year.  We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar, and as a result paid prescriptions continue to increase. Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October.  The expected

revenues from nephrotic syndrome prescriptions are accelerating to the point that, by our calculation, nephritic syndrome scrip value now exceeds MS.

\*     \*     \*

[CARTT:]   Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options. Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact, data from one study at the University of Toronto, is being presented just this week at the Canadian nephrology society annual meeting. This particular study found that about two-thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy, had their proteinuria drop by 50% or more, due to Acthar treatment.

\*     \*     \*

[YOUNG:]   As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug.  While quite rare, there are, in effect, few other successful examples of the type of product. Soliris and Botox come to mind, for example.  We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications. In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs, where we and others believe Acthar could provide

a significant clinical benefit. Currently, we have approximately 20 company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

41.    On July 9, 2012, Questcor's stock reached its Class Period high of $57.64 per share.

42.    On July 10, 2012, Citron issued an in-depth research report regarding Questcor.  Citron expanded on the *StreetSweeper.org* articles and further raised concerns about the Company's marketing strategy and a possible generic threat to Acthar.  The report discussed the competitive landscape for Acthar and was critical of the Company's assertions that there were significant barriers to entry into the market. Citron further questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.  In addition, the research report analyzed the Company's marketing expenses and questioned how the drug was being marketed to doctors.  The Citron report further condemned Questcor for the lack of any meaningful research and development being engaged in by the biopharmaceutical company.  The report noted: "***Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan.***"  The research report was not only critical of the amount of insider selling over the past year but it was also critical about its timing given the Company was buying back large amounts of Company stock at the same time the insiders were selling their shares.

43.    Despite the serious allegations raised in the Citron report, Questcor continued to refute the claims and portrayed the claims as being made by a short seller.  As a result, Questcor's stock continued to be artificially inflated.

44.    On July 24, 2012, Questcor issued a press release announcing its second quarter 2012 financial results.  The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million for the second quarter of 2012.  The release stated in part:

1  "In the second quarter, we surpassed $100 million in quarterly net
2  sales for the first time in our history," said Don M. Bailey, President and
3  CEO of Questcor.   "Our strong financial results were driven by
4  increasing usage of Acthar among nephrologists and neurologists. With
5  the expansion of our Nephrology Sales Force now complete, the
6  expansion of our Neurology Sales Force nearing completion, and the
7  initial detailing effort of a small sales force in Rheumatology just getting
8  started, we are optimistic about the potential for Acthar to help an
9  increasing number of patients with serious, difficult-to-treat autoimmune
10  and inflammatory disorders."

11  45.   After issuing its second quarter 2012 financial results on July 24, 2012,
12  Questcor hosted a conference call for analysts, media representatives and investors.
13  During the call, defendants reiterated the record financial results reported in the
14  Company's press release and defendant Mulroy discussed the Company's financial
15  performance in depth. Defendants Bailey, Cartt and Young further presented prepared
16  statements at the conference call and represented as follows:

17  [BAILEY:]  We made significant progress with our business in the
18  last three months. Financial performance again improved. We almost
19  doubled the number of shipped vials in the quarter, more than doubled
20  net sales, and tripled earnings from the year-ago quarter. Paid scripts
21  increased for both nephrotic syndrome and MS. We expanded two sales
22  forces and started building a third sales force in Rheumatology, using the
23  same formula that worked so well with MS and nephrotic syndrome.
24  And, we also made good progress in both our science and compliance
25  programs.

26  *     *     *

27  [CARTT:]  Very importantly, we often hear anecdotally that
28  Acthar treatment is producing positive results for patients. This is not

always the case, of course; not everyone responds. But, clearly, many patients are benefiting significantly from this drug, and there are few other treatment options available.  All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

\*       \*       \*

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

\*       \*       \*

[YOUNG:]  As you can see by our operating results reported in today's press release, we have been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects – our objectives are to produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond current on-label indications.  Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research.  Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH in the clinical role of Acthar Gel.

\*       \*       \*

In summary, I'd like to bring you back to my initial topic on R&D expansion. As we have previously reported, our R&D efforts have been and are continuing to focus on three areas. First, producing additional supporting data for the commercial team for on-label indications. Second, expanding Acthar Gel use beyond the existing on-label

indications and following FDA processes. And third, our greatest priority, better understanding the unique chemical, biological, and clinical characteristics of Acthar Gel. Our research results from this third area, thus far, suggest that developing a generic drug for Acthar Gel is very challenging. All three areas of research are intended to advance the science of Acthar Gel in order to further help patients with devastating autoimmune and inflammatory diseases.

46.     On September 19, 2012, Citron reported that Aetna, one of the nation's largest insurers, had recently revised its policy concerning Acthar, which would severely limit coverage of Questcor's primary drug. Aetna had engaged in a review of the 19 indications for which the FDA had approved Acthar. Based upon its findings, Aetna decided that clinical research supported only one of the 19 indications. In Aetna's clinical policy bulletin issued in connection with its review, Aetna reported that studies suggested that the drug is only "medically necessary" for West syndrome, a rare condition that causes infantile spasms, and not for other indications, such as MS, that are treated with steroids. Aetna generally only reimburses for drugs when they are deemed medically necessary. According to an Aetna spokesperson, "'Our previous position was that this was a last-resort treatment. . . . We now state that it is not medically necessary because there is no clinical evidence that the drug is more effective than steroids.'"

47.     On this news, Questcor's stock plummeted $24.16 per share to close at $26.25 per share on September 19, 2012, a one-day decline of nearly 48% on high volume.

48.     Subsequently, on September 19, 2012, Questcor issued a press release entitled "Questcor Comments on Insurance Policy Bulletin," which stated in part:

> The Company is continuing to review the Clinical Policy Bulletin
> related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company
> does not believe that the bulletin represents a material change in

insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

49.   Then, on September 24, 2012, Questcor announced in a Form 8-K filed with the SEC that the U.S. government had initiated an investigation into the Company's promotional practices.

50.   After this news, Questcor's stock dropped $11.05 per share to close at $19.08 per share on September 24, 2012, a decline of 37% on high volume.

51.   The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)   Questcor lacked clinical evidence to support the use of Acthar for indications other than infantile spasms.

(b)   Questcor had engaged in questionable tactics to promote the sale and use of Acthar in the treatment of MS and nephrotic syndrome.

(c)   Questcor lacked a reasonable basis to make positive statements about the Company or its outlook, including statements about the effectiveness of and potential market growth for Acthar.

52.   As a result of defendants' false statements, Questcor stock traded at artificially inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 67% from their Class Period high.

## LOSS CAUSATION

53.   During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Questcor common stock and operated as a fraud or deceit on Class Period purchasers of Questcor common stock by

1  misrepresenting the Company's business and prospects. Later, when the defendants'

2  prior misrepresentations and fraudulent conduct became apparent to the market, the

3  price of Questcor common stock fell precipitously, as the prior artificial inflation

4  came out of the price over time. As a result of their purchases of Questcor common

5  stock during the Class Period, plaintiff and other members of the Class suffered

6  economic loss, *i.e.*, damages, under the federal securities laws.

7                              **NO SAFE HARBOR**

8         54.   Questcor's verbal "Safe Harbor" warnings accompanying its oral

9  forward-looking statements ("FLS") issued during the Class Period were ineffective to

10  shield those statements from liability.

11        55.   The defendants are also liable for any false or misleading FLS pleaded

12  because, at the time each FLS was made, the speaker knew the FLS was false or

13  misleading and the FLS was authorized and/or approved by an executive officer of

14  Questcor who knew that the FLS was false. None of the historic or present tense

15  statements made by defendants were assumptions underlying or relating to any plan,

16  projection or statement of future economic performance, as they were not stated to be

17  such assumptions underlying or relating to any projection or statement of future

18  economic performance when made, nor were any of the projections or forecasts made

19  by defendants expressly related to or stated to be dependent on those historic or

20  present tense statements when made.

21                          **CLASS ACTION ALLEGATIONS**

22        56.   Plaintiff brings this action as a class action pursuant to Rule 23 of the

23  Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise

24  acquired Questcor common stock during the Class Period (the "Class"). Excluded

25  from the Class are defendants and their families, the officers and directors of the

26  Company, at all relevant times, members of their immediate families and their legal

27  representatives, heirs, successors or assigns and any entity in which defendants have

28  or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Questcor has nearly 59.7 million shares of stock outstanding, owned by hundreds if not thousands of persons.

58.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Questcor common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

59.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

60.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

62.   Plaintiff incorporates ¶¶1-61 by reference.

63.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Questcor common stock during the Class Period.

65.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Questcor common stock. Plaintiff and the Class would not have purchased Questcor common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

66.   Plaintiff incorporates ¶¶1-65 by reference.

67.   The Individual Defendants acted as controlling persons of Questcor within the meaning of §20(a) of the 1934 Act. By virtue of their positions with the Company, and ownership of Questcor stock, the Individual Defendants had the power

1    and authority to cause Questcor to engage in the wrongful conduct complained of

2    herein.  Questcor controlled the Individual Defendants and all of its employees.  By

3    reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

5    WHEREFORE, plaintiff prays for judgment as follows:

6    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ.

7    P. 23;

8    B.    Awarding plaintiff and the members of the Class damages, including

9    interest;

10   C.    Awarding plaintiff's reasonable costs and attorneys' fees; and

11   D.    Awarding such equitable/injunctive or other relief as the Court may deem

12   just and proper.

### JURY DEMAND

14   Plaintiff demands a trial by jury.

15   DATED:  September 26, 2012          ROBBINS GELLER RUDMAN
                                           & DOWD LLP
16                                       DARREN J. ROBBINS
                                         DAVID C. WALTON
17                                       CATHERINE J. KOWALEWSKI


19                                       _____
                                            CATHERINE J. KOWALEWSKI

20
                                         655 West Broadway, Suite 1900
21                                       San Diego, CA  92101
                                         Telephone:  619/231-1058
22                                       619/231-7423 (fax)

- 25 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Questcor Pharmaceuticals.doc

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| QCOR | See Attached Schedule A | | |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| QCOR | See Attached Schedule A | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _25th_ day of _September_, 2012 in _Avon Lake_ , _Ohio_ .
                                                              City              State

(Signature) X _____

(Print Name) _____ Joan K. Norton _____

2

Schedule A

QCOR Purchased During Class Period

| Date | # Shares Purchased | Price Per Share |
|---|---|---|
| 9/20/2012 | 7000 | $31.7423 |
| 9/20/2012 | 7000 | $28.50 |

QCOR Sold During Class Period

| Date | # Shares Sold | Price Per Share |
|---|---|---|
| 9/20/2012 | 300 | $30.94 |
| 9/20/2012 | 300 | $30.93 |
| 9/20/2012 | 312 | $30.9307 |
| 9/20/2012 | 6088 | $30.942 |
| 9/21/2012 | 1000 | $31.7201 |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dolly Gee and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1623 DMG (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| JOHN K. NORTON, Individually and on Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br>v.<br>QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT and DAVID YOUNG,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV12- 1623 DMG (FMOx)**<br><br><br>**SUMMONS** |
| --- | --- |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Catherine J. Kowalewski _____, whose address is Robbins Geller, et al., 655 West Broadway, #1900, San Diego, CA 92101  619/231-1058 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __SEP 2 6 2012__

By: _____
        Deputy Clerk

DODJIE LAGMAY

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| JOHN K. NORTON, Individually and on Behalf of All Others Similarly Situated<br><br>Ohio | QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT and DAVID YOUNG |
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Catherine J. Kowalewski (216665)<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900, San Diego, CA 92101  619-231-1058 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No  ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§78j(b) and 78t(a)      COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**SACV12- 1623 DMG (FMOx)**

FOR OFFICE USE ONLY:  Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                              CIVIL COVER SHEET                              Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
   ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Ohio |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _Cathrine Vanderwoude_   Date September 26, 2012

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |