

COPY

FILED
CLERK, U.S. DISTRICT COURT

MAR – 5 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   ANDREW J. BROWN (160562)
    ERIK W. LUEDEKE (249211)
3   655 West Broadway, Suite 1900
    San Diego, CA  92101
4   Telephone: 619/231-1058
    619/231-7423 (fax)
5   andrewb@rgrdlaw.com
    eluedeke@rgrdlaw.com
6
    Lead Counsel for Plaintiffs
7
                    UNITED STATES DISTRICT COURT
8
                 CENTRAL DISTRICT OF CALIFORNIA
9
                        SOUTHERN DIVISION
10

11  In re QUESTCOR                    )  No. 8:12-cv-01623-DMG(FMOx)
    PHARMACEUTICALS, INC.             )
    SECURITIES LITIGATION             )  CLASS ACTION
12                                    )
    This Document Relates To:         )  CONSOLIDATED CLASS ACTION
13                                    )  COMPLAINT FOR VIOLATION OF
    JOHN K. NORTON, INDIVIDUALLY      )  THE FEDERAL SECURITIES LAWS
14  AND ON BEHALF OF ALL OTHERS       )
    SIMILARLY SITUATED,               )
15                                    )
                        Plaintiffs,   )
16                                    )
        vs.                           )
17                                    )
    QUESTCOR PHARMACEUTICALS,         )
18  INC., DON M. BAILEY, MICHAEL H.   )
    MULROY, STEPHEN L. CARTT,         )
19  DAVID YOUNG, DAVID J.             )
    MEDEIROS, AND MITCHELL J.         )
20  BLUTT,                            )
                                      )
21                      Defendants.   )
                                      )
22

23

24

25

26

27

28

816412_1

**INTRODUCTION**

1.     This is a securities fraud class action brought pursuant to §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  Lead Plaintiffs bring this action on behalf of themselves and all other purchasers of Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") common stock between April 4, 2011 and September 21, 2012, inclusive (the "Class Period") against Questcor and six of its senior officers and directors to recover damages caused by defendants' violations of the Exchange Act.

2.     Throughout the Class Period, defendants issued false and misleading statements about the effectiveness of, and prospects for, Questcor's primary product H.P. Acthar Gel (Repository Corticotropin Injection) ("Acthar") while simultaneously using Questcor's cash to prop up the price of Questcor shares via the purchase of hundreds of millions of dollars of Questcor stock into the open market.  As a result of defendants' misconduct, Questcor's stock traded at artificially inflated prices, reaching a Class Period high of more than $57 per share.  Questcor's officers and directors took advantage of defendants' fraud by selling more than $100 million of their own Questcor shares at artificially inflated prices.  As the truth about Acthar's effectiveness and prospects reached the market, the price of Questcor stock collapsed to $18 per share, 68% below its Class Period high, inflicting as much as $1 billion of harm on Questcor's public shareholders.

**SUMMARY OF THE ACTION**

3.     Questcor is a biopharmaceutical company with essentially one product – Acthar, an injectable drug currently approved by the U.S. Food and Drug Administration ("FDA") for the treatment of a number of indications, including multiple sclerosis ("MS"), a condition of the central nervous system; nephrotic syndrome ("NS"), a kidney condition; and infantile spasms ("IS"), an epileptic condition affecting young children.  Sales of Acthar account for more than 99% of Questcor's annual revenue.

816412_1

4.    Acthar has been available as a treatment for more than 60 years.  And, although Acthar is responsible for generating almost all of Questcor's revenue and income, Questcor did not invent, discover or meaningfully enhance the use or efficacy of Acthar.  Instead, Questcor purchased the drug in 2001, dramatically increased its price, and adopted sales and marketing tactics designed to expand the use of Acthar for indications for which ***defendants lacked a meaningful scientific or medical basis***. In other words, Questcor effectively became a company of salespeople, rather than the "biopharmaceutical" company it claimed to be.  In the words of Questcor CEO Don M. Bailey, "this is a good place to be for sales people.  We are a sales company, we are commercially focused, and there's [sic] not that many companies that have that orientation."

5.    To support Questcor's singular focus on increasing Acthar sales, defendants sought to create a perception that a legitimate scientific basis existed for Acthar as a treatment for indications other than IS – the indication for which Acthar had been used for decades.  To that end, Questcor began funding – and publicizing – a number of Acthar "studies."  But unlike modern best practices, the "studies" Questcor paid for and utilized were not conducted in accordance with accepted scientific norms, but rather were designed to obtain a desired outcome.  For instance, the most significant "study" publicized by Questcor during the Class Period (and utilized by Questcor to market Acthar to other physicians and support requests for reimbursement from insurers) was conducted in 2010 by Dr. Andrew Bomback ("Bomback"). However, the 2010 Bomback study on the effectiveness of Acthar for treating NS was a "retrospective" study which included a review of a sample of just 21 patients, 40% of whom were patients of Dr. Bomback's own practice.  Questcor paid $50,000 to Dr. Bomback for "consulting" with Questcor and completing this "study."  Moreover, before the results were made public Dr. Bomback essentially sold the results to a money manager in Massachusetts, who in turn traded on that undisclosed information.

1   That money manager is currently being sued by the State of Massachusetts for insider

2   trading and Dr. Bomback's complicity is set forth in that complaint.

3       6.      Defendants' focus on generating Acthar sales growth was without regard

4   to patient need or efficacy.  In fact, Questcor has never conducted a legitimate

5   multiple-phase randomized, double blind test to evaluate Acthar's efficacy for MS,

6   NS, or any other indication.  Rather, Questcor routinely funded small "investigator-led

7   studies" that were designed solely to support Questcor's sales staff and insurance

8   coverage group.  And, when such studies were not providing the results Questcor

9   wanted, Questcor simply stopped funding these "studies."

10      7.      Questcor's efforts to drive sales growth also included making payments

11  to MS patients in exchange for their willingness to attend and participate in Acthar

12  marketing events held for potential patients.  Specifically, during the Class Period,

13  Questcor hired as "contractors" patients who had been treated with Acthar for MS

14  flare-ups.  Those contractors were paid to attend gatherings of MS patients to discuss

15  and promote Acthar.  As part of their contract, Questcor provided "training" to these

16  individuals, and scheduled and organized the meetings for these patient/contractors to

17  attend.

18      8.      By making payments to doctors who prescribed Acthar and to patients

19  who had been prescribed the drug, Questcor was able to report ever-increasing results,

20  driving its stock price upward.  To maintain strong revenue growth, Questcor vastly

21  expanded its sales force.  As of January 11, 2011, Questcor employed 152 full-time

22  employees, of which 75% were "engaged in sales and commercialization activities."

23  A year later, that number had mushroomed to 206 full-time employees, 148 of whom

24  were "engaged in sales and commercialization activities."  Dozens more sales people

25  were added in 2012.

26      9.      Having dramatically raised the price of Acthar to more than $24,000 per

27  vial, it did not take a significant increase in the number of prescriptions to

28  dramatically alter the Company's financial results.  In fact, and relying on the

1   Bomback "study," defendants suggested to investors during the Class Period, that the

2   market for Acthar as a treatment of NS alone could be as much as *$1 billion*.

3       10.    As part of their scheme to inflate the trading price of Questcor stock,

4   defendants also caused the Company to use its cash reserves to buy Questcor stock in

5   the open market.  Defendants caused Questcor to buy back shares while at the very

6   same time, defendants were dumping their own shares  For instance, from late April

7   through May 15, 2012, defendants caused Questcor to buy more that three million

8   shares in the open market – at the very same time, defendants were selling more than

9   $10 million of their own shares at prices as high as $43.95 per share.  In fact, having

10  successfully driven Questcor's stock price up, Questcor insiders seized the

11  opportunity to capitalize on their fraud by dumping unprecedented amounts of

12  Questcor stock – *more than $100 million* – at artificially inflated levels:

13  
| Defendant | Shares Sold | Proceeds |
| --- | --- | --- |
| Donald M. Bailey | 440,000 | $17,718,590 |
| Mitchell J. Blutt | 706,255 | $25,161,890 |
| Stephen L. Cartt | 505,509 | $16,215,281 |
| David J. Medeiros | 1,063,363 | $35,378,782 |
| David Young | 175,124 | $7,047,324 |
| Totals: | 2,890,251 | $101,521,867 |

17      11.    On September 19, 2012, Citron Research ("Citron") reported that Aetna

18  Inc. ("Aetna"), one of the nation's largest insurers, had engaged in its own medical

19  review of the indications for which the FDA had approved Acthar, and based upon its

20  findings, *Aetna determined that clinical research supported only one of the 19*

21  *indications – IS*.  In Aetna's clinical policy bulletin issued in connection with its

22  review, Aetna reported that studies suggested that the drug is only "medically

23  necessary" for IS, and not for other indications, such as MS, or NS that are treated

24  with steroids.  According to an Aetna spokesperson, *Acthar treatment "'is not*

25  *medically necessary because there is no clinical evidence that the drug is more*

26  *effective than steroids*.'"  On this news, Questcor's stock plummeted $24 per share to

1    close at $26 per share on September 19, 2012, a one-day decline of 48% on massive

2    volume of almost 64 million shares.

3        12.    Five days later, on September 24, 2012, Questcor announced in a Form 8-

4    K filed with the Securities and Exchange Commission ("SEC") that the U.S.

5    Attorney's Office had initiated an investigation into the Company's promotional

6    practices. On this news, Questcor's stock dropped another $11 per share to close at

7    $19.08 per share on September 24, 2012, a one-day decline of 37% on volume of

8    more than 31 million shares.

9        13.    Having caused Questcor to make payments to doctors and patients to

10   drive sales of Acthar, defendants then utilized the purported efficacy and success of

11   Acthar to sell over $100 million of their own Questcor shares at prices as high as

12   $57.89 per share. Other investors who relied on defendants' false statements were,

13   however, not so lucky. For, as defendants dumped millions of shares, the truth about

14   Acthar, its efficacy and Questcor's prospects reached the market, and Questcor shares

15   plunged 67% from their Class Period high – causing substantial economic harm to

16   plaintiffs and the Class.

17                                **PARTIES**

18       14.    Lead Plaintiff West Virginia Investment Management Board is a public

19   pension plan dedicated to the interests of the State of West Virginia's teachers, public

20   employees and general workers. As the principal investment management

21   organization for the State of West Virginia, the West Virginia Investment

22   Management Board manages over $13 billion in assets and is responsible for and

23   serves as the fiduciary for the investment of all of the State's defined benefit

24   retirement plans, general revenue, special revenue, municipal bond assets, certain

25   local government assets, state bond proceeds and various other assets held by the

26   State. The West Virginia Investment Management Board purchased Questcor

27   securities during the Class Period as set forth in the certification filed with this Court

28

                                       - 5 -

1  on November 26, 2012 and was damaged as the result of defendants' wrongdoing as
2  alleged in this Complaint.

3      15.   Lead Plaintiff Plumbers & Pipefitters National Pension Fund is a national
4  pension fund with over $4 billion in assets which is operated for the benefit of more
5  than 95,000 participants and their families.  The Plumbers & Pipefitters National
6  Pension Fund provides retirement benefits to plumbers and pipefitters working in the
7  building and maritime construction industries.  The Plumbers & Pipefitters National
8  Pension Fund purchased Questcor securities during the Class Period as set forth in the
9  certification filed with this Court on November 26, 2012 and was damaged as the
10  result of defendants' wrongdoing as alleged in this Complaint.

11      16.   Named Plaintiff Steven Glucksberg ("Glucksberg") purchased Questcor
12  securities during the Class Period as set forth in the certification filed with this Court
13  on November 13, 2012 and was damaged as the result of defendants' wrongdoing as
14  alleged in this Complaint.

15      17.   Defendant   Questcor   Pharmaceuticals,   Inc.   claims   to   be   a
16  biopharmaceutical company that relies entirely on the sale of its principle drug,
17  Acthar, to generate revenue.  Questcor is a California corporation that maintains its
18  principal executive offices at 1300 North Kellogg Drive, Suite D, Anaheim, California
19  92807.  Questcor's stock is traded under the symbol QCOR on the NASDAQ, which
20  is an efficient market.

21      18.   Defendant Don M. Bailey ("Bailey") is, and at all relevant times was, the
22  Company's Chief Executive Officer ("CEO"), President and a director.  During the
23  Class Period, defendant Bailey signed and/or caused to be filed with the SEC
24  documents that contained false and misleading statements as set forth herein,
25  including SEC Forms 10-Q and 10-K.  Defendant Bailey made various other false and
26  misleading statements during the Class Period in press releases and on conference
27  calls, as set forth herein.  During the Class Period, defendant Bailey sold 440,000

28

816412_1

1  shares of his Questcor stock at artificially inflated prices for proceeds of over $17.7

2  million, while in possession of material non-public information.

3      19.    Defendant Michael H. Mulroy ("Mulroy") is, and at all relevant times

4  was, the Company's Chief Financial Officer ("CFO"), Senior Vice President, General

5  Counsel, and Corporate Secretary.  During the Class Period, defendant Mulroy also

6  served as the Chief Compliance Officer ("CCO").  He signed and/or caused to be filed

7  with the SEC documents that contained false and misleading statements as set forth

8  herein, including SEC Forms 10-Q and 10-K.  Defendant Mulroy made various other

9  false and misleading statements during the Class Period in press releases and on

10 conference calls, as set forth herein.

11     20.    Defendant Stephen L. Cartt ("Cartt") is the Company's Chief Operating

12 Officer ("COO") and has been since February 2012.

13         (a)    Defendant Cartt previously served as Questcor's Chief Business

14 Officer and Executive Vice President.  Defendant Cartt made various false and

15 misleading statements during the Class Period in press releases and on conference

16 calls, as set forth herein.  During the Class Period, defendant Cartt sold 505,509 shares

17 of his Questcor stock at artificially inflated prices for proceeds of over $16.2 million,

18 while in possession of material non-public information.

19         (b)    Prior to joining Questcor, defendant Cartt was the Senior Director

20 of Strategic Marketing for Elan Pharmaceuticals ("Elan"), where he led a team

21 responsible for developing and "optimizing" Elan's Central Nervous System (CNS)

22 product portfolio.  Defendant Cartt joined Elan in March of 2000, shortly before the

23 Company launched a drug called Zonegran as a new treatment for epilepsy.  While the

24 FDA approved Zonegran merely as an "adjunctive therapy" for partial epileptic

25 seizures suffered by adults, government authorities claim that Elan intentionally

26 designed a marketing program to target patients outside this narrow group.  Under

27 defendant Cartt's watch, Elan created a least three different off-label promotion

28 campaigns for Zonegran.  While sales of Zonegran increased dramatically initially,

- 7 -

more than half of all prescriptions for the drug were for conditions other than epilepsy. Defendant Cartt left Elan in the summer of 2002, but his impact on the Company persisted as the government began to investigate Elan's marketing practices. With returns severely limited without the help of off-label sales, Elan divested itself of Zonegran in 2004. Ultimately, in February 2011, Elan pled guilty to criminal misconduct for illegally promoting Zonegran and paid more than $200 million in criminal and civil penalties to resolve the government action.

21.    Defendant David Young ("Young") is, and at all relevant times was, the Company's Chief Scientific Officer. Defendant Young made various false and misleading statements during the Class Period in press releases and on conference calls, as set forth herein. During the Class Period, defendant Young sold 175,124 shares of his Questcor stock at artificially inflated prices for proceeds of over $7 million, while in possession of material non-public information.

22.    Defendant David J. Medeiros ("Medeiros") is the Company's Chief Technical Officer and Executive Vice President and has been since February 2012. Defendant Medeiros previously served as Questcor's Senior Vice President. During the Class Period, defendant Medeiros sold 1,063,363 shares of his Questcor stock at artificially inflated prices for proceeds of over $35.3 million, while in possession of material non-public information.

23.    Defendant Mitchell J. Blutt ("Blutt") is, and at all relevant times was, a director of the Company. He is also the founder and CEO of Consonance Capital, a private investment firm in New York that owned hundreds of thousands of shares of Questcor stock. During the Class Period, defendant Blutt sold 706,255 shares of his Questcor stock for proceeds of over $25.1 million, while in possession of material non-public information.

24.    The defendants named above in ¶¶18-23 are referred to herein collectively as the "Individual Defendants." All of the Individual Defendants except Mulroy are referred to herein collectively as the "Insider Trading Defendants."

25.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Questcor's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

26.     Further, the Insider Trading Defendants violated their duty to abstain or disclose inside information before trading Questcor stock.  While in possession of material non-public information, these defendants sold 2,890,251 shares of Questcor stock for over $100 million in insider trading proceeds.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

29.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

30.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including,

816412_1

but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**BACKGROUND**

31.     Questcor is essentially a single product company, with sales of Acthar accounting for nearly all of the Company's revenue.[1]  Acthar is a highly specialized, low-volume, premium-priced drug.  It was originally approved by the FDA in 1952.  The injectable hormone has a broad label, as it is currently approved by the FDA for use in 19 indications.  Acthar is a first-line treatment for IS, a rare seizure disorder that affects approximately 2,000 children annually in the U.S.  Acthar was also approved for the treatment of MS relapse in 1978.  Although Acthar was used for such a treatment in the 1970s, it was largely abandoned in the 1980s after corticosteroids came on the market, as steroids are a superior and far less expensive alternative to Acthar.

32.     Questcor acquired the rights to Acthar in 2001 for $100,000.  At the time, Acthar was almost exclusively being used to treat IS.  In 2007, Questcor filed an application with the FDA to obtain orphan drug status for Acthar for the treatment of IS.  The FDA is authorized to grant orphan status to a drug that treats a disease affecting fewer than 200,000 people.  Orphan drug status provides a company with seven years of marketing exclusivity.  At the same time the Company filed its application with the FDA, Questcor also raised the price of Acthar from $1,650 per vial to $23,000 per vial, an overnight price increase of literally over 1300%.[2]  As a result of the significant price increase, 2007 was the first year in the history of the

---

[1]     Questcor also has a product called "Doral" but sales of that product accounted for less than 1% of Questcor's reported net income during the Class Period.

[2]     Questcor has continued to raise the price since 2007.  At the beginning of the Class Period it was sold for more than $24,000 per vial.  This year Questcor sells it for $28,430 per vial.

816412_1

1  drug that Acthar was profitable.  The FDA approved Questcor's orphan drug status

2  application in October 2010.

3          33.     Soon after the Company enacted the tremendous price hike for Acthar,

4  Questcor embarked on an aggressive strategy to transform Acthar into a blockbuster

5  drug.  Although Acthar received orphan drug status for the IS indication, defendants'

6  strategic goal was to dramatically expand its use for other indications, initially

7  focusing at the end of 2007 on the use of Acthar for the treatment of MS, followed

8  thereafter in the first quarter of 2011 on the use of Acthar for the treatment of NS.

9  Questcor markets Acthar as a second line treatment for MS, that is when MS patients

10  are not responsive to steroids, and markets Acthar as a first-line treatment for NS.

11          34.     As a result of Questcor's new strategy, the Company has been able to

12  report tremendous net sales increases – from $49.8 million in 2007 to $509.3 million

13  for 2012.  The main source of the Company's reported revenue growth is the use of

14  Acthar in the treatment of MS and NS.  IS, the condition for which it received orphan

15  drug status, now accounts for less than 10% of the Company's revenues.

**DEFENDANTS' FRAUDULENT SCHEME**
**AND WRONGFUL COURSE OF BUSINESS**

16

17          35.     By increasing the price overnight from $1,650 to more than $23,000 per

18  vial, and hiring dozens of sales people to sell the product to physicians (and patients),

19  Questcor has posted dramatic increases in revenue and profit.  But the medical

20  community (and the insurance companies which pay for the treatment) require a

21  scientific or medical basis that justify Acthar as a viable treatment alternative to

22  dramatically less expensive corticosteroid treatment.  So Questcor began "sponsoring"

23  studies by treating physicians who were paid large sums to act as "consultants."  In

24  turn, these paid physicians prescribed Acthar to their patients and reported the results

25  as "studies."  Questcor, in turn, then used these "study" results as both part of its sales

26  materials to treating physicians in an attempt to provide a medical basis for

27

28

prescribing Acthar, as well as with insurance companies to obtain coverage for payment.

36.     These so-called "studies" utilized by defendants to ramp up Acthar sales made a mockery of current best practices required by FDA regulations.  Because Acthar had been approved decades earlier for the indications for which Questcor was currently marketing the drug, Questcor has never completed multiple-phase, randomized double-blind clinical trials.  Instead, the so-called studies conducted at defendants' behest were conducted by physicians with undisclosed economic interests in supporting defendants' product and driving Acthar sales.

37.     One of the "studies" Questcor relied on heavily to drive Acthar sales during the Class Period was a "study" conducted by Dr. Bomback.  The Bomback study was designed to analyze Acthar's effectiveness as a treatment for NS.  The retrospective "study" of 21 patients found that 9 of 11 patients with a certain type of NS responded well to treatment.  Questcor then hailed the Bomback "study" as the first modern test of Acthar for kidney patients and presented its results to treating nephrologists and insurers in support of its Acthar marketing efforts.  In truth the "study" was a Questcor-funded retrospective analysis conducted by a physician with an undisclosed economic stake, and conducted in a manner inconsistent with accepted medical practice.

38.     Among the problems that plagued Dr. Bomback's study was the fact that as a retrospective study it was inherently flawed and plagued with errors from confounding and bias, particularly as to the selection of controls, which plague "look back" studies as opposed to the accepted practice of using prospective double blind trials.  Further, Dr. Bomback's "study" involved a review of the treatment responses to Acthar of a sample of just 21 NS patients – 40% of whom were patients of

- 12 -

1   Bomback's own practice.  Finally, Dr. Bomback had received a $50,000-a-year

2   consulting contract with Questcor as the "study" was being conducted.[3]

3         39.    Equally disconcerting, Questcor adopted a practice whereby when it

4   became apparent that a Questcor-sponsored study would not yield the results Questcor

5   desired, Questcor would terminate the study prior to completion and thereby prevent

6   potentially negative results that could jeopardize Acthar's marketing prospects.  In one

7   such instance, a nephrologist stopped a small study testing Acthar as a treatment for

8   NS after determining that Acthar "'just didn't work,'" and Questcor was "'O.K. with

9   me stopping because we weren't getting the results.'"  Another such study which

10   sought to determine whether MS patients who did not have a good response to steroids

11   should be treated with either another round of steroids or with Acthar was terminated

12   by Questcor mid-study (and thereby precluded publication of the results) purportedly

13   "to analyze data."

14         40.    Similarly, and in an effort to promote Acthar as an effective treatment for

15   indications other than IS, Questcor employed a "speakers bureau" of handsomely paid

16   physician "consultants" to drive Acthar sales.  These "hired guns" often would

17   accompany Questcor sales representatives on visits to doctors' offices, and speak to

18   other doctors about prescribing Acthar.

19         41.    Houston neurologist Dr. Staley A. Brod was among the "heavy

20   prescribers" handsomely compensated by Questcor to promote Acthar.  Dr. Brod,

21   whose bio is replete with Acthar studies in which he was or is involved, has been

22   described as "'an evangelist for [Acthar]'" and "'the best salesperson that [Questcor]

23

24   [3]    Notably, before the results of Bomback's study were ever made public, Dr.

25   Bomback effectively sold the results to a money manager from Massachusetts, who in turn traded on the information.  That money manager is currently facing civil charges for insider trading brought by the securities division of the State of Massachusetts.

26   Not only does Dr. Bomback's conduct constitute several of the allegations in the Massachusetts Complaint, but records show that he took thousands of dollars from an

27   intermediary that put him in touch with that money manager and others for the very purpose of allowing those managers to trade on inside information.

28

had.'"  And, Dr. Brod was paid well for his testimonials.  Questcor paid Dr. Brod $2,500 each time he told another doctor about Acthar.  As a result of his Questcor consulting endeavors, Dr. Brod was able to collect over $6,000 in a single day, and over $100,000 a year.  While Questcor claimed in a January 16, 2012 release that "[t]he Company does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar," Dr. Brod was one of the two highest Acthar-prescribing physicians at the end of 2011.

42.    Unlike most pharmaceutical companies which cap the payments a consultant doctor can be paid in a given day, Questcor had no such limitations.  According to the PhRMA Code – a compliance program widely adopted throughout the pharmaceutical industry – drug makers should carefully select their speakers bureau members, closely monitor the extent of work that those doctors perform, and strictly limit the fees that even the most prominent speakers receive.  Despite Questcor's claims to have achieved "substantial compliance" with the PhRMA Code, Questcor refused to join nearly 60 other drug makers (and virtually every other MS drug marketer) and agree to follow the program's guidelines.

43.    Questcor also utilized patient contractors and testimonials to support the sale of Acthar as an attractive treatment for MS.  Questcor's paid consultant doctors would recommend that certain patients serve as a contract speaker for the Company.  In one such instance, for example, Dr. Brod recommended to Questcor a patient who experienced positive results from two Acthar treatments for MS flare-ups after not responding well and experiencing negative side effects from steroids.  This patient became a contractor for Questcor, and she and others like her were paid by Questcor to attend gatherings of other MS patients – organized by the Company – and speak about their specific experience with Acthar and promote the drug.  As part of the contract, Questcor provided training to these individuals, arranged the meetings, and reviewed the patient contractors proposed presentations before they were presented.

- 14 -

44.     Defendants were highly cognizant that their own personal fortunes would fall dramatically if the truth about defendants' scheme and wrongful course of business was revealed.  Not only was their ability to amass a fortune through stock sales affected, but so too was their annual compensation.  By dramatically increasing sales of Acthar without regard to its efficacy for a particular indication, defendants received substantial stock option awards and "incentive compensation" in amounts far beyond their salaries, as detailed in the following chart.

| Name | Year | Salary | Options Award | Non-Equity Incentive Plan Compensation | Incentive and Option Awards[4] | Total |
|------|------|--------|---------------|----------------------------------------|-------------------------------|-------|
| Don M. Bailey | 2011 | $584,875 | $2,628,815 | $1,332,540 | 677% | $4,546,230 |
| Michael H. Mulroy | 2011 | $342,147 | $938,863 | $468,881 | 411% | $1,749,891 |
| Stephen L. Cartt | 2011 | $389,917 | $1,126,635 | $781,756 | 489% | $2,298,308 |
| David J. Medeiros | 2011 | $362,066 | $375,545 | $494,945 | 240% | $1,232,556 |
| David Young | 2011 | $424,320 | $751,090 | $773,394 | 359% | $1,948,804 |

45.     Defendants kept close tabs on the success of their scheme to increase prescriptions by paying doctors and patients to promote and expand the use of Acthar by other doctors and patients.  Indeed, the very structure of the Company was designed for that purpose.  The executive team and reporting structure was kept small in part to enable defendants to maintain knowledge and close control over Questcor's ongoing payments to doctors and patients to increase Acthar sales.  While during the Class Period the number of Questcor full-time employees ranged from approximately 150 – 200 persons, more than 70% of all full-time employees were engaged in "sales

---

[4]     Calculated as Option Awards plus Incentive Plan Compensation, as a percentage of Salary.

and commercialization" activities.[5]  Thus, the other areas of the Company – such as manufacturing, accounting, and compliance, and the administrative staff associated with those groups – were staffed with a small number of people.  In fact, during the Class Period defendant Mulroy himself simultaneously served as the Company's General Counsel, CFO, Corporate Secretary, and CCO.

46.     Regular monthly and quarterly meetings ensured defendants were aware of exactly what was happening within the Company, including Acthar sales on a monthly basis, and any new "research" or "studies" that were being made public.

47.     For instance, Questcor conducted bi-weekly senior leadership meetings. These meetings were attended by Bailey (CEO), Young (CSO), Cartt (COO), Medeiros (VP of Manufacturing), and Mulroy (GC, CFO, CCO), as well as the head of sales.  The topics discussed at these meetings varied, but included the tactical plan to assemble a sales force and the marketing plans for the Company.

48.     Sales forecasts were also discussed at these meetings.  Bailey led the forecasts discussion, and Cartt's personnel assembled the information.  The Director of NS and a Director of MS reported to Cartt and assisted him in putting together what was foreseeable for the Company.  The forecasts discussion also included a market share discussion, as well a discussion of any influential papers recently published that could have an effect on the forecasts.  Young's group communicated with Cartt's group about the impact of any new influential papers on sales.  Since IS (or West's syndrome) only had about 2,000 new cases per year, it was not necessary to discuss or update more than once a month for that indication.

---

[5]     There were a number of "contractors" or other than full-time employees engaged in "sales and commercialization" as well.  If those people were included the percentage would be higher.

49.     At these meetings, defendants also frequently discussed quarterly results. With regard to quarterly results, these discussions were led by Bailey, Cartt and the CFO in the senior leadership meetings.

50.     The nature of Questcor's Acthar sales was such that although the price per vial was high, the number of prescriptions on even a weekly basis was so low that defendants did not believe it warranted more frequent reporting.  Nevertheless, Bailey had access to the actual sales numbers in real-time and thus, had the ability to access or obtain this information throughout the month.  Cartt accessed this information as well.  Because all Acthar sales went through a single specialty pharmacy – Care Script – defendants could obtain real-time sales information on prescriptions by contacting Care Script.

**Insurance Payments**

51.     Acthar's high price of up to $250,000 for a single course of treatment presented a fundamental challenge for defendants to overcome – insurance reimbursement.  Reimbursement by insurance companies was critical to defendants' ability to maintain Questcor's rapid earnings growth.

52.     Typically, health insurers will cover treatments that are "medically necessary."  However, when clinical research does not support the efficacy of a treatment over more accepted alternatives, a drug is not "medically necessary" and health insurers may deny coverage.  For example, UnitedHealthcare states:

> Our Medical and Drug Policies express our determination of whether a health service (*e.g.*, test, drug, device or procedure) is proven to be effective based on the published clinical evidence.  They are also used to decide whether a given health service is medically necessary. ***Services determined to be experimental, investigational, unproven, or not medically necessary by the clinical evidence are typically not covered***.

53.     Despite Acthar's high price, health insurers seldom took exception to the use of Acthar to treat IS due in part to fact that Acthar had been used for decades as a treatment for this rare disease, even if at much lower prices.  But defendants were aware that as Questcor began aggressively pushing Acthar for the treatment of indications such as MS and NS for which there was no clinical data supporting Acthar's efficacy, insurance companies would take notice.  And, they did.

54.     To offset defendants' concern about obtaining reimbursement for Acthar for indications other than IS, during the Class Period Questcor employed a staff of as many as 30 people whose sole responsibility was to assist patients with obtaining insurance reimbursement.  This equated to approximately one staff member for each of the roughly 30 prescriptions Questcor got in a typical day for all uses and constituted as much as 15% of Questcor's entire workforce.   Thus, when a prescription was placed by a doctor, Questcor's Acthar Support and Assistance Program ("ASAP") directly assisted the patient with insurance paperwork.

55.     Questcor tracked and frequently publicly reported its total "paid prescriptions" for a given period and repeatedly described its improved financial performance as being driven by these paid prescriptions.  Defendants freely admitted during the Class Period that insurance coverage was an important issue to them, and they were "monitoring it closely."   According to defendant Cartt, "we speak with payers [insurers] literally on a daily basis as we work the prescriptions through our reimbursement hub."

56.     Analysts tracked this information as it was reported by Questcor, and reported on it to investors.  For example, on an October 25, 2011 analyst call, Cartt was specifically asked about insurance coverage for Acthar.  He reassured those on the call that "overall our coverage remains very, very high across all of our key therapeutic areas."

57.     And defendants were aware that insurance coverage had become an issue that investors cared about, as defendants began reporting the ratio of prescriptions

written that were covered by insurance.  For example, on a conference call with analysts on February 22, 2012, Bailey told investors that "coverage of Acthar for nephrotic syndrome continues to be above 85%."

58.    Defendants also knew that the insurance carriers' concerns as to the effectiveness of Acthar as a treatment for indications other than IS were beginning to mount.  For example, on July 10, 2012, when it was reported that "insurers' scrutiny could soon be causing sales of Acthar Gel to top out," defendants publicly and directly rejected the notion, stating that insurance reimbursement continued to be "very good" and was "around 90%."

59.    Ultimately, in September 2012, it was revealed that Aetna, the nation's fourth largest insurer, had released its determination that Acthar was not "medically necessary" for any indication other than IS.  The publicity surrounding Aetna's comment served as a catalyst for other insurers to also investigate their reimbursement criteria for Acthar.

60.    For example, in December 2012, Blue Cross Blue Shield indicated that it would only consider Acthar to be a "medically necessary" treatment for indications other than IS with evidence of ineffectiveness of other treatment options (*i.e.*, steroids) or adverse reactions to them.  Similarly, in January 2013, UnitedHealthcare issued a policy bulletin announcing that it would require physicians to submit for prior authorization and approval – which "may be subject to medical necessity review" – before administering Acthar for indications other than IS.  As defendants were well aware, these decisions each impose limitations on insurance coverage – and therefore sales – for Acthar for indications constituting over 90% of Acthar prescriptions, materially impacting Questcor's operations and prospects.

**Insider Trading**

61.    The Insider Trading Defendants capitalized on defendants' false and misleading statements and manipulation of Questcor's stock price upward like the use of the stock buyback program by selling tens of millions of dollars of their own

Questcor common stock at artificially inflated levels during the Class Period.  These insider sales are suspicious both in amount and timing.  These defendants' insider sales are summarized in the following chart:

| Defendant | Date | Shares | Proceeds |
|---|---|---|---|
| **Bailey** | Aug. 25, 2011 | 30,000 | $790,890 |
| | Sept. 12, 2011 | 30,000 | $803,035 |
| | Oct. 10. 2011 | 30,000 | $966,156 |
| | Nov. 10, 2011 | 30,000 | $1,232,174 |
| | Dec. 9, 2011 | 30,000 | $1, 321,652 |
| | Jan. 10, 2012 | 30,000 | $1,256,100 |
| | Feb. 10, 2012 | 30,000 | $1,044,426 |
| | Mar. 9, 2012 | 30,000 | $1,069,406 |
| | Apr. 10, 2012 | 30,000 | $1,227,600 |
| | May 10, 2012 | 30,000 | $1,189,650 |
| | June 11, 2012 | 30,000 | $1,361,100 |
| | July 10, 2012 | 30,000 | $1,730,401 |
| | Aug. 27, 2012 | 40,000 | $1,722,800 |
| | Sept. 13, 2012 | 40,000 | $2,003,200 |
| | | **440,000** | **$17,718,590** |
| **Cartt** | May 13, 2011 | 70,400 | $1,600,192 |
| | May 16, 2011 | 79,087 | $1,743,077 |
| | Aug. 4, 2011 | 25,513 | $769,727 |
| | Aug. 10, 2011 | 25,000 | $775,000 |
| | Aug. 11, 2011 | 85,968 | $2,669,758 |
| | Aug. 15, 2011 | 47,155 | $1,485,383 |
| | Oct. 28, 2011 | 139,286 | $5,760,869 |
| | Oct. 31, 2011 | 25,000 | $1,065,000 |
| | Nov. 8, 2011 | 8,100 | $346,275 |
| | | **505,509** | **$16,215,281** |
| **Young** | Aug. 5, 2011 | 10,000 | $285,000 |
| | Aug. 12, 2011 | 9,308 | $297,856 |
| | Aug. 15, 2011 | 6,092 | $194,944 |
| | Oct. 31, 2011 | 79,724 | $3,272,824 |
| | Apr. 27, 2012 | 70,000 | $2,996,700 |
| | | **175,124** | **$7,047,324** |
| **Medeiros** | Apr. 29, 2011 | 204,841 | $4,170,563 |
| | May 2, 2011 | 80,372 | $1,663,700 |
| | May 3, 2011 | 4,500 | $91,710 |
| | May 12, 2011 | 115,128 | $2,540,875 |
| | Aug. 3, 2011 | 94,500 | $2,946,510 |
| | Oct. 28, 2011 | 147,756 | $6,139,262 |
| | Oct. 31, 2011 | 62,469 | $2,642,766 |

| Defendant | Date | Shares | Proceeds |
|---|---|---|---|
| | Nov. 8, 2011 | 180,189 | $7,670,646 |
| | Nov. 11, 2011 | 123,036 | $5,288,087 |
| | Nov. 14, 2011 | 50,572 | $2,224,662 |
| | | **1,063,363** | **$35,378,782** |
| **Blutt** | Sept. 15, 2011 | 370,000 | $9,668,100 |
| | Nov. 15, 2011 | 150,000 | $6,591,000 |
| | May 3, 2012 | 79,952 | $3,513,890 |
| | May 4, 2012 | 11,573 | $494,051 |
| | July 2, 2012 | 70,000 | $3,717,700 |
| | Sept. 4, 2012 | 24,730 | $1,177,148 |
| | | **706,255** | **$25,161,890** |

62.     The Insider Trading Defendants' stock sales are unusual and suspicious in amount.   As set forth below, these defendants sold huge percentages of their Questcor holdings at opportune times, and despite having virtually no sales whatsoever in the 18 months leading up to the Class Period.

| Defendant | Class Period Shares Sold | Class Period Proceeds | Total Holdings Before Class Period Sales | Percentage of Total Holdings Sold |
|---|---|---|---|---|
| **Bailey** | 440,000 | $17,718,590 | 1,426,608 | 30.84% |
| **Cartt** | 505,509 | $16,215,281 | 836,384 | 60.44% |
| **Young** | 175,124 | $7,047,324 | 346,527 | 50.54% |
| **Medeiros** | 1,063,363 | $35,378,782 | 1,360,854 | 78.14% |
| **Blutt** | 706,255 | $25,161,890 | 921,410 | 79.65% |
| **Total** | **2,890,251** | **$101,521,867** | | |

63.     The timing of the Insider Trading Defendants' stock sales was also unusual, particularly when compared to their prior trading history.   They are also suspicious in that they were timed to take advantage of the artificial inflation caused by defendants' misrepresentations, as depicted graphically below.  Notably, except for a single sale by defendant Young on November 2, 2010,[6] no sale of Questcor stock was made by any of the Insider Trading Defendants during the approximately year and a half immediately preceding the Class Period.

---

[6]     On November 2, 2010, Young sold 28,125 shares for proceeds of $346,781, amounting to less than 8% of his holdings.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   64.    Moreover, many of the Insider Trading Defendants' Class Period sales

18   occurred at times when Questcor was trading at or near historical highs and/or at times

19   designed to capitalize on their false statements.  For instance, as set forth more fully

20   herein, on October 25, 2011, defendants announced record quarterly financial results,

21   and that evening defendants held a conference call with analysts.  As a result of their

22   false and misleading statements, the next day the stock climbed more than $7 per

23   share, closing up more than 21%.  Defendants seized this opportunity, selling 450,000

24   shares over the next two trading days for proceeds of almost $19 million.

25   65.    In addition, at the same time defendants were unloading many of their

26   shares of Questcor stock during the Class Period, they were causing the Company to

27   repurchase approximately six million shares at a cost to Questcor of more than $243

28   million.   For example, during the months of April and May 2012, while four

816412_1

defendants collectively sold over $10 million of their Questcor stock, defendants caused the Company to repurchase over 3.6 million shares of Questcor stock at a cost to the Company of over $153 million.  These repurchases had the effect of avoiding further declines and even increasing Questcor's stock price at the same time defendants' massive insider trading was having a downward effect on the price of Questcor's stock as they cashed out their holdings.

66.    Like their insider sales, the Company's stock buy-back was manipulated and suspiciously timed by defendants to support defendants' insider sales.  For example, even though the Company was authorized to buy shares prior to the Class Period – and could have done so at much lower prices – defendants caused the Company to purchase no stock during 2010.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

67.    On April 4, 2011, Questcor issued a release announcing its preliminary first quarter 2011 financial results.  The release stated in part:

> New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of exacerbations of multiple sclerosis (MS) during the quarter were greater than 500, up over 115% from the year ago period and up over 40% from the prior quarter.

> *    *    *

> "The strong performance we saw late in the fourth quarter of 2010 has continued in the first quarter of 2011 and was driven by the increasing productivity of our recently expanded Acthar sales force. March showed significant growth in MS prescriptions and exceeded February's record performance by over 50%.  In addition, we are pleased with the very early results from the efforts of our small dedicated Nephrology sales team.  While we are very encouraged by the first quarter new prescription results, we note that prior sharp increases in

1    sequential quarterly Acthar prescriptions have usually been followed by

2    more modest sequential growth," said Don M. Bailey, President and

3    CEO of Questcor Pharmaceuticals.

4        68.    As a result of this news, the market reacted favorably and sent the price

5    of Questcor stock higher, closing on April 5, 2011 at $18 per share.  This represented

6    a one-day increase of more than $3 per share, or 20%.

7        69.    On April 26, 2011, Questcor issued a release announcing its financial

8    results for the first quarter ended March 31, 2011.  The Company reported net sales of

9    $36.8 million, net income of $11.2 million and earnings per share ("EPS") of $0.17

10   for the first quarter of 2011.  The release stated in part:

11       The Company's financial performance was driven by a 120%

12   year-over-year increase in the number of new paid prescriptions of H.P.

13   Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS)

14   exacerbations.   In the first quarter, paid Acthar prescriptions for the

15   treatment of nephrotic syndrome (NS) increased to 18 while

16   prescriptions for the treatment of infantile spasms (IS) were 89, which is

17   within the historic range for IS.

18       "Our strategy to expand the sales force is clearly paying off," said

19   Don M. Bailey, President and CEO of Questcor.  "Paid MS prescriptions

20   are up sharply from last quarter. March was a particularly strong month

21   and this momentum has continued so far in April.  We believe that

22   Acthar is filling an increasingly important role in the treatment of

23   exacerbations associated with MS and, looking forward, we expect to

24   continue to grow sales in this important therapeutic area."

25       Mr. Bailey added, "We are also encouraged by the early positive

26   results from our small, dedicated nephrology sales team, which initiated

27   selling efforts at the beginning of March. The number of nephrologists

28

816412_1

1   who are using Acthar to treat patients with nephrotic syndrome is

2   increasing."

3      70.   In the release, defendants specifically highlighted the 2010 Bomback

4   study as a basis for increasing NS sales, stating:

5        "During March, we initiated a limited selling effort in nephrology

6        ***and a peer-reviewed journal published the first clinical data supporting***

7        ***the use of Acthar in the treatment of nephrotic syndrome***.  Our NS

8        sales team has generated encouraging early Acthar prescription activity

9        and we are now beginning to explore options for increasing our sales

10       effort in this market," concluded Mr. Cartt.

11     71.   That same day, Questcor hosted a conference call for analysts, media

12  representatives and investors where defendants reiterated the record financial results

13  reported in the Company's release.  Defendant Mulroy discussed the Company's

14  financial performance, while defendants Bailey and Cartt stated:

15       [BAILEY:]  In summary, we are off to a very good start this year

16       as we continue to execute our straightforward strategy to sell more

17       Acthar.  Our decision to expand the MS sales force is clearly paying off.

18       Also, our nephrotic syndrome [NS] sales force is having some early

19       success.

20              *    *    *

21       [CARTT:]   Our promotional efforts are increasingly focused on

22       two main goals. One, convincing an increasing number of prescribers

23       about the benefits of using Acthar with their patients and two, helping

24       doctors, nurses and others in their medical practice become more

25       effective at identifying potential Acthar patients.

26              *    *    *

27       ***Importantly, the recently published case series paper, combined***

28       ***with the clinical data sets expected to be available in November, should***

- 25 -

816412_1

*give us ample tools to grow Acthar prescriptions in nephrology* until we complete the larger Company sponsored phase 4 study that is now underway.

\*     \*     \*

*[W]e know that the studies have been progressing and what we hear from the investigators, and of course these are external studies. They're investigator-sponsored studies . . . [that] we provide grant funding for them.* And the investigators we've talked to, we know that they're – some of them at least are working on wrapping studies up or made significant progress and are planning to present data at ASN in November, so that's really where that comes from.

We really can't comment on specifics about the data. That will come later in the year.

72.     On April 27, 2011, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2011. The Company's Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on April 26, 2011. In addition, the Form 10-Q stated in part:

During the three months ended March 31, 2011, we achieved a significant increase in the number of prescriptions for Acthar to treat MS exacerbations, which was attributable to our expanded sales force calling on physicians who treat patients with MS.

\*     \*     \*

Research and development expenses were $3.0 million in the three months ended March 31, 2011, as compared to $2.7 million for the three months ended March 31, 2010. . . . *Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar*

*in current and new therapeutic applications, product development
efforts and compliance activities.*

73.    The April 2011 statements in ¶¶67, 69-72 above were false and
misleading when made.  The true facts which were then known to or recklessly
disregarded by defendants, include:

(a)    That Questcor's reported net sales of $36.8 million, EPS of $0.17,
and that the "strong performance" of and "significant growth" in Acthar prescriptions
for the first quarter 2011, including 115% in growth in MS indications over the same
quarter of 2010, were the result of improper sales and marketing practices, including
paying physicians tens of thousands of dollars in "consulting" fees in connection with
prescribing Acthar and preparing "investigator-led" studies, and participating in
"speaker's bureaus" conducted in contravention of industry standards and best
practices;

(b)    That the 50% growth in paid MS prescriptions between February
2011 and March 2011 was due not to the efficacy or therapeutic benefit of Acthar, but
rather to the efforts of physicians paid by Questcor to endorse Acthar;

(c)    That the increase in paid Acthar prescriptions for the treatment of
NS was due to the defendants' dissemination of the results of the 2010 Bomback
Study, which study was hopelessly flawed, did not support the use of Acthar for any
indication, and was the result of a payment to Bomback of a $50,000 "consulting fee;"

(d)    That Questcor's "research and development" and "clinical data
sets" consisted of medical "studies" that were used to convince physicians to prescribe
Acthar, which studies were inherently flawed and did not support the conclusions for
which they were being used by Questcor's sales force;

(e)    That Questcor lacked clinical data and scientific evidence to
support the sale of Acthar for any indication other than IS, even as a "second-line"
therapy;

816412_1

(f)     That Questcor's reported revenue growth for first quarter 2011 was the direct result of the improper practices set forth above, which practices were designed to inflate the price of Questcor stock in order to allow defendants to sell their shares of Questcor stock at artificially inflated prices; and

(g)     That as detailed in (a)-(f) above, defendants had no reasonable basis to believe and did not in fact believe their statements in ¶¶67, 69-72 above about Questcor's outlook, including those statements about the effectiveness of and potential market growth for Acthar.

74.     On July 26, 2011, Questcor issued a release announcing its financial results for the second quarter ended June 30, 2011.  The Company reported net sales of $46.0 million, net income of $13.9 million, and EPS of $0.21 for the second quarter of 2011.  The release stated in part:

A 147% year-over-year increase in the number of paid H.P. Acthar® Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS) exacerbations led to increased shipments of Acthar vials. Paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) also increased sharply in the quarter.   In addition, paid Acthar prescriptions for the treatment of infantile spasms (IS) were at the highest quarterly level since the third quarter of 2008.

"Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor.  "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance.   Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow.  Accordingly, growing MS sales remains our number one priority.  Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

75.     After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call for analysts, media representatives and investors where defendants reiterated the record financial results reported in the Company's release.  Defendant Mulroy discussed the Company's financial performance while defendants Bailey, Cartt and Young also participated in the conference call, stating:

> [BAILEY:]  The exceptional MS and NS sales growth along with a very good IS [infantile spasms], sales quarter naturally led to record Acthar vials shipped, record sales and record earnings. In addition today, we are announcing the fourth vertical market we aim to develop for Acthar, which is lupus.
>
> *     *     *
>
> [CARTT:]   During the quarter we shipped a record 751 paid Acthar prescription for the treatment of MS relapses. This was an increase of 147% over the year-ago period, and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected.
>
> *     *     *
>
> Our promotional efforts remain focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients; and two, helping doctors, nurses and others in their medical practice become more effective at identifying the right patients for Acthar.

76.     The market reacted favorably to this announcement.  For instance, on July 27, 2011, analyst Caris & Company issued a report entitled "NS Progress Looks Transformational, Lupus Entering Picture . . . It's a Whole New Ballgame."  The analyst provided a Buy rating and raised its priced target from $30 to $40 per share. Similarly, Oppenheimer & Co. issued a report entitled "Acthar Continues to Outpace

Expectations; Increasing [price target] to $35" in which it stated "[w]e continue to expect robust sales growth for Acthar in MS flares and NS and therefore are increasing our Acthar sales estimates and EPS estimates."  Defendants false and misleading statements drove the stock price up $6.50 per share in a single day, or 25%, on heavy volume.

77.    On July 29, 2011, Questcor filed its Quarterly Report with the SEC on Form 10-Q for the period ended June 30, 2011.  The Company's Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on July 26, 2011.  In addition, defendants commented at length on the Company's "studies."  The Form 10-Q stated in part:

> We also maintain a research and development program focused on gathering data to: (i) evaluate the proper use of Acthar for on-label indications; (ii) investigate other potential uses of Acthar that are not currently FDA approved indications; and (iii) improve our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:
>
> *        *        *
>
> Research and development expenses were $3.9 million in the three months ended June 30, 2011, as compared to $2.9 million for the three months ended June 30, 2010. . . .  ***Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and compliance activities***.
>
> We plan to continue our research and development efforts to explore the use of Acthar as a therapeutic alternative for the treatment of NS. ***In 2010, we supported investigator-initiated studies in patients***

816412_1

*with idiopathic membranous nephropathy (on-label) and diabetic nephropathy (not on-label)*.  Based on the results of these investigations, we have started a Phase IV dose response clinical trial for idiopathic membranous nephropathy and are developing a clinical protocol for a Company-sponsored study to evaluate the safety and efficacy of Acthar in treating diabetic nephropathy.

78.    The statements made in ¶¶74-75, 77 above were false and misleading when made.  The true facts which then were known to or recklessly disregarded by defendants, include:

(a)    That Questcor's "record" second quarter 2011 results of net sales of $46 million and EPS of $0.21 purportedly driven by substantial increases in paid Acthar prescriptions for treatment of NS and MS, including a 140% year-over-year increase in paid MS prescriptions, were not a "strong signal" that Acthar was gaining traction in the MS market, but rather the result of defendants' improper practices detailed herein;

(b)    That Questcor's "research and development" was not designed to pursue objective tests on the efficacy of Acthar, but rather consisted of scientific or medical "studies" that were designed to and used to convince physicians to prescribe Acthar, which studies were inherently flawed and did not support the conclusions for which they were being used by Questcor's sales force;

(c)    That the investigator initiated studies relied upon by defendants as legitimate clinical investigations were not designed to objectively evaluate the safety or efficacy of Acthar, but rather were utilized solely for the sales and marketing of the drug and were, in fact, halted and/or placed in abeyance when they generated data inconsistent with that which defendants desired;

(d)    That Questcor lacked clinical data and scientific evidence to support the sale of Acthar for any indication other than infantile spasms;

(e)     That Questcor's reported revenue growth for second quarter 2011 was the direct result of the improper practices set forth herein, which practices were designed to inflate the price of Questcor stock in order to allow defendants to sell their shares of Questcor stock at artificially inflated prices; and

(f)     That as detailed in (a)-(e) above, defendants had no reasonable basis to believe and did not believe their positive statements in ¶¶74-75, 77 above about Questcor's outlook, including those statements about the effectiveness and potential market growth for Acthar.

79.     On October 25, 2011, Questcor issued a release announcing its financial results for the third quarter ended September 30, 2011.  The Company reported sales of $59.8 million, net income of $22.9 million and EPS of $0.35.  The release stated in part:

> "Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor.  "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar.  We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."
>
> *          *          *
>
> "In addition, new data on Acthar will be presented in November at the American Society of Nephrology Annual Meeting.  This data will provide further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.  ***Our emerging understanding of the apparent immune-modulating properties of Acthar encourages us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, some of which are already on the product label for Acthar***," *added Mr. Cartt*.

- 32 -

80.     On October 25, 2011, Questcor also hosted a conference call for analysts, media representatives and investors where defendants reiterated Questcor's record financial results.  Defendant Mulroy discussed the Company's financial performance in depth and defendants Bailey and Cartt discussed clinical studies, stating:

> [CARTT:] Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the annual meeting of the America Society of Nephrology, or ASN, held this year in Philadelphia. These abstracts are available on ASN's website, www.asn-online.org. ***The new data provides further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease***.
>
> We believe availability of this data provides further evidence for the direction [sic] action of Acthar on kidney disease. Importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology.

81.     On that same conference call, defendants were asked about insurance coverage for indications other than IS.  Defendant Cartt re-assured investors about continued coverage of Acthar, confirming that coverage by insurers "remains very, very high across all our key therapeutic area[s]," stating:

> [CARTT:]   I think over time payers have given a little more pushback, and this is over the last two to three years.  I think we've gotten increasingly good at targeting the right types of patients and ensuring that the offices are giving the proper documentation for why Acthar is appropriate therapy for those patients.
>
> So we're hitting the bull's-eye in terms of patient population that we're driving prescriptions for and we're supporting the offices better. We are getting better at working with the plans through our reimbursement hub.  So while the insurance companies have over time

been a little more resistant, we've been increasingly improving our whole approach to targeting the right kind of patients and supporting the offices.

*So overall, it's kind of a draw between us and the payers and we expect that will be the case going forward.  So, overall our coverage remains very, very high across all of our key therapeutic areas*.

82.     Analysts and the market responded favorably to these statements.  For example, on October 25, 2011, Jefferies issued an analyst report entitled "Monster Quarter; Raising [price target] to $44" in which it stated:

> QCOR reported a stellar quarter driven by Acthar sales in MS and NS.  Sales from the newly expanded nephrology sales force started to impact NS scrips [sic] towards late in Q3, and as a result, we expect this momentum to continue in Q4.  Data will be presented at ASN, and we expect these to help increase Acthar market share in NS.  We have increased our sales estimates and therefore raise our PT to $44 from $36.

83.     Similarly, on October 26, 2011, analysts Caris & Company, Maxim Group, Oppenheimer and ThinkEquity each reiterated Buy or Outperform ratings and raised their price targets.  Questcor's stock price spiked again, jumping more than $7 per share, or 21% in one day.

84.     On October 27, 2011, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2011.  The Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on October 25, 2011.  In addition, the Form 10-Q stated in part:

> We also maintain a research and development program focused on gathering data to: (i) evaluate the proper use of Acthar for on-label indications; (ii) investigate other potential uses of Acthar that are not currently FDA approved indications; and (iii) improve our understanding of how Acthar works in the human body (pharmacology), and ultimately,

- 34 -

its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

\*      \*      \*

Research and development expenses were $4.2 million in the three months ended September 30, 2011, as compared to $2.2 million for the three months ended September 30, 2010. . . . ***Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities***.

\*      \*      \*

We plan to continue our research and development efforts to support the use of Acthar as a therapeutic alternative for the treatment of NS. ***In 2010, we supported investigator-initiated studies in patients with idiopathic membranous nephropathy and because of the results of these investigations, we have started a Phase IV dose response clinical trial for idiopathic membranous nephropathy***.

85.     The statements in ¶¶79-81, 84 above were false and misleading when made.  The true facts which were then known to or recklessly disregarded by defendants, include:

(a)     That the reported net sales of $59.8 million and EPS of $0.35 for the third quarter of 2011 were the result of improper sales and marketing practices, including paying physicians tens of thousands of dollars in "consulting" fees in connections with prescribing Acthar and preparing "investigator-led" studies, participating in "speaker's bureaus," and paying patients as "contractors" to market Acthar to other patients, in contravention of industry standards and best practices;

(b)     That the $2 million year-over-year increase in Questcor's "research and development" costs reported for the third quarter 2011 consisted of scientific or

- 35 -

1  medical "studies" that were used to convince physicians to prescribe Acthar, which

2  studies were inherently flawed, and were conducted by physicians who agreed to

3  subvert adverse test results by, among other things, cancelling clinical studies when it

4  appeared they would not achieve the results desired by Questcor;

5          (c)    That defendants' understanding of Acthar's "immune modulating

6  properties" and "therapeutic benefit" were the result of after-the-fact "studies" and/or

7  otherwise were not completed in compliance with accepted scientific norms;

8          (d)    That defendants did not believe Acthar had the potential to benefit

9  MS and NS patients, and in fact knew Questcor lacked clinical data and scientific

10  evidence to support the sale of Acthar for any indication other than IS, and

11  defendants' references to Questcor's "research and development" program, including

12  discussions of ongoing research and "new scientific data" omitted these important

13  facts;

14          (e)    That because of the $24,000+ per vial cost charged for Acthar and

15  the rapid growth in prescriptions for indications without a legitimate scientific basis,

16  insurance companies were increasingly skeptical of the use of Acthar as a treatment

17  for MS and NS and increasingly likely to decline coverage, yet defendants relied on

18  the same defective "studies" to support and assist patients in getting coverage for

19  Acthar therapy, and defendants' reassuring statements that insurance coverage

20  "remains very, very high" and that defendants "expect that will be the case going

21  forward" misrepresented this substantial and growing risk;

22          (f)    That Questcor's reported revenue growth for third quarter 2011,

23  including "increasing net sales and earnings" was the direct result of the improper

24  practices set forth herein, which practices were designed to inflate the price of

25  Questcor stock in order to allow defendants to sell their shares of Questcor stock at

26  artificially inflated prices; and

27

28

(g)     That defendants had no reasonable basis to believe and did not believe their positive statements about Questcor's outlook, including those statements about the effectiveness and potential market growth for Acthar.

86.     On January 11, 2012, *TheStreetSweeper.org*, a website noted for unearthing corporate fraud, announced that it had initiated a short position in Questcor. *TheStreetSweeper.org* further reported that it intended to release the first article in a two-part investigative series about Questcor the following week. According to *TheStreetSweeper.org*, it had discovered "serious questions about the aggressive marketing practices that QCOR has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug." *TheStreetsweeper.org* also indicated that a "second story [will] further examine[] QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy."

87.     Following the *TheStreetSweeper.org* announcement, Questcor's stock fell $6.20 per share from a closing price of $41.54 per share on January 10, 2012 to close at $35.34 per share on January 11, 2012, a one-day decline of 15% on unusually high volume.

88.     Questcor responded immediately by attempting to refute the assertions made by *StreetSweeper* and defend the Company's business practices. As a result, Questcor's stock continued to trade at artificially inflated levels.

89.     First, on January 11, 2012, Questcor responded to the *StreetSweeper* revelations by issuing a release entitled "Questcor Pharmaceuticals Issues Statement," which repeatedly and falsely claimed Questcor complied with regulatory and industry standards:

> Questcor Pharmaceuticals, Inc. (NASDAQ:QCOR) today announced it became aware that an investor blog is preparing to issue a report regarding the Company's marketing and business practices. Questcor issued the following statement:

- 37 -

*The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices*. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. *The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team*. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. *The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices*. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

90.    Analysts believed defendants and immediately came to Questcor's defense. On January 12, 2012, analysts issued reports reiterating Questcor's claims in opposition to those made in the *StreetSweeper* article. For example, Ladenburg Thalmann stated that "[w]e believe the probability QCOR has inappropriate marketing as a business practices is low. It is our opinion QCOR's management is ethical and QCOR's label allows for QCOR's marketing in the indications of the Company's current focus." Similarly, Maxim Group stated "[o]ur recent discussion with management indicated that QCOR has experienced executives lead its compliance program and is actively trying to ensure appropriate selling and marketing operations."

91.    Then, on January 13, 2012, the day following the article's publication, Questcor arranged for one of its paid physician "consultants," Dr. Bomback, to upload a video on www.youtube.com in support of Questcor's marketing and insurance

coverage efforts of Acthar as a treatment for NS.  In the video, Dr. Bomback states his 2010 study suggests that "***Acthar gel may be a particularly promising therapy for idiopathic membranous nephropathy and in particular for idiopathic membranous nephropathy that is resistant to prior immunosuppressive therapy***."  As of the filing of this Complaint, the video could be accessed via the Internet at http://www.youtube.com/watch?feature=player_detailpage&v=8MdiK13iAoI.

92.    On January 16, 2012, Questcor issued another release entitled "Questcor Pharmaceuticals Responds to Questions From Investor Blog" in which Questcor set forth its responses to questions provided to the Company by *TheStreetSweeper* on January 9, 2012.  The release stated in part:

Does Questcor offer any financial incentives to healthcare providers who use Acthar (such as price discounts or free samples of the drug)? If so, please explain.

Questcor Response:  ***The Company does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar***.  On rare occasions we have provided an Acthar sample to a very small number of doctors at their request.  Providing product samples is of course a very common, accepted practice in the pharmaceutical industry.

\*      \*      \*

How much scientific evidence does Questcor have to support Acthar as an effective treatment for NS?  Please describe any modern clinical studies (such as the Bomback case review) that have been completed in this area so far.

Questcor Response:  In addition to a formal approval from FDA, there is a growing body of more recent scientific data supporting the use of Acthar to treat proteinuria in nephrotic syndrome.  For example, a retrospective case series publication by Bomback et al. which included a

- 39 -

review of treatment results for patients treated with Acthar via prescription showed that in a subset of 10 patients with nephrotic syndrome due to idiopathic membranous nephropathy, 80% achieved a complete or partial remission of proteinuria. More recently, at the 44th Annual Meeting of the American Society of Nephrology in November 2011, Boston University Assistant Professor of Medicine Dr. Laurence H. Beck, Jr., M.D., Ph.D. presented results from a study which found that Acthar may induce a remission of proteinuria in patients with nephrotic syndrome due to idiopathic membranous nephropathy by suppressing production of antibodies to the phospholipase A2 receptor. Separately, results from a prospective clinical study at Columbia University conducted by Appel et al., were presented at the 2011 American Society of Nephrology Annual Meeting. This study found that 47% (7 of 15) of patients suffering from nephrotic syndrome due to various etiologies and who were unsuccessfully treated with one or more other therapies were either partial or complete responders to Acthar treatment as defined by the level of proteinuria. Nonetheless, the Company has been clear in warning investors of the limited scientific evidence in this area, as it did in its most recent Annual Report on Form 10-K, as follows:

"There is limited data on the efficacy of Acthar in the treatment of nephrotic syndrome. It is unclear what amount of clinical or other data physicians will require prior to deciding whether or not to use Acthar in the treatment of nephrotic syndrome."

\*        \*        \*

Please describe any past/current financial arrangements between Questcor and Bomback.

1    Questcor Response:    ***Questcor has no current financial***
2    ***arrangements with Dr. Bomback. As Questcor was learning about the***
3    ***nephrology field and beginning to speak with nephrologists about***
4    ***Acthar, Dr. Bomback was a consultant to the Company with financial***
5    ***arrangements that were within industry norms***.

6                              *    *    *

7    At this point in the conversation, Michael Mulroy, Questcor's
8    Chief Compliance Officer, made the following statement: "In light of
9    StreetSweeper's unclear background, motives and tactics, Questcor does
10   not intend to engage in an ongoing dialog with StreetSweeper and makes
11   no commitment to respond to any further questions.  We believe that
12   substantially all of the information requested in StreetSweeper's
13   questions is already in the public domain.  ***We take our marketing and***
14   ***business practices very seriously.  Questcor has a standard compliance***
15   ***program.  I am the Chief Compliance Officer and we have another***
16   ***compliance officer within the Company with 10 years of***
17   ***pharmaceutical compliance experience whose sole job is to design and***
18   ***execute our ongoing compliance efforts.  We are in substantial***
19   ***compliance with the PhRMA Code on Interactions with Healthcare***
20   ***Professionals.  If we become aware of any unacceptable practices from***
21   ***outside parties or our normal ongoing compliance program we will of***
22   ***course deal with any such matters in a responsible manner***."

23   93.    The statements made by defendants in January, 2012, in ¶¶89, 91-92
24   above were false and misleading when made.  The true facts which were then known
25   to or recklessly disregarded by defendants, include:

26         (a)    That defendants were not in fact complying with regulatory
27   requirements or industry standards concerning Questcor's "research and
28   development," and were not even in "substantial compliance," insofar as the "modern

- 41 -

clinical trials" supporting the use of Acthar for NS were: (i) conducted via an *ex post* review sample of just ten patients by a physician who had been paid handsomely; (ii) the result of a study which found that at best Acthar "may induce" remission of proteinuria in NS; (iii) a prospective study who population totaled just 15 patients, the majority of whom showed no benefit from the treatment of Acthar, and concluded that the results *might* warrant further investigation of Acthar as a third-line or fourth-line treatment; and (iv) other studies had been commenced but not completed because they were not achieving the results desired by Questcor;

(b)     That defendants were not in fact complying with regulatory requirements or industry standards concerning Questcor's sales and marketing practices, and were not even in "substantial compliance," insofar as Questcor was paying physicians large consulting fees to encourage them to write prescriptions and to market Acthar to other physicians, and paying patients as consultants to encourage other patients to try Acthar as set forth more fully in ¶¶5-8, 35-43 above;

(c)     That Questcor did, in fact, "provide financial incentives to doctors or other healthcare practitioners" through funded studies and "speakers bureaus" to encourage them to prescribe Acthar; and

(d)     That defendants were profiting from their misconduct by selling Questcor stock at artificially inflated prices while in possession of material, non-public information.

94.     On February 3, 2012, Questcor issued a release announcing its preliminary fourth quarter and full year 2011 financial results.  The release reiterated that Questcor "***committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices***."

95.     On February 22, 2012, Questcor issued a release announcing its financial results for the fourth quarter and full year ended December 31, 2011.  The Company reported net sales of $75.5 million, net income of $31.6 million and EPS of $0.48 for

816412_1

1  the quarter as well as net sales of $218.2 million, net income of $79.6 million and EPS
2  of $1.21 for the fiscal year.  The release stated in part:

3      "Net sales growth in the fourth quarter was driven by the
4      increasing numbers of physicians who are recognizing the potential for
5      Acthar to help patients with MS and NS," said Don M. Bailey, President
6      and CEO of Questcor.  "We are particularly encouraged by the growing
7      number of physicians who recognize the therapeutic value of Acthar in
8      their practices, especially for those patients who have not adequately
9      responded to other treatments.  At the same time, we are continuing to
10      build our understanding of the potential immune-modulating properties
11      of Acthar, and are considering how best to study the broader possible
12      therapeutic applications in other inflammatory and autoimmune diseases,
13      many of which are already in the list of approved indications on the
14      Acthar label."

15      96.  After issuing its fourth quarter and full year 2011 financial results on
16  February 22, 2012, Questcor hosted a conference call for analysts, media
17  representatives and investors where defendants reiterated the record financial results
18  reported in the Company's release.  Defendant Mulroy, Bailey, Cartt and Young
19  participated in the call.

20      97.  Bailey sought to assure investors that the Company was complying with
21  industry standards and applicable regulations, stating:

22      ***A recent compliance review confirmed that our promotional programs***
23      ***and activities meet all applicable laws and regulations.  With our***
24      ***outlook for sustained growth, this new committee is part of our effort***
25      ***to put the infrastructure in place to make sure we continue to build***
26      ***Questcor the right way, as we have been doing since the new***
27      ***Management team was put in place in 2007***.

28

816412_1

98.    Similarly, Cartt sought to reassure investors that insurance coverage for Acthar was robust and not a concern, stating:

*Our reimbursement team speaks with insurers multiple times daily and all indicators are that insurance coverage for Acthar and nephrotic syndrome should remain very strong*.

99.    Later in the same call, Bailey again sought to reassure investors that the Company was operating legitimately and coverage of Acthar by insurers was not a risk, stating:

Before providing a little overall perspective on the value drivers for Questcor, I wanted to briefly address some of the rumors that we are being told are being spread by members of the short-selling community.

. . . The next rumor was that Questcor was the subject, or soon to become the subject, of one or more government investigations. In reality, we have no knowledge of any government investigation. We have not been contacted by any government agency regarding an actual or potential investigation.  ***Furthermore, our recent compliance review found no violations of policy, guidance, or law***. . . .

. . . We have also heard the rumor that insurance companies are stopping their coverage of Acthar for nephrotic syndrome. As Steve reported, ***coverage of Acthar for nephrotic syndrome continues to be above 85%***.

100.   Also on February 22, 2012, Questcor filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2011.  The Form 10-K was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced.  In addition, the Form 10-K stated in part:

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications

not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

\*       \*       \*

Research and development expenses were $16.8 million in 2011, as compared to $10.9 million in 2010 and $9.7 million in 2009. . . . ***Costs included in research and development also include costs associated with the funding of medical research projects to expand our knowledge of the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities***.

101.   On March 4, 2012, Analyst Caris & Company issued a report entitled "Meeting With Don: Plenty of Room to Grow and Doing Things the Right Way" in which it reported that it had recently spoken with defendant Bailey.  The report discussed Questcor's ongoing clinical studies, stating that "[c]linical data coming in the not too distant future in addition to the original patient case series from late 2010/early 2011: the Columbia study that was released at ASN last November should be published in a journal in the coming months and a small Mayo Clinic study looking at proteinuria response to low/high dose regimens should yield results in 2012."  The report additionally provided that "QCOR emphasizes an ongoing commitment to sales/marketing compliance" and "[i]n our view, QCOR's ongoing commitment to this effort is readily apparent, and the company is serious about identifying and correcting any shortcomings."

102.   The statements made in ¶¶94-100 above were false and misleading when made.  The true facts which were then known to or recklessly disregarded by defendants, include:

816412_1

(a)     That Questcor's reported fourth quarter 2011 sales and EPS were not the result of a "growing number of physicians who recognize the therapeutic value of Acthar," but instead were the result of improper sales and marketing practices, including paying physicians tens of thousands of dollars in "consulting" fees in connection with prescribing Acthar and preparing "investigator-led" studies, participating in "speaker's bureaus," and paying patients as "contractors" to market Acthar to other patients, in contravention of industry standards and best practices, and these practices had exposed Questcor to a high degree of likelihood of government investigation;

(b)     That Questcor's $5.9 million increase in "research and development" costs represented scientific or medical "studies" that were used to convince physicians to prescribe Acthar, but which studies were inherently flawed as they were conducted by physicians who agreed to subvert adverse test results by, among other things, cancelling clinical studies when it appeared they would not achieve the desired results;

(c)     That Questcor did not market Acthar "in accordance with regulatory requirements and industry standard practices," but rather, as set forth in ¶¶5-8, 35-43 above, defendants violated those requirements and standard practices;

(d)     That Questcor's recent internal "compliance review" was a sham, designed to appease investors and regulators but in fact did not properly gauge Questcor's compliance with federal regulations or industry standards;

(e)     That insurance companies were increasingly skeptical of the use of Acthar as a treatment for MS and NS and because of the practices detailed herein, defendants knew that "coverage of Acthar for nephrotic syndrome . . . above 85%" would not "remain very strong," and in fact could not continue;

(f)     That Questcor's reported revenue growth for fourth quarter 2011 and fiscal year 2011 was the direct result of the improper practices set forth above,

- 46 -

816412_1

1  which were designed to inflate the price of Questcor's stock in order to allow

2  defendants to sell their shares of Questcor stock at artificially inflated prices; and

3        (g)    That defendants had no reasonable basis to believe and did not

4  believe their positive statements about Questcor's outlook, including those statements

5  about the effectiveness and potential market growth for Acthar.

6      103.  On April 24, 2012, Questcor issued a release announcing its financial

7  results for the first quarter ended March 31, 2012.  The Company reported  sales of

8  $96 million, net income of $38.5 million, and EPS of $0.58 for the quarter.  The

9  release stated in part:

10        "While our substantial NS commercial effort only began in the

11        fourth quarter of 2011, the value of NS shipped prescriptions now

12        exceeds that of MS," said Don M. Bailey, President and CEO of

13        Questcor.  "This faster-than-expected NS growth drove us to further

14        expand the NS commercial effort prior to the additional expansion of our

15        MS commercial team.  At the same time, ***we continue to increase our***

16        ***investment in efforts to learn about the possible therapeutic***

17        ***applications of Acthar in other inflammatory and autoimmune***

18        ***diseases as well as increase investments in our management systems,***

19        ***internal control, and compliance infrastructure***."

20                *    *    *

21        "We have been expanding our scientific efforts and R&D

22        investments in Acthar, and expect that we will continue to increase

23        spending to support Questcor's future growth," commented Dr. David

24        Young, Chief Scientific Officer.

25      104.  After issuing its first quarter 2012 financial results on April 24, 2012,

26  Questcor hosted a conference call for analysts, media representatives and investors

27  where defendants reiterated the results reported in the Company's release.  Defendant

28

Mulroy discussed the Company's financial performance, and defendants Bailey and Cartt stated:

[BAILEY:]  Questcor's unconventional but simple business model continues to produce excellent financial results. . . .  We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar, and as a result paid prescriptions continue to increase. Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October.  The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that, by our calculation, nephritic syndrome scrip value now exceeds MS.

*      *      *

[CARTT:]  *Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered.  We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options.  Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding.*

*      *      *

*So everything looks positive from our standpoint.  The insurance coverage is good*.  The docs in general are trying out Acthar in their first one or two patients, and seeing how those patients do.  Of course, it takes them six months or so, to see the results, but – and we're – at this point,

- 48 -

now that we're two full quarters into it with our sales force of 28, we're seeing some repeat prescriber[s].  And we expect to see that increase as we go forward.  ***No red flags from our standpoint.  Everything looks quite encouraging***.

\*       \*       \*

[BAILEY:]  ***[B]asically the writers are writing, the payers are paying, and everything's good there***.

105.   On April 26, 2012, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2012.  The Form 10-Q was signed by defendants Bailey and Mulroy, and reaffirmed the Company's financial results previously announced on April 24, 2012.  In addition, the Form 10-Q stated in part:

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

\*       \*       \*

Research and development expenses were $5.7 million in the three months ended March 31, 2012, as compared to $3.0 million for the three months ended March 31, 2011. . . .  ***Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities***.

816412_1

1      106.   The statements made in ¶¶103-105 above were false and misleading

2 when made.  The true facts which were known to or recklessly disregarded by

3 defendants, includes:

4      (a)   That Questcor's reported first quarter 2012 sales and EPS were not

5 the result of "nephrologist and neurologist awareness of patient benefits from Acthar,"

6 as defendants claimed, but rather was the result of improper sales and marketing

7 practices, including paying physicians tens of thousands of dollars in "consulting" fees

8 in connection with prescribing Acthar and preparing "investigator-led" studies,

9 participating in "speaker's bureaus," and paying patients as "contractors" to market

10 Acthar to other patients, in contravention of industry standards and best practices;

11      (b)   That as a result of the practices detailed in (a) above, Questcor's

12 operations and results were neither "good," "positive" nor "encouraging," as

13 defendants' practices had exposed Questcor to a substantial likelihood of government

14 investigation and a substantial likelihood that insurers would not cover Acthar for

15 indications other than IS;

16      (c)   That Questcor's expanded "scientific efforts and research and

17 development" consisted of "studies" used to convince physicians to prescribe Acthar,

18 which studies were inherently flawed and were conducted by physicians who agreed

19 to subvert adverse test results by, among other things, cancelling clinical studies when

20 it appeared they would not achieve the desired results;

21      (d)   That Questcor lacked clinical data and scientific evidence to

22 support the sale of Acthar for any indication other than IS, and the studies relied upon

23 by Questcor did not "support[] both coverage and prescribing activity" as claimed;

24      (e)   That because defendants knew there was no clinical or scientific

25 basis supporting the use of Acthar rather than corticosteroids, insurance companies

26 were increasingly skeptical of the use of Acthar as a treatment for MS and NS and

27 because of the practices detailed herein, defendants knew that "[i]nsurance

28

816412_1

1 reimbursements for Acthar in [NS] continues to be very good," and coverage of "more
2 than 85%" could not continue;

3       (f)    That Questcor's reported revenue growth for first quarter 2012 was
4 the direct result of the improper practices set forth above, which were designed to
5 inflate the price of Questcor stock in order to allow defendants to sell their shares of
6 Questcor stock at artificially inflated prices; and

7       (g)    That as a result of (c)-(f) above, defendants had no reasonable
8 basis to believe and did not believe their positive statements about Questcor's outlook,
9 including those statements about the effectiveness and potential market growth for
10 Acthar.

11     107.   On July 9, 2012, Questcor's stock reached an all time high, closing at
12 $57.64 per share.

13     108.   On July 10, 2012, Citron issued an in-depth research report entitled
14 *Questcor: A Single Digit Stock in 18 Months or Less and Here's Why.* More
15 specifically, the Citron report addressed the lack of credible scientific data to support
16 Questcor's aggressive strategy to expand the use of Acthar for indications other than
17 IS. In addition, the research report analyzed the Company's marketing expenses and
18 questioned how the drug was being marketed to doctors, noting that "[t]he sales and
19 marketing for HP Acthar Gel is now up to $6,100 a vial . . . ***more than 5 X the***
20 ***original price of the drug before Questcor became involved***." The Citron report
21 further addressed the lack of meaningful research and development at Questcor, and
22 the fact that, "[j]ust the insider selling over the last year represents more cash than
23 Questcor has spent on research and development over its entire lifespan." Finally, the
24 Citron report raised concerns over insurance reimbursement for Acthar for indications
25 beyond IS, specifically noting "the company's push into new indications despite poor
26 scientific justification" and that "insurers' scrutiny could soon be causing sales of
27 Acthar Gel to top out."

28

109.   Following the Citron report, Questcor's stock fell $12.57 per share to close at $45.07 per share on July 10, 2012, a one-day decline of nearly 22% on unusually high volume.  Despite the serious allegations raised in the Citron report, defendants continued to defend Acthar and maintain their improper practices while disregarding the lack of clinical data supporting its effectiveness.

110.   Moreover, analysts once again came to Questcor's defense in response to the Citron report.  For example, on July 11, 2012, Jefferies & Co. issued a report entitled "It's Groundhog Day In July – Citron Report Rehashes Old Arguments," stating "[d]espite being voluminous, in our view the Citron report rehashes old bear arguments on QCOR and Acthar including competitive threats, and the lack of clinical data and IP protection."  Similarly, analyst ThinkEquity issued a report entitled "QCOR: We Continue to See QCOR as Our Top Pick in Specialty Pharma," stating "[w]e have reviewed the report and we find little new in the latest 9-point report that hadn't been said already in the January 9-point StreetSweeper report. . . .  Maintains Buy rating, $58 [price target]."  As a result, Questcor's stock continued to trade at artificially inflated despite Citron's allegations.

111.   On July 24, 2012, Questcor issued a release announcing its financial results for the second quarter ended June 30, 2012.  The Company reported net sales of $112.5 million, net income of $41.5 million, and EPS of $0.65 for the second quarter of 2012.

112.   After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call for analysts, media representatives and investors where defendants reiterated the financial results reported in the Company's release.  Defendant Mulroy discussed the Company's financial performance.  Defendants Bailey, Cartt and Young also addressed investors.  Bailey commented on the Company's earnings growth, stating:

> [BAILEY:]  Questcor's financial results were driven by the increasing
> acceptance  of  Acthar  among  nephrologists  and  neurologists,  as

evidenced by the continued growth in nephrotic syndrome and MS paid prescriptions. These two uses of Acthar are now each at annualized sales of approximately $200 million.

113.    Cartt addressed investor concerns over insurance coverage for Acthar, stating:

*Insurance reimbursement continues to be very good for Acthar in nephrotic syndrome, with about 90% of prescriptions covered by insurance*.  We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition.

\*      \*      \*

*In terms of reimbursement in nephrotic syndrome, it remains very, very strong*.  The payers, in fact, are becoming more accustomed now, as you would expect, to see nephrotic syndrome prescriptions, whereas several months ago there were – for a lot of payers, they were still new.  Just seeing their first one or two or handful, but now they're becoming more accustomed to seeing them. *And our coverage rates are remaining very strong.  We're up at around 90% coverage.  We see no indication that that's changing at all and are monitoring it closely. You know, we speak with payers, literally, on a daily basis as we work the prescriptions through our reimbursement hub, and we're seeing no indication there's any slow down in coverage whatsoever there*.

114.    Young addressed the clinical evidence defendants used to support Acthar sales and insurance reimbursement efforts, stating:

As you can see by our operating results reported in today's press release, we have been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory

- 53 -

properties of Acthar Gel.  Our subjects – our objectives are to produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond current on-label indications.  Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research.  Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH in the clinical role of Acthar Gel.

115.   On July 25, 2012, Questcor filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2012.  The Form 10-Q was signed by defendants Bailey and Mulroy and reaffirmed the Company's financial results previously announced on July 24, 2012.  In addition,  the Form 10-Q stated in part:

In the quarter ended June 30, 2012, our expanded Nephrology Sales Force effort resulted in 314 new, paid NS prescriptions, a significant increase over the 45 new, paid NS prescriptions in the quarter ended June 30, 2011. During the three months ended June 30, 2012, the number of new, paid prescriptions for Acthar to treat MS exacerbations increased to 1,110 from 751 in the quarter ended June 30, 2011, which was attributable to increased physician awareness of the therapeutic role of Acthar.

*     *     *

We maintain a research and development program focused on gathering data to: (i) evaluate the use of Acthar for certain on-label indications; (ii) investigate other potential uses of Acthar for indications not currently FDA approved; and (iii) expand our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future:

\*   \*   \*

Research and development expenses were $8.5 million in the three months ended June 30, 2012, as compared to $3.9 million for the three months ended June 30, 2011. . . . ***Costs included in research and development also include costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar in current and new therapeutic applications, product development efforts and regulatory compliance activities***.

116.   The statements made in ¶¶111-115 above were false and misleading when made.   The true facts which were known to or recklessly disregarded by defendants, includes:

(a)   That the reported net sales of $112.5 million and EPS of $0.65, and the 1,100 reported new paid prescription for MS and the 314 reported new paid prescriptions for NS were not the result of "increasing acceptance of Acthar among nephrologists and neurologists" as claimed by defendants, but rather were the result of improper sales and marketing practices, including paying physicians tens of thousands of dollars in "consulting" fees in connection with prescribing Acthar and preparing "investigator-led" studies, participating in "speaker's bureaus," and paying patients as "contractors" to market Acthar to other patients, in contravention of industry standards and best practices, and these practices had exposed Questcor to a substantial likelihood of government investigation;

(b)   That Questcor's "research and development" was not designed "to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel," but rather consisted of "studies" that were designed and used to convince physicians to prescribe Acthar, but which studies were inherently flawed and conducted by physicians who agreed to subvert adverse test results by, among other things, cancelling clinical studies when it appeared they would not achieve the desired results;

- 55 -

816412_1

(c)     That Questcor still lacked clinical data and scientific evidence to support the sale of Acthar for any indication other than IS, and defendants' discussions of "increasing our investment in research and development" omitted these important facts;

(d)     That because defendants knew there was no valid clinical or scientific basis supporting the use of Acthar rather than corticosteroids, insurance companies were increasingly skeptical to approve the use of Acthar as a treatment for MS and NS and because of the practices detailed herein, defendants knew that insurance reimbursement would not continue to be "very, very strong for Acthar in nephrotic syndrome," or result in "90% coverage;"

(e)     That Questcor's reported revenue growth for second quarter 2012 was the direct result of the improper practices set forth above, which were designed to inflate the price of Questcor stock in order to allow defendants to sell their shares of Questcor stock at artificially inflated prices; and

(f)     That as a result of (c)-(e) above, defendants had no reasonable basis to believe and did not believe their positive statements about Questcor's outlook, including those statements about the effectiveness and potential market growth for Acthar.

**THE TRUTH EMERGES THROUGH A SERIES OF DISCLOSURES**

117.   As discussed in ¶¶86-92 and ¶¶108-110 above questions regarding Acthar's efficacy and Questcor's promotion practices first began to arise in January 2012 with the *Streetsweeper* report, and again in July 2012 with the Citron report. However, due to Questcor's vigorous public defense of the Company's business practices and continued false and misleading statements in response to and in the face of these allegations, Questcor's stock remained artificially inflated until September 2012.

118.   Then, on September 19, 2012, it was reported that Aetna, one of the nation's largest insurers, had issued on September 14, 2012 a clinical policy bulletin

- 56 -

revising its policies concerning Acthar which would severely limit its coverage of Questcor's primary drug because "Aetna has disclosed that after studies and review of scientific literature, it finds **no proof of efficacy** to substantiate reimbursement for Acthar, except for Infantile Spasms (West Syndrome)."

119.   More specifically, Aetna's Clinical Policy Bulletin entitled Repository Corticotropin Injection (H.P. Acthar Gel), Number: 0762, stated in part:

I.      Aetna considers repository corticotropin (H.P. Acthar® Gel) medically necessary for West syndrome (infantile spasms)

II.     Aetna considers repository corticotropin **not** medically necessary for diagnostic testing of adrenocortical function because it has not been shown to be superior to cosyntropin for this purpose.

III.    Aetna considers repository corticotropin **not** medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications.

IV.     Aetna considers repository corticotropin **experimental** and **investigational for all other indications because its effectiveness for these indications has not been established**.

The Policy Bulletin went on to state "[t]here are a lack of clinical studies comparing the effectiveness of ACTH gel to corticosteroids in corticosteroid-responsive conditions. **In addition, there is no reliable evidence of the effectiveness of ACTH gel in persons who have failed to respond to corticosteroids**." Perhaps even more troubling, Aetna stated that "**because of uncertainties in the effect of ACTH gel on the magnitude of endogenous cortisol production, ACTH gel has the potential for inducing significant adverse effects**."

120.   Also, on September 19, 2012, *Bloomberg* reported that according to Aetna spokesperson Cynthia Michener, Aetna "had made its decision based on a lack of clinical evidence that the drug is more effective than steroids. . . . '**We now state**

1   *that it is not medically necessary because there is no clinical evidence that the drug*
2   *is more effective than steroids*.'"

3   121.   In response to this news, Questcor's stock plummeted $24.17 per share to
4   close at $26.35 per share on September 19, 2012, a one-day decline of nearly 48% on
5   massive volume.

6   122.   Finally, on September 24, 2012, Questcor filed a Form 8-K filed with the
7   SEC in which it admitted that the U.S. government had initiated an investigation into
8   the Company's promotional practices.  While Questcor did not provide additional
9   details with respect to the U.S. government investigation, analysts issued reports that
10   same week raising the concern that Questcor was paying "too-high honorarium" to
11   prescribing doctors which has the appearance for "paying for Rx's" or kickbacks to
12   prescribing physicians.

13   123.   In response to this news, Questcor's stock dropped an additional $11.05
14   per share to close at $19.08 per share on September 24, 2012, a decline of 37% on
15   high volume.

16   124.   Aetna's rejection of coverage of Acthar for uses other than IS based on a
17   lack of clinical data was followed on December 28, 2012, by Blue Cross Blue Shield
18   of Michigan's announcement that it would not provide coverage for Acthar for any
19   indication other than IS – causing the stock price to plunge more than 7% that day.
20   Then on January 2, 2013, it was disclosed that UnitedHealthcare had issued a bulletin
21   to treating physicians and facilities changing its "advanced notification review
22   process" for Acthar prescriptions.  Specifically, as of April 1, all participating network
23   physicians will be required to submit for prior authorization review and approval prior
24   to administration of Acthar for members with UnitedHealthcare commercial coverage
25   plans, including those members currently on therapy. And these requests may be
26   subject to "medical necessity review" to determine coverage.  On that announcement
27   Questcor's stock price again fell.

28

125.   Defendants' false and misleading statements during the Class Period had the desired effect of inflating the price of Questcor stock to as high as $57 per share and allowed defendants to sell more than $100 million of their own stock.  However, after the above revelations leaked into the market, the Company's shares were hammered by massive sales, sending them down approximately 67% from their Class Period high.  The declines have resulted in significant economic losses for plaintiffs and the Class.

## LOSS CAUSATION

126.   During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a fraudulent scheme and wrongful course of business which was designed to and did artificially inflate the price of Questcor securities and operated as a fraud or deceit on Class Period purchasers of Questcor securities.  Later, as the defendants' misconduct became apparent to the market, the price of Questcor securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Questcor securities during the Class Period, plaintiffs and other members of the Class suffered substantial economic loss.

## CLASS ACTION ALLEGATIONS

127.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Questcor securities during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

128.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial

816412_1

1  benefits to the parties and the Court.  Questcor has nearly 60 million shares of stock
2  outstanding, owned by hundreds if not thousands of persons.

3      129.   At all relevant times during the Class Period, the market for Questcor's
4  common stock was an efficient market for the following reasons, among others:

5         (a)   The Company's common stock was actively traded on the
6  NASDAQ exchange, a highly efficient market;

7         (b)   As a regulated issuer, the Company filed periodic public reports
8  with the SEC and was eligible to file an SEC Form S-3;

9         (c)   The Company was covered regularly by several securities analysts;

10         (d)   The Company regularly issued press releases, which were carried
11  by national news wires and over the internet.  Each of these releases, was publicly
12  available and entered the public marketplace; and

13         (e)   There were numerous market makers for the Company's stock.

14      130.   As a result, the market for the Company's common stock promptly
15  digested current information with respect to Questcor from all publicly available
16  sources and reflected such information in the price of the Company's securities.
17  Under these circumstances, all purchasers of the Company's common stock during the
18  Class Period suffered similar injury through their purchase of the common stock of
19  Questcor at artificially inflated prices and a presumption of reliance applies.

20      131.   There is a well-defined community of interest in the questions of law and
21  fact involved in this case.  Questions of law and fact common to the members of the
22  Class which predominate over questions which may affect individual Class members
23  include:

24         (a)   whether the Exchange Act was violated by defendants;

25         (b)   whether defendants misrepresented material facts;

26         (c)   whether defendants' statements omitted material facts necessary to
27  make the statements made, in light of the circumstances under which they were made,
28  not misleading;

1        (d)     whether defendants acted knowingly or with reckless disregard that

2  their statements were false and misleading;

3        (e)     whether defendants engaged in a fraudulent scheme and wrongful

4  course of business;

5        (f)     whether the price of Questcor securities was artificially inflated;

6  and

7        (g)     the extent of damage sustained by Class members and the

8  appropriate measure of damages.

9     132.   Plaintiffs' claims are typical of those of the Class because plaintiffs and

10  the Class sustained damages from defendants' wrongful conduct.

11     133.   Plaintiffs will adequately protect the interests of the Class and have

12  retained counsel who are experienced in class action securities litigation.  Plaintiffs

13  have no interests which conflict with those of the Class.

14     134.   A class action is superior to other available methods for the fair and

15  efficient adjudication of this controversy.

16                       **COUNT I**

17    **For Violation of §10(b) of the Exchange Act and Rule 10b-5**

18               **Against All Defendants**

19     135.   Plaintiffs incorporate ¶¶1-134 by reference.

20     136.   During the Class Period, defendants disseminated or approved the false

21  and misleading statements and omissions specified above, which they knew or

22  deliberately disregarded were misleading in that they contained misrepresentations

23  and failed to disclose material facts necessary in order to make the statements made,

24  in light of the circumstances under which they were made, not misleading.

25     137.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that

26  they:

27        (a)     employed devices, schemes and artifices to defraud;

28

816412_1

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Questcor securities during the Class Period.

138.   Defendants further violated §10(b) of the Exchange Act and Rule 10b-5 in that they violated their duty to abstain from trading on inside information.  While in possession of material, non-public information, defendants improperly sold 2,890,251 shares of Questcor stock for more than $100 million in illegal insider trading proceeds.

139.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Questcor securities. Plaintiffs and the Class would not have purchased Questcor securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misconduct.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Bailey, Mulroy, Cartt, Medeiros and Young

140.   Plaintiffs incorporate ¶¶1-139 by reference.

141.   As set forth more fully above in ¶¶18-25 defendants Bailey, Mulroy, Cartt, Medeiros and Young acted as controlling persons of Questcor within the meaning of §20(a) of the Exchange Act.

142.   By virtue of their high-level positions within the Company providing them with direct and supervisory involvement in its day-to-day operations, ownership of Questcor stock, participation in bi-weekly senior leadership meetings, awareness of the Company's finances and operations as demonstrated by their public statements made on behalf of the Company, and intimate knowledge of the false statements and

816412_1

1    omissions made by the Company and disseminated to the investing public, defendants

2    Bailey, Mulroy, Cartt, Medeiros and Young had the power and authority to influence

3    and control, directly or indirectly, the decision making of the Company, including the

4    manner and timing of the buyback and the content and dissemination of the various

5    statements identified herein which plaintiffs contend are false and misleading.

6    Defendants Bailey, Mulroy, Cartt, Medeiros and Young participated in conference

7    calls with investors and were provided with or had unlimited access to copies of the

8    Company's reports, press releases, public filings and other statements, alleged by

9    plaintiffs to be false and misleading, prior to and/or shortly after these statements were

10   issued and had the ability to prevent the issuance of the statements or cause the

11   statements to be corrected.

12      143.   As set forth above, defendants Bailey, Mulroy, Cartt, Medeiros and

13   Young violated §10(b) and Rule 10b-5 by their acts and omissions as alleged herein.

14   By virtue of their positions as controlling persons, these defendants are liable pursuant

15   to §20(a) of the Exchange Act.  As a direct and proximate result of these defendants'

16   wrongful conduct, plaintiffs and other members of the Class suffered damages in

17   connection with their purchase of the Company's publicly-traded securities during the

18   Class Period.

### COUNT III

**For Violation of §20A of the Exchange Act**
**Against Defendants Bailey and Blutt**

19

20

21   144.   Plaintiffs incorporate ¶¶1-142 by reference.

22   145.   Plaintiffs repeat and reallege each and every allegation contained above

23   as if fully set forth herein.  Count III is brought pursuant to §20A of the Exchange Act

24   against defendants Bailey and Blutt on behalf of plaintiffs who were damaged by

25   defendants' insider trading.

26   146.   As detailed herein, defendants Bailey and Blutt were in possession of

27   material, non-public information concerning Questcor.  These defendants took

28

advantage of their possession of material, non-public information regarding Questcor to obtain millions of dollars in insider trading profits during the Class Period.

147.   Defendants Bailey's and Blutt's sales of Questcor stock were made contemporaneously with named plaintiff Glucksberg's and other class members' purchases of Questcor stock during the Class Period.

148.   Named plaintiff Glucksberg, along with other class members who purchased shares of Questcor common stock contemporaneously with sales by defendants Bailey and Blutt, suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the stock at the prices paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.   Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.   Awarding plaintiffs and the members of the Class damages, including interest;

C.   Ordering an accounting of defendants' insider trading proceeds and awarding plaintiffs and members of the Class disgorgement of all amounts received by defendants as a result of their violation of §20A;

D.   Awarding plaintiffs' reasonable costs and attorneys' fees; and

E.   Awarding such equitable/injunctive or other and further relief as the Court may deem just and proper.

816412_1

F.    JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: March 5, 2013                              Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW J. BROWN
ERIK W. LUEDEKE

ANDREW J. BROWN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs West Virginia
Investment Management Board and
Plumbers and Pipefitters National Pension
Fund

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

LAW OFFICE OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Additional Counsel for Plaintiffs

- 65 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.      That on March 5, 2013, declarant served the **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 5, 2013, at San Diego, California.

CHRISTINE CLARK

816412_1

QUESTCOR
Service List - 3/5/2013     (12-0151)
Page 1 of 2

**Counsel For Defendant(s)**

Virginia F. Milstead
Peter B. Morrison
Thomas J. Nolan
Skadden, Arps, Slate, Meagher & Flom LLP
300 S. Grand Ave., Suite 3400
Los Angeles, CA  90071
  213/687-5000
  213/687-5600 (Fax)

**Counsel For Plaintiff(s)**

George E. Barrett
Barrett Johnston, LLC
217 Second Avenue North
Nashville, TN  37201
  615/244-2202
  615/252-3798 (Fax)

Lionel Z. Glancy
Michael  Goldberg
Robert V. Prongay
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
  310/201-9150
  310/201-9160 (Fax)

Corey D. Holzer
Michael I. Fistel, Jr.
Marshall P. Dees
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA  30338
  770/392-0090
  770/392-0029 (Fax)

Ramzi  Abadou
Eli R. Greenstein
Stacey M. Kaplan
Kessler Topaz Meltzer & Check, LLP
One Sansome Street, Suite 1850
San Francisco, CA  94104
  415/400-3000
  415/400-3001 (Fax)

Alfred G. Yates, Jr.
Law Offices of Alfred G. Yates, Jr., P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
  412/391-5164
  412/471-1033 (Fax)

Bruce G. Murphy
Law Offices of Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL  32963
  772/231-4202
  772/234-0440 (Fax)

QUESTCOR

Service List – 3/5/2013     (12-0151)
Page 2 of 2

Patrick V. Dahlstrom
Pomerantz Grossman Hufford Dahlstrom &
Gross LLP
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
  312/377-1181
  312/377-1184 (Fax)


Darren J. Robbins
Andrew J. Brown
Tricia L. McCormick
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)


Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
Wolf Haldenstein Adler Freeman & Herz, LLP
750 B Street, Suite 2770
San Diego, CA 92101
  619/239-4599
  619/234-4599 (Fax)

Marc I. Gross
Jeremy A. Lieberman
Pomerantz Grossman Hufford Dahlstrom &
Gross LLP
600 Third Avenue
New York, NY 10016
  212/661-1100
  212/661-8665 (Fax)


Gregory M. Nespole
Alan D. Weiss
Wolf Haldenstein Adler Freeman & Herz, LLP
270 Madison Avenue
New York, NY 10016
  212/545-4600
  212/545-4653 (Fax)