ROBBINS GELLER RUDMAN
  & DOWD LLP
ANDREW J. BROWN (160562)
ERIK W. LUEDEKE (249211)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
andrewb@rgrdlaw.com
eluedeke@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re QUESTCOR PHARMACEUTICALS, INC. SECURITIES LITIGATION | ) ) ) |
| ──────────────────────────── | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) |
| ──────────────────────────── | ) |

No. 8:12-cv-01623-DMG(FMOx)

CLASS ACTION

PLAINTIFFS' CONSOLIDATED
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS

DATE:           September 13, 2013
TIME:           9:30 a.m.
COURTROOM:   The Honorable
                Dolly M. Gee

852669_1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................ 1

II.    STATEMENT OF FACTS ...................................................... 4

III.   ARGUMENT ................................................................... 8

   A.   Defendants' Materially False and Misleading Statements Are
        Actionable ............................................................... 9

        1.   Defendants Misled Investors About the Scientific Basis
             for Acthar ......................................................... 10

        2.   Defendants Misled Investors About Their Compliance
             with Regulatory Standards and Industry Practices ................. 12

        3.   Defendants Misled Investors About Insurance Coverage
             for Acthar ......................................................... 14

        4.   Defendants' Reported Financial Results and Forecasts
             Were False and Misleading .......................................... 17

   B.   Defendants Acted with Scienter ........................................... 18

        1.   Defendants' Insider Selling Establishes a Strong
             Inference of Scienter ............................................... 19

             a.   Defendants Sold Suspicious Amounts and
                  Percentages of Their Holdings During the Class
                  Period ......................................................... 19

             b.   Defendants' Class Period Sales Were Suspiciously
                  Timed .......................................................... 22

             c.   Defendants' Class Period Sales Were Dramatically
                  out of Line with Prior Trading Practices ....................... 24

             d.   Defendants' Attempts to Discount Their Insider
                  Selling Are Unavailing ......................................... 26

             e.   Defendants' Use of Company Money to Buy
                  Millions of Shares While They Were Selling
                  Supports a Finding of Scienter ................................. 29

        2.   Defendants' Incentive Compensation Supports a Strong
             Inference of Scienter ............................................... 30

        3.   Facts Supporting the Core Operations Inference
             Establishes a Strong Inference of Scienter .......................... 31

   C.   Plaintiffs Adequately Pled Loss Causation ................................ 35

- i -

852669_1

**Page**

1.    The Disclosure that Aetna Would Not Cover Acthar
      Prescriptions Because It Was Not "Medically Necessary"
      Was a "Corrective Disclosure"....................................................36

2.    The Disclosure that the U.S. Attorney's Office Was
      Investigating Questcor's Sales and Marketing Practices
      Was a "Corrective Disclosure"....................................................37

D.    Defendants Are Separately Liable for Violating §10(b) and
      SEC Rule 10b-5 for Trading on Inside Information..........................38

E.    Defendants Are Liable as Control Persons Under §20(a) .................39

F.    Defendants Bailey and Blutt Are Liable Under §20A.......................40

IV.   CONCLUSION .........................................................................40

852669_1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Backe v. Novatel Wireless, Inc.*,
　642 F. Supp. 2d 1169 (S.D. Cal. 2009) ............................................................. 28

*Batwin v. Occam Networks Inc.*,
　No. CV 07-2750 CAS, 2008 U.S. Dist. LEXIS 52365
　(C.D. Cal. July 1, 2008) ............................................................................. 21, 32

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ................................... 9

*Berry v. Valence Tech., Inc.*,
　175 F.3d 699 (9th Cir. 1999) ........................................................................... 29

*Berson v. Applied Signal Tech., Inc.*,
　527 F.3d 982 (9th Cir. 2008) ................................................................... *passim*

*Brody v. Transitional Hosps. Corp.*,
　280 F.3d 997 (9th Cir. 2002) ........................................................................... 12

*Buttonwood Tree Value Partners, LP v. Sweeney*,
　No. SACV10-00537-CJC(MLGx), 2012 U.S. Dist. LEXIS 183438
　(C.D. Cal. Dec. 10, 2012) ........................................................................... 20, 26

*Fecht v. Price Co.*,
　70 F.3d 1078 (9th Cir. 1995) ........................................................................... 19

*Freudenberg v. E*Trade Fin. Corp.*,
　712 F. Supp. 2d 171 (S.D.N.Y. 2011) ........................................................ 18, 28

*Gammel v. Hewlett-Packard Co.*,
　No. SACV 11-1404 AG(RNBx), 2013 U.S. Dist. LEXIS 68026
　(C.D. Cal. May 8, 2013) ................................................................................. 33

*Glazer Capital Mgmt. v. Magistri*,
　549 F.3d 736 (9th Cir. 2008) ........................................................................... 35

*Hayley v. Parker*,
　No. SACV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255
　(C.D. Cal. Aug. 31, 2001) ............................................................................... 24

852669_1

**Page**

*Henning v. Orient Paper, Inc.*,
   No. CV 10-5887-VBF, 2011 U.S. Dist. LEXIS 79135
   (C.D. Cal. July 20, 2011)........................................................................ 9

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000).................................................. 30, 39, 40

*In re Amgen, Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008)................................................ 37

*In re Amylin Pharm., Inc. Sec. Litig.*,
   No. 01cv1455 BTM(NLS), 2002 U.S. Dist. LEXIS 19481
   (S.D. Cal. Oct. 10, 2002)........................................................................ 32

*In re Apollo Grp., Inc. Sec. Litig.*,
   No. CV-10-1735-PHX-JAT, 2011 WL 5101787
   (D. Ariz. Oct. 27, 2011)................................................................. 37, 38

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989).................................................. 19, 25, 26

*In re China Educ. Alliance, Inc. Sec. Litig.*,
   No. CV 10-9239 CAS, 2011 U.S. Dist. LEXIS 117416
   (C.D. Cal. Oct. 11, 2011)......................................................................... 9

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................ 40

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008).......................................... 29, 30

*In re Credit Acceptance Corp. Sec. Litig.*,
   50 F. Supp. 2d 662 (E.D. Mich. 1999).................................................. 23

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005).......................................................... 24, 33

*In re Evci Colls. Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006)..................................................... 26

852669_1

Page

*In re Fannie Mae Sec. Litig.*,
   503 F. Supp. 2d 25 (D.D.C. 2007) ....................................................27

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)................................................*passim*

*In re Hansen Natural Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007)...........................................27

*In re Immersion Corp. Sec. Litig.*,
   No. C-09 4073 MMC, 2011 U.S. Dist. LEXIS 24886
   (N.D. Cal. Mar. 11, 2011) ..............................................................20

*In re InfoSonics Corp. Deriv. Litig.*,
   No. 06cv1136 BTM (WMC), 2007 U.S. Dist. LEXIS 66043
   (S.D. Cal. Sept. 4, 2007)...........................................................27, 28

*In re InterMune Inc. Sec. Litig.*,
   No. C 03-2954 SI, 2004 WL 1737264
   (N.D. Cal. July 30, 2004) ...............................................................13

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C 02-1486 CW, 2005 U.S. Dist. LEXIS 20831
   (N.D. Cal. Jan. 6, 2005)..................................................................22

*In re KeySpan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003)............................................23

*In re Lexar Media, Inc. Sec. Litig.*,
   No. C-04-2013 SC, 2005 U.S. Dist. LEXIS 21467
   (N.D. Cal. July 5, 2005) .................................................................26

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008)..........................................30

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
   No. C 08-4575 SI, 2011 WL 1842819 (N.D. Cal. May 16, 2011)....................35

852669_1

**Page**

*In re Omnivision Techs.*,
   No. C-04-2297 SC, 2005 U.S. Dist. LEXIS 16009
   (N.D. Cal. July 29, 2005) ............................................................24, 29

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999)..................................................26

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...................................................10, 11

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003)........................................26

*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...................................................19, 20

*In re STEC Inc. Sec. Litig.*,
   No. SACV 09-1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75093
   (C.D. Cal. June 17, 2011) ...........................................................15

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) .......................................................31

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..........................................38

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009)..........................................27

*In re Verifone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ..............................................27, 33, 34

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009)....................................................35

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ..........................................21

*Johnson v. Aljian*,
   394 F. Supp. 2d 1184 (C.D. Cal. 2004).............................19, 20, 25, 39

852669_1

**Page**

*Maiman v. Talbott*,
  No. SACV 09-0012 AG (ANx), 2010 U.S. Dist. LEXIS 142712
  (C.D. Cal. Aug. 9, 2010) ...................................................................... 20

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ......................................................... 33, 35

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) .................................................... 20

*Matrixx Initiatives, Inc. v. Siracusano*,
  _U.S. _, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) ........................ 9, 10, 18, 35

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .............................................................. 38

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ............................................................ 38

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) .......................................................... 13, 15

*Nathenson v. Zonagen, Inc.*,
  267 F.3d 400 (5th Cir. 2001) ............................................................... 32

*Nguyen v. Radient Pharm. Corp.*,
  No. SACV 11-0406 DOC (MLGx), 2013 U.S. Dist. LEXIS 71650
  (C.D. Cal. May 17, 2013) ............................................................... 20, 35

*Nguyen v. Radient Pharm. Corp.*,
  No. SACV 11-0406 DOC (MLGx), 2011 U.S. Dist. LEXIS 122533
  (C.D. Cal. Oct. 20, 2011) .................................................................... 30

*No. 84 Employer-Teamster Joint Council Pension*
  *Trust Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ........................................................*passim*

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ..................................................... 19, 24, 33

852669_1

**Page**

*Prop. Mgmt. & Invs., Inc. v. Lewis*,
   752 F.2d 599 (11th Cir. 1985) ........................................................................ 26

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ................................................................ 20, 24

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ................................................................... 20, 24

*Rush v. Walter Energy, Inc.*,
   No. 2:12-CV-281-VEH, 2013 U.S. Dist. LEXIS 11589
   (N.D. Ala. Jan. 29, 2013) .............................................................................. 26

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................... 31, 32

*SEC v. Adler*,
   137 F.3d 1325, 1337-39 (11th Cir. 1998),
   *aff'd*, 490 F.3d 778 (9th Cir. 2007) ............................................................. 39

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ......................................................................... 9

*Smith v. Circuit City Stores, Inc.*,
   286 F. Supp. 2d 707 (E.D. Va. 2003) ........................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ................ 8, 18, 19, 30

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976) ...................................... 9

*United States v. O'Hagan*,
   521 U.S. 642, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997) .............................. 39

*Winslow v. BancorpSouth, Inc.*,
   No. 3:10-00463, 2011 U.S. Dist. LEXIS 45559
   (M.D. Tenn. Apr. 26, 2011) ........................................................................... 31

852669_1

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78j ................................................................................................*passim*
   §78j(b) ....................................................................................... 8, 38, 39
   §78t(a) ........................................................................................ 39, 40
   §78t-1 ................................................................................................ 40
   §78u-4(b)(1).................................................................................... 9, 10
   §78u-4(b)(2).......................................................................................... 18
   §78u-5(c)(1).......................................................................................... 17

17 C.F.R.,
   §240.10b-5 ................................................................................. 8, 38, 39
   §240.10b-5(b) ....................................................................................... 8
   §240.10b5-1(b) .............................................................................. 38, 39
   §240.10b5-1(c) .................................................................................... 27
   §240.10b5-1(c)(1)(i)-(iii)..................................................................... 28

Federal Rules of Civil Procedure
   Rule 8(a) ............................................................................................ 35
   Rule 9(b) .............................................................................................. 9
   Rule 12 ............................................................................................... 37
   Rule 12(b)(6) ........................................................................................ 9
   Rule 15(a)(2).................................................................................... 40

**SECONDARY AUTHORITIES**

Allan Horwich, *The Origin, Application,*
   *Validity, and Potential Misuse of Rule 10b5-1,*
   65 Bus. Law. 913 (2007) .................................................................. 28

1   By this single consolidated opposition, Lead Plaintiffs Plumbers and Pipefitters

2   National Pension Fund and West Virginia Investment Management Board hereby

3   oppose the motions to dismiss filed by Questcor Pharmaceuticals, Inc. ("Questcor" or

4   the "Company") and the Individual Defendants (collectively, "defendants").[1]

## I.   INTRODUCTION

6   The Consolidated Class Action Complaint for Violation of the Federal

7   Securities Laws ("Complaint") describes in detail how defendants purchased a

8   pharmaceutical product with little practical use, exploited a loophole in FDA

9   regulations, and capitalized on their scheme by misleading investors and selling

10  unprecedented amounts of their own shares at artificially inflated prices.   The

11  Complaint's allegations demonstrating defendants' fraud are both salacious and

12  overwhelming.  This is no mere "fraud by hindsight" pleading.

13  The Complaint details how before the Class Period, defendants purchased

14  Acthar, increased the price of it overnight by more than $22,000 per vial, and obtained

15  "orphan drug" status for Acthar as a treatment for Infantile Spasms ("IS"), a condition

16  affecting only 2,000 children per year.  But after obtaining "orphan drug" status,

17  defendants began marketing the drug for potentially much more lucrative indications,

18  specifically Multiple Sclerosis ("MS") and Nephrotic Syndrome ("NS").

19  The Complaint also demonstrates that, despite the Truman-era FDA approval

20  for these indications, defendants had no legitimate medical or scientific support for

21  Athcar's efficacy for treatment of MS or NS.  So defendants engaged in a scheme of

22  funding small so-called "investigator-led" studies that allowed defendants to

23  manipulate the available science supporting their rapidly growing sales staff, as well

24  as their insurance reimbursement hub.  Defendants also handsomely paid both doctors

25  _____

26  [1]   The Individual Defendants are Don M. Bailey ("Bailey"), Michael H. Mulroy
    ("Mulroy"), Stephen L. Cartt ("Cartt"), David Young ("Young"), David J. Medeiros
27  ("Medeiros"), and Mitchell J. Blutt ("Blutt").

28

1  and patients to market the drug to other doctors and patients.  In this way, defendants
2  were able to report ever-increasing prescriptions, and therefore earnings, quarter after
3  quarter.

4       The market cheered these financial results, driving the stock price to lofty highs
5  of more than $57 per share.  Defendants took full advantage of their scheme, cashing
6  in on the inflated price of Questcor stock to the tune of more than $100 million.
7  Shareholders, on the other hand, suffered terribly.  The massive and increased costs to
8  insurers caused them to conduct their own medical analysis and they began denying
9  coverage, having determined there was no legitimate scientific basis to support the use
10 of Acthar for any indication other than IS.  As the market learned this harsh truth, the
11 stock price cratered.  The U.S. Department of Justice is now investigating Questcor's
12 marketing and sales practices.

13      Defendants have almost no response.  They contend plaintiffs allege "fraud by
14 hindsight," because their statements turned out to be false and misleading only at the
15 end of the Class Period.  Of course, this is true of every fraud – it is only discovered
16 after the fact.  But that fact neither renders their Class Period statements true, nor does
17 it explain their massive insider selling.

18      Defendants argue that not a single Class Period statement was false or
19 misleading.  But they do so only by rewriting the complaint, claiming plaintiffs simply
20 challenge the results of certain studies, or otherwise fail to show the Company did not
21 earn the money it claimed to earn, or obtain insurance coverage as defendants
22 claimed.  By focusing on these individual trees, defendants hope the Court will ignore
23 the forest.

24      Of course, plaintiffs do not base their claims on the accuracy of any particular
25 study.  Rather, plaintiffs allege defendants knew at the time they were reporting on
26 various medical studies that they were manipulating which studies were publicized
27 and which ones were not.  Because FDA approval already had been obtained shortly
28 after WWII, defendants were not required to complete modern, reliable efficacy

- 2 -

1   studies.  Instead, they only needed to manufacture enough science to allow their sales
2   staff to convince doctors to prescribe the drug, and then for their insurance hub to
3   convince insurers to pay for those prescriptions.  So unbeknownst to shareholders (and
4   likely insurers), Questcor simply cancelled those studies they were funding that were
5   not rendering the desired results.

6         While Questcor claims its sales and marketing practices were entirely
7   legitimate, the Complaint demonstrates that defendants were paying certain doctors
8   huge sums to help Questcor gain prescriptions, and paying patients to peddle the drug
9   to other patients.   These practices were not consistent with industry norms (as
10  Questcor claimed), and led to an investigation by the Department of Justice.

11        Attempting to challenge allegations demonstrating defendants acted with
12  "scienter," defendants try to justify their massive insider selling, claiming their $100
13  million in stock sales were not "suspicious" at all.  But not only did the Individual
14  Defendants sell huge amounts of stock, constituting large percentages of their
15  holdings, but they did so at times when the stock price was hitting all-time highs.
16  These sales were totally out of line with their prior trading practices, as only one
17  defendant had a single sale during the entire 18 months immediately prior to the Class
18  Period.  To the extent they try to justify these sales – asserting a "trading plan" for one
19  defendant or looking at sales from 4 years prior for others – at best defendants simply
20  raise a question of fact not to be decided on a motion to dismiss.

21        Defendants also ignore all the allegations demonstrating scienter based on facts
22  establishing the "core operations inference."   Given their positions at the small
23  company, the importance of Acthar's sales, their access to information and other facts
24  demonstrating their knowledge, defendants' assertions of ignorance are not remotely
25  plausible. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988-89 (9th Cir. 2008).

26        In the end, defendants' motions are based upon arguments that ignore important
27  facts, misapply the law, or both.  Defendants' motions to dismiss should be denied.

28

## II.     STATEMENT OF FACTS

Acthar was first discovered in the early 1950s.  At that time, it was approved by the FDA to treat more than 40 different indications, although efficacy to treat those indications had not been demonstrated.  Once corticosteroids came to market in the 1980s, Acthar was relegated to treating just one of those indications for which it had been used effectively – IS.  Thus, in the years leading up to the Class Period, Acthar was used for virtually no other purpose than to treat this rare disease, which affected approximately 2,000 infants per year.  ¶31.[2]

Questcor purchased Acthar for $100,000 in 2001, but did not meaningfully enhance the efficacy the drug.  Instead, defendants undertook a more "creative" plan – defendants increased the price of each vial of Acthar by $22,000, or more than 1300%, overnight and then they applied for "orphan drug" status for Acthar.  The FDA awards "orphan drug" status to those drugs that treat fewer than 200,000 people and allows a pharmaceutical company seven years of marketing exclusivity.  Questcor then adopted sales and marketing tactics designed to expand the use of Acthar in any way possible, including for indications that had been approved decades earlier, but for which *there was no meaningful scientific or medical basis*.  Questcor began hiring salespeople by the dozens, effectively becoming a company of salespeople, rather than the "biopharmaceutical" company it claimed to be.  ¶¶32, 33, 35.

To support Questcor's singular focus on increasing Acthar sales, Questcor's sales people had to convince doctors to prescribe it.  Defendants therefore sought to create the perception that a legitimate scientific basis existed for Acthar as a treatment for indications other than IS.  To that end, Questcor began funding – and publicizing – a small number of Acthar "studies."  But unlike modern best practices utilized in the medical community for such studies, the "studies" Questcor paid for and utilized were

---

[2]     All references herein to "¶_" or "¶¶_-_" are to the Complaint.

1  not conducted in accordance with accepted scientific norms, but rather were designed
2  to obtain a desired outcome.  For instance, the most significant "study" publicized by
3  Questcor during the Class Period (and utilized by Questcor to market Acthar to other
4  physicians and support requests for reimbursement from insurers) was conducted in
5  2010 by Dr. Andrew Bomback ("Bomback").  However, the 2010 Bomback study on
6  the effectiveness of Acthar for treating NS was a "retrospective" study which included
7  a review of a sample of just 21 patients, 40% of whom were patients of Dr.
8  Bomback's own practice.  Questcor paid $50,000 to Dr. Bomback for "consulting"
9  with Questcor and completing this "study."  ¶38.  Moreover, before the results were
10  made public, Dr. Bomback essentially sold the results to a money manager in
11  Massachusetts, who in turn traded on that undisclosed information.  ¶¶5, 35, 38.

12      In fact, as of the filing of the Complaint, Questcor has ***never*** conducted a
13  legitimate multiple-phase randomized, double blind test to evaluate Acthar's efficacy
14  for MS, NS, or any other indication.  Instead, Questcor funded several small
15  "investigator-led" studies that were designed solely to support Questcor's sales staff
16  and insurance coverage group.  And when such studies were not providing the results
17  Questcor wanted, Questcor simply stopped funding these "studies" and they were
18  never completed.  In this way, Questcor was able to control and manipulate the
19  available scientific data.  ¶¶6, 38, 39.

20      Having dramatically raised the price of Acthar to more than $24,000 per vial, it
21  did not take a significant increase in the number of prescriptions to dramatically alter
22  the Company's financial results.  In fact, relying on the Bomback "study," defendants
23  suggested to investors during the Class Period that the market for Acthar as a
24  treatment of NS alone could be as much as ***$1 billion***.  ¶9.

25      To promote Acthar for indications other than IS, Questcor employed a
26  "speakers bureau" of handsomely paid physician "consultants."  These "hired guns"
27  often would accompany Questcor sales representatives on visits to doctors' offices,
28  and speak to other doctors about prescribing Acthar.  For instance, Houston

- 5 -

1   neurologist, Dr. Staley A. Brod, was among the "heavy prescribers" handsomely
2   compensated by Questcor to promote Acthar.  Dr. Brod, whose bio is replete with
3   Acthar studies in which he was or is involved, has been described as "'an evangelist
4   for [Acthar]'" and "'the best salesperson that [Questcor] had.'"  ¶41.  Questcor paid
5   Dr. Brod $2,500 each time he told another doctor about Acthar.  As a result of his
6   Questcor consulting endeavors, Dr. Brod was able to collect over $6,000 in a single
7   day, and over $100,000 a year.  While Questcor claimed in a January 16, 2012 release
8   that "[t]he Company does not provide financial incentives to doctors or other
9   healthcare practitioners to prescribe Acthar," Dr. Brod was one of the two highest
10  Acthar-prescribing physicians at the end of 2011.  ¶¶40-42.

11          Questcor's efforts to drive sales growth also included making payments to MS
12  patients in exchange for their willingness to attend and participate in Acthar marketing
13  events held for potential patients.  Specifically, during the Class Period, Questcor paid
14  as "contractors" patients who had been treated with Acthar for MS flare-ups to attend
15  gatherings of MS patients to promote Acthar.  As part of their contract, Questcor
16  provided "training" to these individuals and then scheduled and organized the
17  meetings for these patient/contractors to attend.  ¶¶7, 43.

18          By making payments to doctors who prescribed Acthar and to patients who had
19  been prescribed the drug, Questcor was able to report ever-increasing revenues,
20  driving its stock price upward.  To maintain strong revenue growth, Questcor vastly
21  expanded its sales force.  As of January 11, 2011, Questcor employed 152 full-time
22  employees, of which 75% were "engaged in sales and commercialization activities."
23  A year later, that number had mushroomed to 206 full-time employees, 148 of whom
24  were "engaged in sales and commercialization activities."  ¶¶8, 45.

25          Selling Acthar for MS and NS became Questcor's singular focus.  Acthar
26  accounted for more than 99% of the Company's revenues, and by 2012, sales
27  attributable to IS were only 10% with the rest being attributable to MS and NS
28  indications.  ¶¶3, 34.  With most of the Company's employees committed to sales and

1    "commercialization" activities, it was easy for the senior executives to keep close tabs

2    on their efforts to increase Acthar sales.  Indeed, the very structure of the Company

3    was designed for that purpose.  ¶45.  Defendants had regular meetings – bi-weekly,

4    monthly and quarterly – to discuss sales strategies, any new "research" or "studies"

5    that were being made public, as well as financial results.  ¶¶46-49.  And because all

6    Acthar sales went through a single specialty pharmacy, defendants were able to

7    monitor real-time sales information through that pharmacy.  ¶50.

8         Defendants also were able to closely monitor insurance coverage, which was

9    extremely important due to the excessive price charged for Acthar.  During the Class

10   Period, defendants claimed to have as many as 30 people committed to assisting

11   patients obtain insurance coverage for Acthar prescriptions. ¶54.  According to

12   defendant Cartt, "we speak with payers [insurers] literally on a daily basis as we work

13   the prescriptions through our reimbursement hub." ¶55.  And defendants repeatedly

14   reported the levels of insurance coverage to investors.  *See, e.g.*, ¶¶81, 98, 99, 104,

15   113.

16        Having successfully driven Questcor's stock price up, Questcor insiders sold

17   unprecedented amounts of Questcor stock – ***more than $100 million*** – at artificially

18   inflated levels during the Class Period.  ¶¶61-64.  Defendants' stock sales were

19   stunning in both amount and timing.  In the 18 months leading up to the Class Period,

20   defendants sold virtually no stock whatsoever.  ¶63; *see* Ex. A attached hereto.  Once

21   the stock price began climbing as a result of their fraudulent scheme, defendants

22   began unloading stock as never before.  And their sales frequently occurred right after

23   they announced positive news, and the stock price jumped.  *See, e.g.*, ¶¶61, 63-64, 69-

24   72, 74-77, 79-84; Ex. A.

25        In order to support these massive sales, defendants caused the Company to buy

26   stock in the open market, spending hundreds of millions of dollars of Company

27   (shareholder) money at elevated prices.  Defendants also timed Questcor's share buy-

28

852669_1

1  back, causing Questcor to buy shares at the very same time the Individual Defendants
2  were selling their own shares.  ¶¶65-66.  But investors were not so fortunate.

3  The inflated stock price that defendants had so diligently created came crashing
4  down in late September 2012 as the truth about defendants' fraudulent practices came
5  to light.  On September 19, 2012, Citron Research reported that Aetna Inc. ("Aetna")
6  had conducted its own medical review of the 19 indications for which the FDA had
7  approved Acthar, and determined that clinical research supported only one such
8  indication – IS.  ¶¶11, 59, 118-120.  This news directly contradicted the positive
9  statements concerning Acthar's efficacy and prospects that defendants repeatedly
10  presented to investors, resulting in a one-day 48% decline in Questcor's stock price.
11  ¶¶11, 121.  But the bleeding was not over for Questcor's shareholders.  On September
12  24, 2012, defendants disclosed that the U.S. Attorney's Office had initiated an
13  investigation into the Company's promotional practices, causing Questcor's stock
14  price to plummet another 37%.  ¶¶12, 122-123.  The combined 67% plunge of
15  Questcor's shares from their Class Period high caused substantial economic harm to
16  plaintiffs and the class.  ¶¶13, 125.

17  **III.   ARGUMENT**

18  Under Section 10(b) of the Securities Exchange Act, it is unlawful for any
19  person to "use or employ, in connection with the purchase or sale of any security . . .
20  any manipulative or deceptive device or contrivance in contravention of such rules
21  and regulations as the [SEC] may prescribe as necessary or appropriate in the public
22  interest or for the protection of investors."  15 U.S.C. 78j(b).  SEC Rule 10b-5 makes
23  it unlawful to "make any untrue statement of a material fact or to omit to state a
24  material fact necessary in order to make the statements made, in the light of the
25  circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-
26  5(b).

27  At the motion to dismiss stage, the Court "must . . . accept all factual allegations
28  in the complaint as true."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

852669_1

322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).  While plaintiffs must meet a heightened pleading standard under both Rule 9(b) and the PSLRA,[3] "it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6*)*."  *In re China Educ. Alliance, Inc. Sec. Litig*., No. CV 10-9239 CAS (JCx), 2011 U.S. Dist. LEXIS 117416, at *8 (C.D. Cal. Oct. 11, 2011).  Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

### A.   Defendants' Materially False and Misleading Statements Are Actionable

"To prevail on a §10(b) claim, a plaintiff must show that the defendant made a statement that was '***misleading*** as to a ***material*** fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, _U.S._, 131 S. Ct. 1309, 1318, 179 L. Ed. 2d 398 (2011) (emphasis in original).  A "statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson*, 527 F.3d at 985.  The materiality requirement is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus. v. Northway, Inc*., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976); *Siracusano v. Matrixx Initiatives, Inc*., 585 F.3d 1167, 1178 (9th Cir. 2009) ("'determining materiality in securities fraud cases "should ordinarily be left to the trier of fact"'").  Importantly, the Supreme

---

[3]    The PSLRA requires that a plaintiff alleging securities fraud "'[s]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *Henning v. Orient Paper, Inc.*, No. CV 10-5887-VBF (AJWx), 2011 U.S. Dist. LEXIS 79135, at *6, (C.D. Cal. July 20, 2011) (quoting 15 U.S.C. §78u-4(b)(1)).  Stated simply, this is a "'who, what, when, where, and how'" requirement.  *Id.*  Citations are omitted and emphasis is added throughout, unless otherwise indicated.

852669_1

1   Court has repeatedly rejected attempts to "'artificially exclud[e]' [information that]
2   'would otherwise be considered significant to the trading decision of a reasonable
3   investor.'" *Matrixx*, 131 S. Ct. at 1318.

4          Here, plaintiffs' well-pled Complaint alleges with particularity that defendants
5   knowingly made material false and misleading statements regarding Acthar, the
6   Company's only drug, including its prospects as a treatment for MS and NS, in
7   violation of the Securities Exchange Act of 1934.  15. U.S.C. §78u-4(b)(1); *Berson*,
8   527 F.3d 982.

**1.      Defendants Misled Investors About the Scientific
         Basis for Acthar**

9
10
11          Prior to the Class Period, there was no legitimate scientific basis supporting
12   Acthar for treating the MS and NS indications, and Acthar was rarely, if ever, being
13   prescribed for those indications.  ¶¶31-32.  For this reason, defendants embarked on a
14   scheme of paying Dr. Bomback and others to conduct "investigator led" studies to
15   provide a purportedly legitimate basis for Questcor's sales and insurance groups to
16   peddle Acthar specifically for those indications.  The nature of the studies rendered
17   them inherently flawed, unreliable and entirely inconsistent with customary scientific
18   practices.  Moreover, defendants manipulated the studies to obtain desired results by
19   stopping those studies that were not rendering results that defendants wanted.
20   Defendants' repeated statements about the studies that were known to the market, and
21   the Company's research practices generally, were therefore false and misleading.  *See,
22   e.g.*, ¶¶77-78, 80, 82, 84, 91-92, 103-105, 114.

23          Redrafting the Complaint to fit within the *Rigel* case, defendants repeatedly
24   argue that plaintiffs are simply criticizing the design or interpretation of the results of
25   the Bomback study.  *See, e.g.*, Questcor's Motion to Dismiss ("Questcor's MTD")
26   (Dkt. No. 92) at 12-15; *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir.
27   2012).  In *Rigel*, plaintiffs contended the study conducted by the Company to win
28   FDA approval was flawed, did not show what defendants publicly claimed it showed,

- 10 -

1   and when the market learned about those flaws in the study, the stock price dropped
2   dramatically.[4]  But here, plaintiffs do not contend the results themselves were "false"
3   or misstated.  Instead, plaintiffs contend that, as part of defendants' wrongful course
4   of business, the Company improperly used that study as a marketing tool, and
5   cancelled other studies that were not yielding the desired results, to get physicians to
6   prescribe Acthar and insurers to pay for it when they otherwise would not have.  *See,*
7   *e.g.*, ¶73(a) (Questcor's financial results "were the result of improper sales and
8   marketing practices, including paying physicians . . . ."); ¶73(c) ("the increase in paid
9   Acthar prescriptions for the treatment of NS was due to the defendants' dissemination
10  of the results of the 2010 Bomback Study"); ¶78(c) ("[T]he investigator initiated
11  studies . . . were utilized solely for the sales and marketing of the drug and were, in
12  fact, halted and/or placed in abeyance when they generated data inconsistent with that
13  which defendants desired.").  Thus defendants' reliance on *Rigel* and similar cases is
14  unavailing.

15      So while it is true the Bomback Study does not demonstrate what defendants
16  contend it demonstrates, their fraudulent scheme was not simply to misrepresent the
17  results of the Bomback Study to the public, thereby inflating the stock price.
18  Defendants conduct here was much more nefarious – they manipulated the available
19  scientific evidence by paying for studies, and pulling the plug on those that would not
20  give them the desired results.[5]  Combined with their improper "speakers bureau"

---

22  [4]    "The district court held that Plaintiff had failed to adequately plead a false
23  statement regarding efficacy because disagreements over statistical methodology and
    study design are insufficient to allege a materially false statement.  Plaintiff argues
24  that it met the pleading requirements by alleging 'false' study results, including
    allegations of 'statistically "false p-values,"' and inaccurate and improper statistical
25  analysis.  We hold that the district court did not err."  *Rigel*, 697 F.3d at 877.

26  [5]    Defendants assert that "[t]o be transparent with the market, [Questcor] disclosed
    the methodology and purpose of such studies."  Questcor's MTD at 6.  This is beside
27  the point.  Defendants only disclosed the methodology and purpose *of the studies*
    *whose results satisfied Questcor*.

28

852669_1

1  payments and paying patients to promote the drug to other patients, their sales staff
2  was able to convince a small but growing number of physicians to prescribe the drug,
3  dramatically increasing the Company's sales and earnings.  *See Brody v. Transitional*
4  *Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (a statement is misleading if it
5  would give a reasonable investor the "impression of a state of affairs that differs in a
6  material way from the one that actually exists").

### 2. Defendants Misled Investors About Their Compliance with Regulatory Standards and Industry Practices

8
9  Defendants further misconstrue the allegations in order to claim their fraudulent
10  scheme did not violate any particular regulation, and therefore every one of their
11  statements concerning compliance with industry practices and regulatory requirements
12  could not be false or misleading as a matter of law.[6]  As if they had not read the
13  Complaint at all, defendants repeatedly contend that "Plaintiff simply pleads no facts
14  to support its inference that physicians and patients sold themselves out to [Questcor]
15  for an undisclosed amount of money."  Questcor's MTD at 22.  Defendants are wrong.

16  Plaintiffs allege in detail the scheme of paying doctors and patients to promote
17  the drug, and gives specific examples of each.  *See, e.g.*, ¶¶40-41 (example of a
18  specific physician by name who received over $100,000 in consulting fees in one
19  year, including payments of $2,500 each time he discussed Acthar with another
20  physician); ¶41 (the same physician who received over $100,000 in consulting fees
21  was "one of the two highest Acthar-prescribing physicians at the end of 2011"); ¶43
22  (example of a patient paid by the Company to market the drug to other patients, who
23  was referred to Questcor by that same physician, including allegations that "Questcor

24  _____
[6]  These statements are not statements of "opinion," they are facts.  Questcor's
25  MTD at 20; *see, e.g.*,¶89 ("The Company maintains a compliance program, which is
led by an experienced compliance officer and includes the active participation of
26  Questcor's executive management team. . . .  The Company is committed to . . .
marketing Acthar in accordance with regulatory requirements and industry standard
27  practices."); ¶92 ("The Company does not provide financial incentives to doctors or
other healthcare practitioners to prescribe Acthar.").

28

- 12 -

1  provided training," "arranged the meetings," and "reviewed the patient contractors'

2  proposed presentations before they were presented").

3      In light of these allegations, defendants' contentions that "[p]laintiff simply

4  pleads no facts to support its inference that physicians and patients sold themselves

5  out to [Questcor] for an undisclosed amount of money," and that the Complaint is

6  "devoid of any concrete facts or examples," are patently wrong.  Questcor's MTD at

7  22-23.    These allegations render misleading defendants' repeated assertions

8  throughout the Class Period that Questcor's ever-increasing number of prescriptions

9  and revenues were based on legitimate sales practices and scientific research.  *Miller*

10  *v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (statements literally true on

11  their face may be misleading in context).  As the Ninth Circuit recently articulated,

> so long as the plaintiff alleges facts to support a theory that is not facially
> implausible, the court's skepticism is best reserved for later stages of the
> proceedings when the plaintiff's case can be rejected on evidentiary
> grounds.  "[A] well-pleaded complaint may proceed even if it strikes a
> savvy judge that actual proof of those facts is improbable, and that a
> recovery is very remote and unlikely."

15  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).[7]

16      Defendants' related contention that there are no facts "calling into question

17  [Questcor's] statement that it had no ***current*** arrangements with Dr. Bomback when

18  the statement was made in January 2012," is, in a word, shocking.  Questcor's MTD at

19  22 (emphasis in original).  According to the September 17, 2011 *New York Times*

20  article ***submitted to the Court by this very same defendant and counsel***, Dr. Bomback

21  ***did*** have a financial "arrangement" with Questcor at that time, proving the lie:

> Dr. Bomback and other Columbia researchers continue to analyze Acthar
> in  a  company-sponsored  clinical  trial.    As  for  the  $50,000-a-year

---

[7]      Defendants' citations on this point are off-point.  There is no allegation in this
case about  accounting fraud, as in *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d
707, 718 (E.D. Va. 2003).  *See* Questcor's MTD at 20.  Nor do plaintiffs allege
defendants were simply providing doctors with written "informational material," as in
*In re InterMune Inc. Sec. Litig.*, No. C 03-2954 SI, 2004 WL 1737264 (N.D. Cal. July
30, 2004).  *See* Questcor's MTD at 22.

- 13 -

1

2

consulting agreement he signed with Questcor in January 2010, Dr. Bomback said it was changed in April 2010 to $10,000 a year for five years "to comply with new rules adopted by Columbia University limiting consulting fees."

3

4

5

The university's policy was actually last changed in July 2009, said Douglas Levy, a spokesman.  It generally prohibits faculty with consulting payments over $10,000 from researching that company's products.

6

Mr. Levy declined to discuss Dr. Bomback's actions in detail, saying any university inquiry would be conducted and resolved privately.

7

8

9

10

11

12

*See* Ex. 8 to the Declaration of Virginia F. Milstead (Dkt. No. 94).[8]  And defendants have no response whatsoever to the unusual allegation that, "on January 13, 2012, the day following the [*StreetSweeper*] article's publication, Questcor arranged for . . . Dr. Bomback to upload a video on www.youtube.com in support of Questcor's marketing and insurance coverage efforts."  ¶91.

13

### 3.    Defendants Misled Investors About Insurance Coverage for Acthar

14

15

16

17

18

19

20

Due to Acthar's extreme cost, defendants and investors knew that insurance coverage was key to Questcor's sales and revenues from Acthar, as most patients simply could not afford it on their own.  In fact, defendants frequently reported the rate of insurance coverage on conference calls and in SEC filings.  In order to assure coverage for the drug, Questcor maintained an insurance "hub" that employed as many as 30 people (comprising 15% to 20% of the entire workforce), whose sole job was to assist patients with submitting insurance forms and obtaining reimbursement.

21

22

23

24

25

26

27

[8]    Defendants are hardly in a position to claim they are unaware of the "sources" of the allegations.  *See* Questcor's MTD at 9, 14-15, 21.  The important sources – those demonstrating defendants false and misleading statements – are cited throughout the Complaint.  *See, e.g.*, ¶¶79-84 (identifying false statements, who made them, where and when they appeared, along with date and title of specific analyst reports).  In fact, defendants have requested the Court review more than 100 additional exhibits, *claiming they know that most of them somehow form the basis for plaintiffs' allegations*.  *See, e.g.*, Request for Judicial Notice in Support of Questcor's Motion to Dismiss ("Questcor's RJN") (Dkt. No. 94) at 4; Request for Judicial Notice in Support of Individual Defendants' Motion to Dismiss ("Ind. Defs.' RJN") (Dkt. No. 89) at 1, 6-7, 10-11.

28

- 14 -

1   Defendants contend their statements concerning insurance coverage were
2   literally true at the time they were made.  That is, when defendants said coverage was
3   "above 85%," plaintiffs have not alleged that coverage was not, in fact, above 85%.
4   Questcor's MTD at 10 n.6.  But this is only half the inquiry, and ignores plaintiffs'
5   theory of fraud.

6   "Some statements, although literally accurate, can become, through their
    context and manner of presentation, devices which mislead investors.
7   For that reason, the disclosure required by the securities laws is not
    measured not by literal truth, but by the ability of the material to
8   accurately inform rather than mislead prospective buyers."

9   *Miller*, 519 F.3d at 886.  In this case, defendants' statements reassuring investors that
10  insurance coverage "remains very, very high" and "we expect that will be the case
11  going forward," combined with their other misrepresentations and omissions
12  concerning medical studies supporting Acthar prescriptions, created a materially
13  misleading impression for investors.  ¶81.  *See, e.g.*, *In re STEC Inc. Sec. Litig.*, No.
14  SACV 09-1304 JVS (MLGx), 2011 U.S. Dist. LEXIS 75093, at *19-*20 (C.D. Cal.
15  June 17, 2011), (truthful statements which omit information "could reasonably be
16  interpreted to create such an impression [] that the information omitted from the
17  statements could render them material, misleading 'half-truths'").

18  Defendants knew coverage at the reported levels could not and would not
19  continue indefinitely, because no reliable scientific/medical basis existed for Acthar
20  prescriptions for MS and NS, and there were much cheaper, more effective
21  alternatives.  Nevertheless, defendants not only reported "very, very high" levels of
22  coverage, they repeatedly sought to reassure the market that ***those levels of coverage***
23  ***were not in jeopardy***.  For example;

24  • Cartt noting growing "pushback" from carriers but also that the company
25    is "getting better at working with the plans through our reimbursement
      hub" so that reimbursement levels are not changing, "So overall, it's
26    kind of a draw between us and the payers ***and we expect that will be the***
      ***case going forward.  So, overall our coverage remains very, very high***
27    ***across all of our key therapeutic areas*."  ¶81.
28

- Cartt stating on a conference call: "***Our reimbursement team speaks with insurers multiple times daily and all indicators are that insurance coverage for Acthar and nephrotic syndrome should remain very strong***." ¶98.

- Bailey attempting to reassure investors, stating on a conference call: "***We have also heard the rumor that insurance companies are stopping their coverage of Acthar for nephrotic syndrome. As Steve reported, coverage of Acthar for nephrotic syndrome continues to be above 85%***." ¶99.

- Cartt stating on a conference call: "Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. . . . ***Further supporting coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. . . . So everything looks positive from our standpoint. The insurance coverage is good***." ¶104.

- Cartt stating on a conference call: "We're up at around 90% coverage. ***We see no indication that that's changing at all and are monitoring it closely. You know, we speak with payers, literally, on a daily basis as we work the prescriptions through our reimbursement hub, and we're seeing no indication there's any slow down in coverage whatsoever there***." ¶113.

These statements and others like them misled investors. Defendants knew there was scant medical basis supporting coverage, insurer 'pushback' was increasing early in the Class Period, yet they repeatedly told investors there was absolutely nothing to worry about. Having chosen to speak on the topic, they were obligated to tell investors the ***whole*** truth. *Berson*, 527 F.3d at 987 ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of").

Defendants seek to rely on their boilerplate warning that insurance coverage could change. Questcor's MTD at 1, 5, 11, 26. But this so-called warning simply

- 16 -

states what the market already knew – that insurance coverage was important to the company and could change.[9]   That of course is the very reason why analysts continually asked about it and why defendants continually reassured the market. *See, e.g.*, ¶¶55-57, 81, 98-99, 104, 113.

But as defendants also knew, insurance coverage required a demonstrable medical basis that could support coverage under the insurers' plans, *i.e.*, "medically necessary." *See, e.g.*, ¶¶11, 52.  And ***unbeknownst to the market***, there was no legitimate medical basis for prescribing or covering the cost of Acthar – it was being manipulated by defendants.  Rather than disclose this information, defendants traded on it.  This is fraud.

### 4. Defendants' Reported Financial Results and Forecasts Were False and Misleading

More than 99% of Questcor's annual revenues and earnings came from the sale of Acthar.  ¶3.  The Company's reported revenues, earnings, and various other reported financial results and projections were therefore entirely reliant on defendants' fraudulent scheme during the Class Period.  Because defendants repeatedly discussed the source and basis for the Company's financial results, and those results would not have been achieved but for defendants' fraudulent scheme, defendants' public statements concerning Questcor's financial results (including those filed with the SEC) were necessarily false and misleading.

Defendants argue that they could not have been false and misleading because plaintiffs have not alleged that the Company did not earn the amounts it claimed to have earned.  Questcor's MTD at 3, 23-25. This is simply a rehash of their argument concerning insurance coverage rates, and ignores the allegations.  Statements literally

---

[9]   Defendants do not contend that their false statements are "forward-looking" statements protected by the PSLRA's "safe harbor" provision.  15 U.S.C. §78u-5(c)(1).  Nor could they. *See, e.g.*, *Berson*, 827 F.3d at 986 ("[t]he passage, moreover, speaks entirely of as-yet-unrealized risks and contingencies.  Nothing alerts the reader that some of these risks may already have come to fruition . . . .").

1   true can still be misleading.  *See supra* at §III.A.3.  *Berson*, 527 F.3d at 987 ("[O]nce

2   defendants chose to tout the company's [earnings], they were bound to do so in a

3   manner that wouldn't mislead investors as to what [those earnings] consisted of.");

4   *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179-80 (S.D.N.Y. 2011)

5   ("If a company, like E*TRADE here [], 'puts the topic of the cause of its financial

6   success at issue, then it is obligated to disclose information concerning the source of

7   its success, since reasonable investors would find that such information would

8   significantly alter the mix of available information.'").  So too here.

9        **B.    Defendants Acted with Scienter**

10       Under §10(b), a complaint must "state with particularity facts giving rise to a

11  strong inference that the defendant acted with the required state of mind," or scienter.

12  15 U.S.C. §78u-4(b)(2).  The inquiry "is whether ***all*** of the facts alleged, taken

13  collectively, give rise to a strong inference of scienter, not whether any individual

14  allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 323

15  (emphasis in original); *Matrixx*, 131 S. Ct. at 1324 ("the court must review 'all the

16  allegations holistically'" when analyzing scienter).  A court must analyze whether the

17  facts plead render an inference of scienter "cogent" and "***at least as likely as***" – not

18  more likely than – "any plausible opposing inference." *Tellabs*, 551 U.S. at 314, 328

19  (emphasis in original).

20       Here, plaintiffs plead numerous facts and circumstances demonstrating

21  defendants' knowledge of their false statements.  Taken collectively and accepted as

22  true, plaintiffs' allegations "'giv[e] rise to a strong inference' that defendants acted

23  with the intent to deceive or with deliberate recklessness as to the possibility of

24  misleading investors."  *See Berson*, 527 F.3d at 987.  Thus, plaintiffs have pled

25  scienter.

26

27

28

852669_1

### 1. Defendants' Insider Selling Establishes a Strong Inference of Scienter

According to the Supreme Court, "it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 324. Not surprisingly then, "suspicious" Class Period stock sales by corporate insiders will demonstrate scienter. *See, e.g., Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003). "To evaluate suspiciousness of stock sales, [courts] consider, *inter alia,* three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Oracle*, 380 F.3d at 1232 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)); *accord In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989). Here, each of these factors and others weigh heavily in demonstrating a strong inference of scienter.

### a. Defendants Sold Suspicious Amounts and Percentages of Their Holdings During the Class Period

The amount and percentage of holdings sold by defendants during the Class Period were extremely suspicious. *See Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199 n.10 (C.D. Cal. 2004) ("the Court considers the amount *and* percentage of the shares sold") (emphasis in original). Combined, defendants Bailey, Cartt, Young, Medeiros and Blutt sold over 2.8 million shares of their Questcor stock *for proceeds of over $101 million* during the Class Period.[10] ¶¶61-62; *see Fecht v. Price Co.*, 70 F.3d

---

[10]    Defendants' assertion that "two insiders responsible for most of the challenged statements, Bailey and Mulroy, did not make any suspicious stock sales[] substantially undermin[es] Plaintiff's scienter allegations," is flat out wrong. *See* Individual Defendants' Motion to Dismiss ("Ind. Defs.' MTD") (Dkt. No. 88) at 13, 15. Plaintiffs' scienter allegations are not overcome by Bailey's trades allegedly pursuant to his 10b5-1 trading plan, *see infra*, §III.B.1.d., or a lack of trading by Mulroy during the Class Period. The Ninth Circuit and courts in this District have repeatedly held

852669_1

1    1078, 1084 (9th Cir. 1995) (sales of $1.6 million by two insiders found to be

2    suspicious); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (defendants' sale

3    of just $1,340,000 of company stock was suspicious).  The percentages of total

4    holdings sold by each of these five defendants, equating to 30.8%, 60.4%, 50.5%,

5    78.1% and 79.6%, are no less suspicious.[11]  ¶62; *see Johnson*, 394 F. Supp. 2d at

6    1199-1200 (finding sales of 18% of holdings "significant" when considered with

7    "significant" proceeds from those sales); *Marksman Partners, L.P. v. Chantal Pharm.*

8    *Corp.*, 927 F. Supp. 1297, 1312-13 (C.D. Cal. 1996) (sales of 20% of a corporate

9    insider's shares, "especially where the dollar amounts involved are high, may

10   constitute a 'suspicious amount' sufficient to support a scienter allegation").

11   ────────────────────────────────────────────

12   that "[s]cienter can be established even if the officers who made the misleading
     statements did not sell stock during the class period."  *Am. West*, 320 F.3d at 944;
13   *Buttonwood Tree Value Partners, LP v. Sweeney*, No. SACV10-00537-CJC(MLGx),
     2012 U.S. Dist. LEXIS 183438, at *6 (C.D. Cal. Dec. 10, 2012) ("the absence of stock
14   sales is not dispositive"); *Maiman v. Talbott*, No. SACV 09-0012 AG (ANx), 2010
     U.S. Dist. LEXIS 142712, at *16-*18 (C.D. Cal. Aug. 9, 2010); *Nguyen v. Radient*
15   *Pharm. Corp.*, No. SACV 11-0406 DOC (MLGx), 2013 U.S. Dist. LEXIS 71650, at
     *33 (C.D. Cal. May 17, 2013).

16

17   [11]    *Ronconi v. Larkin*, 253 F.3d 423, 435-36 (9th Cir. 2001) and *In re Immersion*
     *Corp. Sec. Litig.*, No. C-09 4073 MMC, 2011 U.S. Dist. LEXIS 24886, at *26 (N.D.
18   Cal. Mar. 11, 2011) do not suggest a different result.  *See* Ind. Defs.' MTD at 11 n.6.
     First, defendants inexplicably neglect to acknowledge that "the two [*Ronconi*] insiders
19   who made most of the representations at issue . . . sold only 10 percent and 17
     percent" of their total shares (*Ronconi*, 253 F.3d at 435) and instead carelessly assert
20   that the *Ronconi* "defendants sold between 69% and 98% of their stock."  Ind. Defs.'
     MTD at 11 n.6.  Importantly, the *Ronconi* court noted that while 10 and 17 percent
21   were "just above the 7.7 percent and 6.9 percent that [it] held not to be suspicious in
     *Silicon Graphics*," higher percentages "support an implication that [defendants] knew
22   the rosy characterizations were false when made."  253 F.3d at 435-36.  Moreover,
     unlike here, most of the *Ronconi* defendants "sold at about what the stock was worth
23   after the bad news was public, not when they might have gained market advantage
     from as yet undisclosed bad news."  *Id.* at 435.  Similarly, while the *Immersion* court
24   found that defendants' sales were not suspicious, the *Immersion* defendants actually
     ***retained*** 79.11% and 90.28% of their holdings when exercisable options were
25   included.  *Immersion*, 2011 U.S. Dist. LEXIS, at *26-*27.  Defendants, however,
     misrepresent that defendants ***sold*** 79.11% and 90.28% of their stock holdings when
26   exercisable options were included.  Ind. Defs.' MTD at 11 n.6.  The fact that the
     *Immersion* defendants' sales occurred during a period in which the stock value would
27   have been artificially depressed further weighed against scienter.  *Immersion*, 2011
     U.S. Dist. LEXIS, at *26-*27.

28

1    Defendants only response to plaintiffs' allegations concerning the substantial

2  percentages and staggering amounts of defendants' Class Period sales is to complain

3  that plaintiffs chose an "unusually long class period" in order to "sweep as many stock

4  sales into their totals as possible."  *See* Ind. Defs.' MTD at 11-12.  This is a red

5  herring.  The 18-month Class Period is hardly "unusually long" in light of the scope of

6  the fraud alleged here.  *See, e.g.*, *Batwin v. Occam Networks Inc.*, No. CV 07-2750

7  CAS (SHx), 2008 U.S. Dist. LEXIS 52365, at *2-*3, *43-*45 (C.D. Cal. July 1, 2008)

8  (finding stock sales during three and a half year class period supported inference of

9  scienter); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 404-406 (S.D.N.Y.

10  2003) (same for three year class period).

11    In any event, plaintiffs' chosen start date of April 4, 2011 coincides with

12  Questcor's announcement of its preliminary first quarter 2011 financial results – the

13  first statement plaintiffs allege to be false and misleading – which culminated in a

14  one-day 20% share price increase.  ¶¶67-68.[12]  And the Class Period ends when their

15  fraudulent scheme is finally exposed – it is announced the U.S. Attorney's office is

16  investigating the Company's sales practices and the stock price plummets.  ¶¶122-123.

17  Defendants give no reason why this is not the appropriate Class Period, nor do they

18  suggest any other dates upon which the Class Period should begin or end.[13]

19

20

_____

21  [12]    On April 4, 2011 defendants announced to the market record growth in MS
22  prescriptions and that the Company's strong first quarter 2011 performance "was driven by increasing productivity of our recently expanded Acthar sales force."  ¶67.
23  These statements were false and misleading, drove the Company's stock price up 20%, and created an opportunity for defendants to dramatically profit from their stock
24  sales.

25  [13]    This is the Class Period alleged by other plaintiffs as well.  *See, e.g.*, *Heng v. Questcor Pharm., Inc.*, No. 8:12-CV-01707 (class period of April 4, 2011 to
26  September 21, 2012); *Ho v. Questcor Pharm., Inc.*, No. 8:12-CV-01814 (same); *Glucksberg v. Questcor Pharm. Inc.*, No. 8:12-CV-01975 (same); *Norton v. Questcor*
27  *Pharm., Inc.*, No. 8:12-CV-01623 (class period of April 26, 2011 to September 21, 2012), *Danon v. Questcor Pharm., Inc.*, No. 8:12-CV-01717 (same).

28

852669_1

### b. Defendants' Class Period Sales Were Suspiciously Timed

The timing of defendants' massive sales was also extremely suspicious. Defendants regularly took advantage of the price increases created by their false statements by trading at opportune times as the Company's stock price ascended from below $15 per share on April 4, 2011, to a Class Period high of $57.89.  ¶¶13, 62-64, 68.  For example, on October 25, 2011, defendants announced false and misleading "record" financial results and reassured the market regarding insurance coverage. ¶¶64, 79-81, 85.  That day and the next, analysts raved and raised their price targets for Questcor stock.  ¶¶82-83.  Finally, on October 27, 2011, Questcor filed with the SEC its Quarterly Report on Form 10-Q which contained false and misleading statements concerning, *inter alia*, the Company's financial results and research and development efforts.  ¶¶84-85.  Questcor's stock price rose dramatically as a result of these false and misleading statements, jumping from $33.30 per share on October 25, 2011 to $41.35 per share on October 27, 2011.  ¶¶64, 83.  Defendants Cartt, Young and Medeiros quickly capitalized on this then-record high stock price, selling a combined 450,000 shares over the next two trading days for proceeds of nearly $19 million.  ¶¶61, 64; *see also* Ex. A.

The sales by defendants Cartt and Young occurred at a then-record high price for the stock, and constituted more stock than they had sold on any other single day during the Class Period or during the 18 months leading up to it, while defendant Medeiros had his third largest trading day during that period.  ¶¶61, 63-64.  These sales, like many others by defendants throughout the Class Period, immediately follow false and misleading positive announcements and constitute strong evidence of scienter.[14]  *See, e.g., In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, 2005

---

[14]    *See, e.g.*, ¶¶61, 69-72 (defendant Medeiros sold 289,713 Questcor shares for nearly $6 million the week following defendants' April 26-27, 2011 announcement of "a very good start this year" and positive clinical data regarding Acthar as a treatment

1    U.S. Dist. LEXIS 20831, at *30-*31 (N.D. Cal. Jan. 6, 2005) (finding inference of

2    scienter where stock sales dramatically increased at price peaks during Class Period).

3           Relying on district court decisions from other circuits, defendants contend the

4    strong inference of scienter associated with defendants' stock sales is "negated"

5    because several of the sales "occurred more than ten months before the alleged

6    corrective disclosures."[15] But this argument simply ignores the reality that defendants

7    sold at opportune times following their false and misleading statements.  To require

8    insider sales occur *only* at the end of the Class Period would assume that defendants

9    always know when their fraudulent scheme is coming to an end, and always sell

10   accordingly.

11          Moreover, defendants' argument ignores that between October 10, 2011 to

12   January 11, 2012, the day on which *TheStreetSweeper.org* raised the first red flags

13   about Questcor's marketing practices, defendants Bailey, Cartt, Young, Medeiros and

14   Blutt sold a combined 1,086,132 shares of Questcor stock for over $45.7 million,

15   representing over 45% of their total Class Period sales.  ¶¶61-62, 86.   While

16   defendants vehemently denied *TheStreetSweeper.org*'s allegations and the stock price

17   eventually recovered and continued its rise as defendants' fraud persisted, this mid-

18   Class Period corrective disclosure resulted in 15% one-day decline in Questcor's stock

19   price.  ¶87.  Defendants Bailey and Blutt sold an additional 104,730 shares of

20   Questcor stock in late August and September 2012, less than one month prior to the

22   for NS); ¶¶61, 74-77 (defendants Cartt, Young and Medeiros sold a combined 130,013
23   Questcor shares for over $4 million the week following defendants' July 26-29, 2011
     release of "terrific" financial results for the second quarter 2011).

24   [15]    In each of those cases, a long lag time between sales and the corrective
25   disclosure may have weakened the inference of scienter, but in no case did it "negate"
     it.  *See, e.g., In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384-85 (E.D.N.Y.
26   2003) (stock sales one year prior to disclosure did not support scienter); *In re Credit
     Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) (ten-month
27   gap between sales and disclosure weakens scienter inference drawn from those early
     sales).

1  ultimate disclosures.  ¶61; *see, e.g.*, *Provenz*, 102 F.3d at 1491 (finding sales 96 days

2  before disclosure raised strong inference of scienter).

3        Defendants' additional assertion that "any negative inference" is undermined

4  where defendants' sales were not timed to the very Class Period high is of a piece.

5  *See* Ind. Defs.' MTD at 12-13.  To satisfy the "timing" element, plaintiffs must allege

6  that defendants took financial advantage of their false statements, not that all of their

7  sales occurred at the Class Period's highest price.  *See, e.g.*, *In re Daou Sys.*, 411 F.3d

8  1006, 1024 (9th Cir. 2005) (finding insider sales probative of scienter even though

9  defendant sold at a maximum price of $22.86 per share while the Class Period high

10  reached $34.375 per share).  Defendants' citation to *Ronconi* does not help them here.

11  In *Ronconi*, defendants "sold at about what the stock was worth after the bad news

12  was public, not when they might have gained market advantage from as yet

13  undisclosed bad news."  253 F.3d at 435.  In stark contrast, defendants' sales here

14  occurred at prices well above the post-disclosure lows, and at times when they "gained

15  market advantage from as yet undisclosed news."  *Id.*; *see* ¶¶63-64; Ex. A.  Because

16  defendants sold as Questcor's stock price was progressing ever-upward to new

17  historical highs, and at prices generally well in excess of the post-disclosure low, or

18  otherwise shortly before a corrective disclosure, the timing of defendants' massive

19  sales was extremely suspicious.  ¶¶63-64.

20
21         **c.**    **Defendants' Class Period Sales Were Dramatically out of Line with Prior Trading Practices**

22        Finally, defendants' Class Period stock sales were highly inconsistent with the

23  prior pattern of their sales.  *See Oracle*, 380 F.3d at 1232 (finding inference of scienter

24  supported by fact that sales were inconsistent with prior trading history); *Hayley v.*

25  *Parker*, No. SACV 01-69 DOC (EEx), 2001 U.S. Dist. LEXIS 23255, at *16 (C.D.

26  Cal. Aug. 31, 2001) (same); *In re Omnivision Techs.*, No. C-04-2297 SC, 2005 U.S.

27  Dist. LEXIS 16009, at *14-*15 (N.D. Cal. July 29, 2005) (same).  During the roughly

28  18-month Class Period, defendants Bailey, Cartt, Young, Medeiros, and Blutt sold

1    2,890,251 Questcor shares for proceeds of over $101 million.  ¶¶18, 20-23, 61-62.

2    During a period of the same length, immediately prior to the Class Period, however,

3    no defendant had a single sale except for Young, who on November 2, 2010 sold

4    28,125 Questcor shares for proceeds of $346,781.  ¶63 n.6; *see Apple Computer*, 886

5    F.2d at 1111 (comparing ten month class period to ten months immediately preceding

6    class period to determine whether alleged class period insider trading was consistent

7    with the prior pattern of sales).  And that figure pales in comparison to his own Class

8    Period sales.  ¶¶62-63.[16]  *See* Ex. A.

9           Unable to demonstrate that defendants' stock sales during the period equal in

10   length and immediately prior to the Class Period were consistent with defendants'

11   Class Period stock sales, defendants resort to a comparison of defendants' sales from

12   as far back as 2006.  *See* Ind. Defs.' MTD at 14.  This is improper.  Not only should

13   this Court disregard the stock sales figures from 2009 and earlier as presented by

14   defendants, *see* Plaintiffs' Consolidated Opposition to Requests for Judicial Notice

15   ("Pltfs.' RJN Opp.") at 6-7, [17] but the comparison defendants request this Court make

16

17   _____

18   [16]    Defendants suggest that their lack of pre-Class Period sales was partially the
       result of a "blackout period" in place "during the final months of the FDA application
19   and approval process" that prevented them from trading in late 2010 and early 2011.
       *See* Ind. Defs.' MTD at 6-7, 14.  The existence and extent of this supposed blackout
20   period, however, is disputed. More importantly, it appears to be directly contradicted
       by the fact that ***defendant Young sold 28,125 shares on November 2, 2010***.  ¶63 n.6.
21   Nonetheless, the existence and impact of a blackout period is a factual dispute not for
       this stage of the litigation.  *Johnson*, 394 F. Supp. 2d at 1200 (noting the existence of a
22   dispute among the parties as to the lifting of a trading bar and holding that "[t]he
       Court cannot resolve this issue at the pleadings stage").

23   [17]    Even if the Court were to accept defendants' proposed charts and figures as
       true, the "pattern of selling" that defendants attempt to demonstrate is belied by
24   defendants' same charts and figures. Ind. Defs.' MTD at 14; *see, e.g.*, Gray Decl., ¶28
       (indicating defendant Cartt sold five times over a seventeen month period in 2008 to
25   2009 but then sold nine times during a six month period in 2011); Gray Decl., ¶30
       (indicating defendant Medeiros sold three times over a 15 month period in 2008 to
26   2009 but then sold ten times during a seven month period in 2011); *Id.*, ¶¶32-33
       (indicating defendant Blutt and his private equity firm sold once before the Class
27   Period in 2011 but then sold seven times during the Class Period).

28

is clearly contrary to Ninth Circuit authority.  *See Apple Computer*, 886 F.2d at 1111.[18]

### d. Defendants' Attempts to Discount Their Insider Selling Are Unavailing

Defendants' assertion that they retained a small portion of their shares is of little consequence here.  *See* Ind. Defs.' MTD at 14-15, 25.  First, "the proposition that a strong inference of scienter is negated by the fact that [defendants] retained . . . stock during the class period" should be rejected since "the Court cannot take judicial notice of the [defendants'] stock purchases" or post-class period stock holdings.  *Buttonwood Tree*, 2012 U.S. Dist. LEXIS 183438, at *5-*6.[19]  Second, the majority of total holdings "retained" by defendants, if any, appear to be stock options – not stock.  *See* Ind. Defs.' MTD at 14 (asserting defendant Bailey "held over 147,000 shares and over one million exercisable options" at the end of the Class Period).  "[V]ested options are not shares," however, and thus their retention at the end of the Class Period is irrelevant to the scienter analysis.  *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999); *see also In re Evci Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) ("vested but unexercised options are not shareholdings").  Finally, the significant percentages of total holdings sold by defendants during the Class Period in conjunction with plaintiffs' other scienter allegations, are more than sufficient to satisfy an inference of scienter and outweigh

---

[18]     *In re Lexar Media, Inc. Sec. Litig.*, No. C-04-2013 SC, 2005 U.S. Dist. LEXIS 21467, at *21-*23 (N.D. Cal. July 5, 2005) is not dissimilar.  *See* Ind. Defs.' MTD at 14.  There the court compared a "prior period" of three months with a "class period" of six months in finding that class period sales were not out of line with earlier transactions.  *Lexar Media*, 2005 U.S. Dist. LEXIS 21467, at *21 n.2, *22-*23.

[19]     If the Court chooses to consider "'matters outside the pleading, it must convert the motion to dismiss into one for summary judgment'" and allow discovery.  *Rush v. Walter Energy, Inc.*, No. 2:12-CV-281-VEH, 2013 U.S. Dist. LEXIS 11589, at *7-*8 (N.D. Ala. Jan. 29, 2013) (quoting *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985)).  *See* Plaintiffs' Motion to Strike the Declaration of Andrew R. Gray (filed concurrently herewith) at 13-14.

1   any contrary inference from defendants' alleged retention of shares.  ¶62; *see, e.g., In*

2   *re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal.

3   2003) (class period sales of 7.6% of holdings supported inference of scienter).[20]

4          The fact that Bailey claims his Class Period sales were made pursuant to a

5   10b5-1 trading plan also fails to overcome plaintiffs' strong scienter allegations.  *See*

6   Ind. Defs.' MTD at 13, 15-16.  Rule 10b5-1 creates an ***affirmative defense*** for

7   defendants, which must be pled in their Answer and proven at trial.  It is therefore

8   inappropriate to consider the impact of a Rule 10b5-1 trading plan at the pleading

9   stage.  *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal.

10  2009) (existence of a 10b5-1 trading plan is an affirmative defense).  SEC regulations

11  require that a Rule 10b5-1 plan specify the amount of the securities to be sold, the date

12  and price of the sales, or a formula for determining the amount, date and price, and

13  that the plan was "entered into in good faith."  *See* 17 C.F.R. §240.10b5-1(c).  At the

14  pleading stage, however, "this Court cannot determine from the face of the pleadings

15  whether these criteria have been sufficiently satisfied to establish this affirmative

16  defense."  *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 48 (D.D.C. 2007).[21]

17         Moreover, courts and commentators alike have noted that ***Rule 10b5-1 trading***

18  ***plans can be manipulated for the very purpose of carrying out a fraudulent scheme***

---

20      Defendants' reliance on *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d
1142, 1160 (C.D. Cal. 2007) is misguided.  Questcor's MTD at 14-15.  Unlike here
where only defendants Bailey and Mulroy claim to have retained the "majority" of
their stock holdings, in *Hansen* seven out of the eight individual defendant retained
the majority of their holdings.  ¶62; *Hansen*, 527 F. Supp. 2d at 1160.  The *Hansen*
court also made clear that it was only those seven defendants who "potentially would
suffer the same losses as other investors when the value of Hansen's stock dropped."
*Id*.  But more importantly, and in direct contrast to plaintiffs' allegations here, *see
supra* §III.B.1.b., the *Hansen* plaintiff "failed to link any Individual Defendant's sale
of stock to any of the alleged misstatements by Hansen."  *Hansen*, 527 F. Supp. 2d at
1160-61.

21      *Cf. In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 n.2 (9th Cir.
2012) (class period stock sales that take place under ***preexisting*** trading plans and
which ***are not "out of line" with prior trading volume*** "do not ***by themselves*** support
an inference of scienter").

1  *of insider trading*.  *See, e.g.*, *In re InfoSonics Corp. Deriv. Litig.*, No. 06cv1136 BTM

2  (WMC), 2007 U.S. Dist. LEXIS 66043, at *24-*25 (S.D. Cal. Sept. 4, 2007)

3  ("whether these trading plans were legitimately adopted or were put in place after

4  learning of material, nonpublic information that could affect the price of stock, cannot

5  be resolved at the pleading stage"); Allan Horwich, *The Origin, Application, Validity,*

6  *and Potential Misuse of Rule 10b5-1*, 65 Bus. Law. 913, 949-50 (2007) ("If an

7  executive knows that his or her Plan will result in a sale of company stock on a

8  particular date, he or she may be able to cause a delay in the disclosure of unfavorable

9  news so that the expected stock price decline is deferred until after the sale, thereby

10  producing larger proceeds."); *Freudenberg*, 712 F. Supp. 2d at 200 ("A Rule 10b5-1

11  trading plan may give rise to an inference of scienter because 'a clever insider "might

12  maximize" their gain from knowledge of an impending price drop over an extended

13  amount of time, and seek to disguise their conduct with a 10b5-1 plan.'").

14      That defendant Bailey "implemented a Section 10b5-1 trading plan in the

15  second quarter of 2011"[22] and "in July 2012, [] adopted a substantially similar plan,"

16  thus can only raise a question of fact not capable of resolution at the pleading stage.

17  *See* Ind. Defs.' MTD at 7. [23]   Nonetheless, the stark contrast between Bailey's stock

18  sales before and after the Class Period undermines the premise of his 10b5-1 trading

19  plans.  *See* 17 C.F.R. §240.10b5-1(c)(1)(i)-(iii); *see also Backe v. Novatel Wireless,*

20  *Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (finding that "the unusual pattern of

21

22

---

23  [22]    Perhaps coincidentally, perhaps not, the first week of the second quarter of 2011 was when defendants began to make false statements.  ¶67; *see Freudenberg*, 712 F.

24  Supp. 2d at 200 ("Trading plans are not a cognizable defense to scienter allegations on a motion to dismiss where, as here, they were adopted during the Class Period.").

25  [23]    Should the Court take judicial notice of Exs. 12 and 22 as defendants request,

26  *see* Ind. Defs.' MTD at 7, 14-15, which it should not (*see* Pltfs.' RJN Opp. at 4-7), determining the sufficiency of the terms of defendant Bailey's trading plan requires a

27  fact-heavy examination that is inappropriate at the pleading stage.  *See InfoSonics*, 2007 U.S. Dist. LEXIS 66043, at *24-*25.

28

1  sales supports and inference of scienter" despite trades being made pursuant to a

2  10b5-1 plan).[24]

3          e.    **Defendants' Use of Company Money to Buy
                **Millions of Shares While They Were Selling
4                **Supports a Finding of Scienter**

5          Finally, because Questcor's stock price was inflated and insiders were

6  simultaneously selling the Company's stock, defendants' use of Company money to

7  make Questcor's Class Period stock purchases supports a finding of scienter.

8  Apparently without irony, defendants contend the stock was ***undervalued*** at the time

9  they caused the Company to repurchase shares (*see* Ind. Defs.' MTD at 5).  Of course

10  this  is belied by defendants' own massive insider ***sales*** at the very same time.  *See*

11  *Am. West*, 320 F.3d at 939 (company repurchases combined with insider sales are

12  suspicious); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1188

13  (C.D. Cal. 2008) (same).

14          For example, defendants had Questcor repurchase 3.6 million shares during

15  April and May 2012 at a cost to the Company of over $153 million – when the price

16  of Questcor stock was hitting another all-time high – while defendants personally sold

17  more than 221,000 shares during the same period for what defendants claim to be a

18  "minimal" $9.4 million.  ¶¶62, 65; *see* Ind. Defs.' MTD at 18.  Yet, in stark contrast,

19  _____

20  [24]    Similarly, the suspiciousness of defendant Medeiros' stock sales is not
21  undermined by defendants' claims that he made no misstatements.  Ind. Defs.' MTD
     at 15-16.  "Under the group pleading doctrine, there is 'a presumption that the
22  allegedly false and misleading group published information' complained of is the
     collective action of officers and directors."  *In re Omnivision Techs.*, No. C-04-2297
23  SC, 2005 U.S. Dist. LEXIS 16009, at *16-*17 (N.D. Cal. July 29, 2005) (quoting
     *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 706 (9th Cir. 1999)).  Because defendant
24  Medeiros was a senior Questcor executive responsible for the day-to-day operations of
     the Company, the alleged false and misleading SEC filings and press releases issued
25  by the Company – and particularly those occurring after February 2012 when he was
     promoted to Chief Technical Officer and Executive Vice President – may be attributed
26  to him.  *See*, *e.g.*, ¶¶94-95, 100, 103, 105, 111, 115.  Moreover, Medeiros'
     participation in bi-weekly senior leadership meetings where research and sales
27  forecasts were discussed and his highly suspicious insider sales of over $35 million
     worth of Questcor stock demonstrate his scienter.  ¶¶47-48, 62.

28

1  and despite being authorized to repurchase shares, defendants caused the Company to

2  purchase absolutely no Questcor stock in 2010 when the Company's stock was trading

3  at much lower prices.  ¶66.  In truth, the only reason for causing Questcor to purchase

4  shares in the open market during the Class Period and not before was to prop up the

5  Company's stock while defendants unloaded their shares.  In other words, Questcor's

6  "buying could reasonably have augmented market demand . . . allowing more sales

7  without depressing prices."  *Countrywide*, 588 F. Supp. 2d at 1187.  It fails reason for

8  Questcor to make a large purchase at the same time defendants are selling, unless their

9  purpose is fraudulent.  *Id*. at 1188.

10  ## 2.  Defendants' Incentive Compensation Supports a Strong Inference of Scienter

11  Pleading motive is not a required element of scienter or of fraud in general.

12  While a plaintiff is not obligated to allege a defendant's motivation to commit fraud,

13  courts have held that well-pled allegations of motive contribute to the totality of

14  allegations supporting a strong inference of scienter.  *Howard v. Everex Sys.*, 228 F.3d

15  1057, 1064 (9th Cir. 2000) (motive allegations combined with other "red flags"

16  establish scienter); *Nguyen v. Radient Pharm. Corp.*, No. SACV 11-0406 DOC

17  (MLGx), 2011 U.S. Dist. LEXIS 122533, at *9 (C.D. Cal. Oct. 20, 2011) (same).

18  In addition to the insider trading allegations set forth above – which standing

19  alone establish a strong inference of scienter – the Complaint bolsters this inference

20  with allegations that defendants were motivated to mislead investors in order to obtain

21  massive stock option awards and other forms of incentive compensation.  ¶44; *see*

22  *Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a

23  scienter inference"); *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008)

24  ("A motive to defraud based on compensation incentives such as bonuses . . . also may

25  strengthen an inference of scienter.").  Defendants' incentive compensation, which

26  ranged from 240% to 677% of salary for the executive defendants in 2011, was

27  "substantial in relation to the individual Defendants cash compensation" and provided

28

added motivation to defendants to commit fraud.  *Winslow v. BancorpSouth, Inc.*, No.
3:10-00463, 2011 U.S. Dist. LEXIS 45559, at *69 (M.D. Tenn. Apr. 26, 2011)
(finding inference of scienter where performance-based compensation comprised
nearly 75% of the value of defendants' total compensation); ¶44.  These allegations,
viewed holistically with plaintiffs' other allegations, contribute to a strong inference
of scienter.[25]

### 3. Facts Supporting the Core Operations Inference Establishes a Strong Inference of Scienter

Allegations establishing fraud in a company's "core operations" can
demonstrate a strong inference of scienter.  *See, e.g.*, *S. Ferry LP v. Killinger*, 542
F.3d 776, 784 (9th Cir. 2008); *Berson*, 527 F.3d at 989; *Am. West*, 320 F. 3d at 941-
43.  In *South Ferry*, the Ninth Circuit confirmed that "the core operations inference
can be one relevant part of a complaint that raises a strong inference of scienter."  542
F.3d at 784.  Thus, "[a]llegations regarding management's role in a corporate structure
and the importance of the corporate information about which management made false
or misleading statements may also create a strong inference of scienter when made in
conjunction with detailed and specific allegations about management's exposure to
factual information within the company."  *Id.* at 785.  In fact, even standing alone, a
senior manager's role can satisfy scienter where the facts were "prominent enough
that it would be 'absurd to suggest' that top management was unaware of them."
*Berson*, 527 F.3d at 989 (citing *Am. West*, 320 F. 3d at 943 n.21); *see also S. Ferry*,
542 F.3d at 786.

The crux of defendants' fraud goes to the very heart of Questcor's business as a
biopharmaceutical company with essentially one product, Acthar.  ¶¶2-3, 17, 31,

---

[25]  Defendants' Class Period stock sales also greatly exceeded defendants' Class
Period compensation, providing further indicia of scienter.  *See* ¶¶44, 61, 62; *In re
Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (finding
that trades that "were substantial in comparison to [corporate officers'] overall
compensation" support and inference of scienter").

852669_1

73(g), 78(f), 85(g), 102(g), 106(g), 116(f).  Notably, each alleged false statement relates directly to the promotion and/or effectiveness of Acthar as a treatment for MS or NS, and/or receiving payment related thereto.  *See generally* ¶¶67-116.  At the time defendants made these statements, Acthar sales accounted for over 99% of Questcor's revenue, with the treatment for IS accounting for less than 10% of those revenues.  ¶¶3, 31, 34.  Given the overarching significance of MS and NS related Acthar sales to the Company's business, it would be "'absurd to suggest'" defendants were unaware that Acthar's "success" was the result of improper sales and marketing practices, and manipulation of the available research.  *Berson*, 527 F.3d at 988; *see also In re Amylin Pharm., Inc. Sec. Litig.*, No. 01cv1455 BTM(NLS), 2002 U.S. Dist. LEXIS 19481, at *22 (S.D. Cal. Oct. 10, 2002) (finding scienter sufficiently pled where complaint alleged "SYMLIN was Amylin's primary drug candidate and Amylin is a small biotech company") (citing *Nathenson v. Zonagen, Inc*., 267 F.3d 400, 425-26 (5th Cir. 2001) (officer's position supports the inference of scienter where the company in question "was essentially a one product company")).

In support of this inference, the Complaint pleads each defendants' active role within Questcor, including facts that "suggest" defendants had access to information concerning Acthar's effectiveness and its business prospects.  *South Ferry*, 542 F.3d at 785-86 (finding allegations regarding "management's role in a company" support a strong inference of scienter "where they are particular and suggest that defendants had actual access to the disputed information"); *Berson*, 527 F.3d at 988 (Because defendants were "directly responsible for Applied Signal's day-to-day operations," . . . "it is hard to believe that they would not know about stop-work orders that allegedly halted tens of millions of dollars of the company's work.").

In this case, defendants were the most senior executives and directors of a Company with a mere 150 to 200 full-time employees, 70% of whom were engaged in "sales and commercialization activities."  ¶¶18-23, 25, 45; *Occam Networks*, 2008 U.S. Dist. LEXIS 52365, at *34 ("Given [the company's] relatively small size and

1   plaintiff's allegations regarding the officer defendants' considerable involvement . . . ,

2   plaintiff's allegations of scienter are persuasive.").[26]   Each of these defendants

3   received regular reports on Acthar sales and total "paid prescriptions" and discussed

4   Acthar sales forecasts and any new Acthar "research" or "studies" at regular bi-

5   weekly, monthly and/or quarterly meetings.   ¶¶25, 45-50, 55-57.   Bailey and Cartt

6   even had the ability to access actual sales numbers in real time.   ¶50.   Under the

7   circumstances "it is exceedingly unlikely" that the false statements made by

8   defendants – those "at the top of the corporate pyramid" – concerning essentially the

9   Company's only product were based on merely careless mistakes rather than an intent

10  to deceive or deliberate recklessness. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513

11  F.3d 702, 711 (7th Cir. 2008).

12       The inference of scienter is even stronger where, as here, defendants were

13  "hands-on managers."   *Verifone*, 704 F.3d at 710 (scienter demonstrated where

14  defendants were "hands-on managers with respect to operational details and financial

15  statements"); *Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG(RNBx), 2013

16  U.S. Dist. LEXIS 68026, at *52-*53 (C.D. Cal. May 8, 2013) (finding allegations that

17  defendants were "hands-on" managers supports "core operations" inference).[27]   This is

18  particularly true where managers ***admit*** their involvement in the company's operations

19  at the heart of the alleged fraud. *Daou*, 411 F.3d at 1022-23 ("[S]pecific admissions

20  from top executives that they . . . monitored portions of the company's database are

21  factors in favor of inferring scienter. . . ."); *Oracle*, 380 F.3d at 1231 (finding strong

22  

_____

23  [26]       Another 15% of Questcor's entire workforce was devoted to assisting Acthar
24  patients with obtaining insurance reimbursement.   ¶54.

25  [27]       Cartt was well aware of the marketing risks associated with Acthar due to his
    previous employment as an executive for a pharmaceutical company where he
26  oversaw a division involved in off-label promotion of a drug that would ultimately
    cause his former company to plead guilty to criminal misconduct for illegally
27  promoting the drug and pay more than $200 million in penalties to resolve a
    government action.   ¶20.

28  

852669_1

1    inference of scienter where, among other things, CEO stated "'[w]e know exactly how

2    much we have sold in the last hour around the world'").

3         Here, the Complaint provides numerous examples of defendants repeatedly

4    saying they closely monitored insurance coverage.  *See, e.g.*, ¶55 (Defendants

5    admitted insurance coverage was an important issue that they were "monitoring []

6    closely."); *id.* (Defendant Cartt stated that "we speak with payers [insurers] literally on

7    a daily basis as we work the prescriptions through our reimbursement hub."); ¶56

8    (Defendant Cartt assured analysts that "overall our coverage remains very, very high

9    across all of our key therapeutic areas."); ¶58 (Defendants rejected the notion that

10   "insurers' scrutiny could soon be causing sales of Acthar Gel to top out," instead

11   providing that insurance reimbursement continued to be "very good" and was around

12   "90%."); *see also* ¶¶81, 98, 99, 104, 113.

13        Similarly, defendants indicated they kept a close eye on the Company's

14   investigator-led studies, and Questcor's compliance programs.  *See, e.g.*, ¶71 (Cartt

15   stating, "we know that the studies have been progressing and what we hear from the

16   investigators . . . some of them at least are working on wrapping studies up or made

17   significant progress. . . ."); ¶89 ("The Company maintains a compliance program,

18   which is led by an experienced compliance officer ***and includes the active***

19   ***participation of Questcor's executive management team*.").  These admissions by

20   defendants support a strong inference of scienter.  *In re Verifone Holdings, Inc. Sec.*

21   *Litig.*, 704 F.3d at 708 (inference of scienter is "more compelling" where defendants

22   made public statements touting the very issue).

23        The Complaint's particular allegations demonstrate defendants had direct access

24   to, and did access through their executive and board positions, information about the

25   Company's core operations critical to its financial success and their own personal

26   fortunes.  Alone, and certainly when viewed "holistically" with plaintiffs' other

27

28

852669_1

1   scienter allegations, these core operations allegations raise a strong inference of

2   scienter.  *Matrixx*, 131 S. Ct. at 1324.[28]

3       **C.    Plaintiffs Adequately Pled Loss Causation**

4       To allege loss causation, a plaintiff must simply plead "sufficient detail to give

5   defendants ample notice of plaintiffs' loss causation theory, and to give [the Court]

6   some assurance that the theory has a basis in fact."  *Berson*, 527 F.3d at 989-90;

7   *Gilead Scis.*, 536 F.3d at 1056 (same).  The question of loss causation is inherently

8   fact driven.  As a result, it "'becomes most critical at the proof stage'" and therefore

9   "it is normally ***inappropriate to rule on loss causation at the pleading stage***."  *Gilead*

10  *Scis.*, 536 F.3d at 1057.  Thus, plaintiffs need only satisfy Rule 8(a) to plead this

11  element of a section 10(b) claim, or enough facts "'to raise a reasonable expectation

12  that ***discovery*** will reveal ***evidence*** of 'loss causation.'"  *Id.*[29]

13      In this case plaintiffs have clearly pled that defendants' false statements

14  increased the stock price during the Class Period, and once the truth concerning

15  defendants' false and misleading statements became known to the market, the price of

16  Questcor's securities fell precipitously.  *See, e.g.*, ¶¶8, 68, 76, 83, 121, 123, 126.

17  Nothing more is required.  *Gilead Scis.*, 536 F.3d at 1056.

18  _____

19  [28]    Questcor additionally contends that a finding that the Company acted with
    scienter is precluded because plaintiffs "failed adequately to plead that any of the
20  Individual Defendants acted with scienter."  Questcor's MTD at 25-26.  This is wrong.
    Not only are plaintiffs' allegations concerning the scienter of the Individual
21  Defendants sufficient to establish Questcor's scienter, *see, e.g.*, *Nguyen*, 2013 U.S.
    Dist. LEXIS 71650, at *32, but an inference of corporate scienter may exist even
22  where no individual defendants' scienter is found.  *See Glazer Capital Mgmt. v.
    Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (stating collective scienter allegations
23  may support an inference of corporate scienter even when the knowledge of individual
    officers and directors cannot be determined); *Makor Issues & Rights, Ltd.*, 513 F.3d at
24  710 ("[I]t is possible to draw a strong inference of corporate scienter without being
    able to name the individuals who concocted and disseminated the fraud.").

25  [29]    Defendants cases do not suggest a different outcome.  *See, e.g.*, *In re Nuveen
26  Funds/City of Alameda Sec. Litig.*, No. C 08-4575 SI, 2011 WL 1842819, at *5-*12
    (N.D. Cal. May 16, 2011) (deciding loss causation at the ***summary judgment*** stage);
27  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) (same).
    Questcor's MTD at 28.

28

                            - 35 -

### 1. The Disclosure that Aetna Would Not Cover Acthar Prescriptions Because It Was Not "Medically Necessary" Was a "Corrective Disclosure"

As demonstrated above, plaintiffs have pled defendants' fraudulent scheme in great detail. Specifically, plaintiffs allege that reimbursement by insurance companies was critical to defendants' ability to maintain Questcor's rapid earnings growth and that typically, health insurers will cover treatments that are "medically necessary." ¶¶51-52. Defendants were aware that as Questcor began aggressively pushing Acthar for the treatment of indications such as MS and NS for which there is no clinical data supporting Acthar's efficacy, insurance companies would take notice, and in fact, they did. ¶53. To offset defendants' concern about obtaining reimbursement for Acthar for indications other than IS, Questcor employed a staff of as many of 30 people whose sole responsibility was to assist patients with obtaining insurance reimbursements. ¶54. Importantly, defendants freely admitted during the Class Period that insurance coverage was an important issue to them and they were "monitoring it closely." ¶¶55, 113.

Plaintiffs also allege numerous false and misleading statements by defendants concerning its insurance coverage. *See, e.g.*, ¶81 ("So, overall our coverage remains very, very high across all of our key therapeutic arears."); ¶98 ("Our reimbursement teams speaks with insurers multiple times daily and all indicators are that the insurance coverage for Acthar and nephritic syndrome should remain very strong."); ¶113 ("We are at around 90% coverage. We see no indication that that's changing at all and are monitoring it closely. You know, we speak with payers, literally, on a daily basis as we work the prescriptions through our reimbursement hub, and we're seeing no indication that there's any slow down in coverage whatsoever there.").

Last, plaintiffs further allege that on September 19, 2012, Citron reported that Aetna, one of the nation's largest insurers, had engaged in its own medical review of the indications for which the FDA had approved Acthar, and based on its finding, Aetna determined that clinical research supported only one of the 19 indications – IS.

852669_1

¶¶11, 59, 118-119.  In Aetna's clinical policy bulletin issued in connection with its review, Aetna reported that studies suggested that the drug is only "'medically necessary'" for IS, and not for other indications, such as MS or NS that are treated with steroids.  ¶¶11, 60, 119-120.  As a result, Aetna would be revising its policies concerning Acthar which would severely limit its coverage of Acthar.  ¶118-119.  In response to this news, Questcor's stock plummeted $24.17 per share to close at $26.35 per share on September 19, 2012, *a one-day decline of nearly 48% on massive volume*. ¶¶11, 121.  Thus, plaintiffs have more than adequately alleged that the Aetna bulletin was a corrective disclosure for the purposes of a Rule 12 motion to dismiss. *In re Amgen, Inc. Sec. Litig.,* 544 F. Supp. 2d 1009, 1026 (C.D. Cal. 2008).  And defendants offer no alternative explanation for this stock price decline.

### 2.   The Disclosure that the U.S. Attorney's Office Was Investigating Questcor's Sales and Marketing Practices Was a "Corrective Disclosure"

On September 24, 2012, Questcor filed a Form 8-K with the SEC in which it admitted that the U.S. government had initiated an investigation into the Company's promotional practices.  ¶¶12, 122.  On this news, the Company's stock dropped another $11 per share to close at $19.08 per share on September 24, 2012, *a one-day decline of 37% on volume of more than 31 million shares*.  ¶¶12, 123.

Questcor's contention that an announcement of a governmental investigation can never qualify as a corrective disclosure as a matter of law, is simply wrong. Questcor's MTD at 29-30.  To the contrary, the announcement of a governmental inquiry "at this stage in the litigation" is sufficient to establish loss causation as long as plaintiffs "adequately allege underlying facts and scienter of misrepresentations or omissions that eventually led to this disclosure." *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-10-1735-PHX-JAT, 2011 WL 5101787, at *17 (D. Ariz. Oct. 27, 2011); *see also Gilead Scis.*, 536 F.3d 1441 (public disclosure of FDA warning letter followed by stock price decline months later sufficient to plead loss causation).  As set forth in great detail above, plaintiffs allege the underlying facts and scienter relating to

1    defendants' promotional practices which led to the September 24, 2012 disclosure.

2    Accordingly, "at this stage in the litigation" plaintiffs alleged sufficient facts related to

3    the September 24, 2012 disclosure to establish loss causation.  *Apollo*, 2011 WL

4    5101787, at *17; *Gilead Scis.*, 536 F.3d at 1057.[30]

5         Defendants' reliance on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d

6    1049 (9th Cir. 2008) is misplaced for this very reason.  Questcor's MTD at 29-30.  In

7    *Metzler*, plaintiffs failed to tie the announcement of the investigation to the alleged

8    company-wide fraudulent scheme.  540 F.3d at 1063.  But that is not the case here, as

9    the scheme alleged consists of defendants' sales and marketing practices – the very

10   topic announced to be the purpose of the investigation by the U.S. Attorneys' office.

11   ¶122.

12        **D.    Defendants Are Separately Liable for Violating §10(b) and
                  SEC Rule 10b-5 for Trading on Inside Information**

13        Even assuming, *arguendo*, that each of the defendants did not themselves make

14   a false or misleading statement to the market in violation of §10(b), defendants Bailey,

15   Cartt, Young, Medeiros and Blutt are still be liable for insider trading.  17 C.F.R.

16   §240.10b5-1(b).  To assert an insider trading violation, a plaintiff need only allege that

17   defendants traded "while in possession of material, nonpublic information." *Johnson*,

18

19   _____

20   [30]    Questcor's assertion that "[t]he Ninth Circuit rule [that the announcement of a
         governmental investigation does qualify as a corrective disclosure] is in harmony with

21   the weight of authority in other circuits as well" is similarly wrong and misleading.
         Questcor's MTD at 30 n.21.  Indeed, as the court noted in *Apollo* "there is a split of

22   authority among district courts with regard to whether the announcement of an
         investigation is sufficient to plead loss causation" and specifically noted the *Maxim*

23   case relied upon by Questcor.  2011 WL 5101787, at *17 & n.10.  *See also In re Take-
         Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287 (S.D.N.Y. 2008) (finding

24   allegation of 7.5% drop in share price sufficient, stating that "[o]ther courts have
         found that similar allegations of significant stock drops in response to announced SEC

25   investigations are sufficient to plead loss causation under the framework established
         by *Dura* and its progeny").  Finally, the very case relied upon by Questcor, *Meyer v.*

26   *Greene*, 710 F.3d 1189 (11th Cir. 2013), does not support this proposition.  In *Meyer*,
         the court did not establish a bright line rule, holding only that "the commencement of

27   an SEC investigation, ***without more***, is insufficient to constitute a corrective
         disclosure.  *Id*. at 1201.

28

394 F. Supp. 2d at 1198-99 (citing *SEC v. Adler*, 137 F.3d 1325, 1337-39 (11th Cir. 1998)), *aff'd*, 490 F.3d 778 (9th Cir. 2007). "[A] purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." 17 C.F.R. §240.10b5-1(b).

With the exception of Mulroy, defendants here sold over $101 million worth of their Questcor stock during the Class Period with knowledge that research supporting Acthar's effectiveness was vastly insufficient and that, as a result, insurance companies would eventually restrict their coverage of the expensive drug. This was a "classic" violation of Exchange Act §10(b) and SEC Rule 10b-5. *United States v. O'Hagan,* 521 U.S. 642, 651-52, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997) ("Under the 'traditional' or 'classical theory' of insider trading liability, §10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information."); *Am. West*, 320 F.3d at 937 ("Trading on material, nonpublic 'information qualifies as a "deceptive device" under §10(b) . . . .' Thus, the fact that [certain defendants did not make] any of the allegedly misleading statements does not shield them from liability."). The suspicious nature of defendants' Class Period stock sales, and facts demonstrating the core operations inference combined with plaintiffs' allegations establishing that defendants were aware of the problems that ultimately caused Questcor's stock price to tumble, supplies the necessary scienter. *Johnson,* 394 F. Supp. 2d at 1198-99.

### E. Defendants Are Liable as Control Persons Under §20(a)

To state a claim for violation of the Exchange Act §20(a), plaintiffs must allege: "(1) a primary violation of federal securities laws . . .; and (2) that the defendant[s] exercised actual power or control over the primary violator." *Howard*, 228 F.3d at 1065. It is enough to plead that defendants had the ability to control the primary wrongdoer. *Id*. Plaintiffs allege, and defendants do not contest, that defendants are control persons and had the power to control Questcor. Defendants simply argue that

852669_1

1   this claim must be dismissed because plaintiffs have failed to properly plead the

2   underlying §10(b) claim.  Questcor's MTD at 25.  However, as demonstrated above,

3   plaintiffs' §10(b) claim is properly plead.  Thus, the §20(a) claim should be sustained.

4           **F.    Defendants Bailey and Blutt Are Liable Under §20A**

5           To adequately plead a §20A violation, "a plaintiff must plead (1) a predicate

6   violation of the securities laws, . . . and (2) facts showing that the trading activity of

7   plaintiffs and defendants occur[red] 'contemporaneously[.]'" *In re Countrywide Fin.*

8   *Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1074 (C.D. Cal. 2008).  As set forth

9   above, plaintiffs have adequately alleged a predicate violation under §10(b).  The

10  Complaint also adequately alleges contemporaneous trades between defendants Bailey

11  and Blutt and named plaintiff Glucksberg, along with other class members, which

12  defendants do not contest.  *See, e.g.*, ¶¶147-148; *see also* Questcor's MTD at 25.

13  Accordingly, plaintiffs have satisfied the requirements of §20A.

14  **IV.    CONCLUSION**

15          For the foregoing reasons, plaintiffs respectfully request defendants' motions to

16  dismiss be denied in their entirety.  If the Court should grant any part of defendants'

17  motions, plaintiffs respectfully request leave to amend.  *See* F.R.C.P. 15(a)(2).

18  DATED:  July 3, 2013                    Respectfully submitted,

19                                          ROBBINS GELLER RUDMAN
                                             & DOWD LLP
20                                          ANDREW J. BROWN
                                            ERIK W. LUEDEKE
21

22                                          s/ ANDREW J. BROWN
23                                          ANDREW J. BROWN

24                                          655 West Broadway, Suite 1900
                                            San Diego, CA  92101
25                                          Telephone:  619/231-1058
                                            619/231-7423 (fax)
26
                                            Lead Counsel for Plaintiffs
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

LAW OFFICE OF ALFRED G.
    YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Additional Plaintiffs' Counsel

852669_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 3, 2013.

<div style="margin-left:40%">

 s/ ANDREW J. BROWN
ANDREW J. BROWN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        andrewb@rgrdlaw.com

</div>

852669_1

- 42 -

## Mailing Information for a Case 8:12-cv-01623-DMG-JPR

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  rabadou@ktmc.com,knguyen@ktmc.com,arobles@ktmc.com

- **Brian Barry**
  bribarry1@yahoo.com

- **David E Bower**
  dbower@faruqilaw.com,ecf@faruqilaw.com,mblackman@faruqilaw.com,dure@faruqilaw.com

- **Andrew J Brown**
  andrewb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Marshall Dees**
  mdees@holzerlaw.com

- **Michael Ira Fistel , Jr**
  mfistel@holzerlaw.com

- **Jon C Furgison**
  jonfurg@gmail.com

- **Todd M Garber**
  info@toddgarberlaw.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com

- **Michael M Goldberg**
  mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

- **Andrew Gray**
  andrew.gray@lw.com,everett.bulthuis@lw.com,#ocecf@lw.com,whitney.bruder@lw.com,manny.abascal@lw.com,jana.roach@lw.com

- **Eli R Greenstein**
  egreenstein@ktmc.com,arobles@ktmc.com

- **Corey D Holzer**
  cholzer@holzerlaw.com

- **Michele D Johnson**
  michele.johnson@lw.com,#ocecf@lw.com,jana.roach@lw.com

- **Stacey M Kaplan**
  skaplan@ktmc.com,arobles@ktmc.com

- **Catherine J Kowalewski**
  katek@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com

- **Nicole Lavallee**
  nlavallee@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Erik W Luedeke**
  eluedeke@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com

- **Virginia F Milstead**
  virginia.milstead@skadden.com,avelkes@skadden.com

- **Peter Bradley Morrison**
  peter.morrison@skadden.com,alejandra.lopez@skadden.com,allison.velkes@skadden.com

- 11 -

- **Thomas Jerome Nolan**
  thomas.nolan@skadden.com,carl.roth@skadden.com

- **Erik David Peterson**
  epeterson@ktmc.com,knguyen@ktmc.com,arobles@ktmc.com

- **Darren J Robbins**
  darrenr@rgrdlaw.com

- **Joseph J Tabacco , Jr**
  jtabacco@bermandevalerio.com,ysoboleva@bermandevalerio.com

- **Peter Allen Wald**
  peter.wald@lw.com,#sfdocket@lw.com

- **David C Walton**
  davew@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)