UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 1 of 33 |
|---|---|---|---|

Present: The Honorable   DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| VALENCIA VALLERY | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: [IN CHAMBERS] ORDER RE DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' MOTION TO STRIKE [DOC. ## 88, 92, 106]**

**I.
INTRODUCTION**

On March 5, 2013, Plaintiff John K. Norton, individually and on behalf of all others similarly situated, filed the Consolidated Class Action Complaint[1] ("CAC") against Defendants Questcor Pharmaceuticals, Inc.; Don M. Bailey; Michael H. Mulroy; Stephen L. Cartt; David Young; David J. Medeiros; and Mitchell J. Blutt.[2]  [Doc. # 83.]  The CAC raises the following alleged violations:  (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 against all Defendants; (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t against Individual Defendants Bailey, Mulroy, Cartt, Medeiros, and Young; and (2) Section 20A, 15 U.S.C. § 78t-1, against Defendants Bailey and Blutt.

On May 6, 2013, Questcor and the Individual Defendants filed separate Motions to Dismiss.  [Doc. ## 88, 92.]  Questcor and the Individual Defendants each joined in their co-Defendants' motions.  [Doc. ## 95, 96.]  On July 3, 2013, Plaintiff filed a Motion to Strike the Declaration of Andrew R. Gray, Exhibits, and All References Thereto.  [Doc. # 106.]  The Court held a hearing on September 13, 2013.  Having duly considered the parties' arguments as presented in their briefs and at oral argument, the Court **DENIES** Plaintiffs' motion to strike, and **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

---

[1] On January 4, 2013, the action was consolidated with the following cases:  *Heng v. Questcor Pharm., Inc., et al.*, CV 12-01707 DMG (FMOx); *Danon, et al. v. Questcor Pharm., Inc., et al.*, CV 12-01717 DMG (FMOx); *Ho v. Questcor Pharm., Inc., et al.*, CV 12-01814 DMG (FMOx); and *Glucksberg v. Questcor Pharm. Inc., et al.*, CV 12-01975 DMG (FMOx).

[2] All Defendants except Questcor are collectively referred to as the "Individual Defendants."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | | Date | October 1, 2013 |
|---|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | | Page | 2 of 33 |
|---|---|---|---|---|

## II.
## REQUESTS FOR JUDICIAL NOTICE AND MOTION TO STRIKE

District courts have "inherent power to control their docket." *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010). This power includes the authority to "strike from the docket material that is improperly part of the record, such as material that is procedurally improper or that fails to comply with the Court's rules or orders." *Omaha Steaks Int'l, Inc. v. Pathak*, 2011 U.S. Dist. LEXIS 79520, at *2 (C.D. Cal. Jul. 21, 2011) (striking documents as improperly filed because they were not subject to judicial notice as requested).

In support of their Motion to Dismiss, Questcor and the Individual Defendants filed Requests for Judicial Notice ("RJN") asking the Court to take notice of 59 documents. [Doc. ## 89, 90.] The RJNs contain the following types of documents:

(1)   Forms filed by Questcor with the SEC, including Forms 8-K Current Reports, 10-K Annual Reports, Schedule 14A Definitive Proxy Statements, 10Q Quarterly Reports, and Forms 3 and 4 Stock Ownership and Insider Trading Reports;

(2)   Explanatory charts prepared by counsel;

(3)   News articles and analyst reports from various sources published during and immediately following the Class Period discussing Questcor;

(4)   Transcripts of conference calls and presentations given by the Individual Defendants on behalf of Questcor; and

(5)   An abstract of the Bomback Study, discussed in greater depth below.

As a general rule, the Court may consider only the pleadings and properly attached documents on a Rule 12(b)(6) motion. *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). There are two exceptions to this rule. First, courts may consider evidence "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.* (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). Second, courts may take judicial notice of "matters of public record," but not of facts that may be "subject to reasonable dispute." *Id.* at 999 (citing Fed. R. Evid. 201; *Lee*, 250 F.3d at 689). Specifically, courts "may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed." *Id.* (citing *Lee*, 250 F.3d at 689). This rule applies with equal force in the context of securities cases. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 (C.D. Cal. 2012) (taking judicial notice of SEC filings only to prove the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 3 of 33 |
|---|---|---|---|

"existence and content" of the filings, not the truth of the information contained in them); *Teamsters Local 617 Pension & Welfare Funds v. Apollo Gp., Inc.*, 633 F. Supp. 2d 763, 776 (D. Ariz. 2009) (same); *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) (taking judicial notice of SEC Forms 4 and the fact that they were filed, but not of the truth of their contents).

Bearing these principles in mind, the Court grants Defendants' request as to the SEC filings at Individual Defs.' RJN, Exhibits 1-20 and 22-27 and Questcor's RJN, Exhibits 2-4, 13, 14, 20-28, 30, and 32.[3]  *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 (9th Cir. 2006) (SEC filings appropriate for judicial notice).  The Court grants Defendants' request as to the analyst reports and newspaper articles contained at Questcor RJN, Exhibits 1, 6-8, 10, 12, 18, 19, 29, and 31, as these are documents a court may consider in a motion to dismiss securities fraud claims to establish "whether and when certain information was provided to the market," not the truth of the matters asserted therein.  *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008) (quoting *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 987 n.1 (D. Ariz. 1999)).  The Court also grants Defendants' request as to the Bomback Study abstract, referenced in the CAC, only for the purpose of determining the information that was made public about Acthar, not the scientific viability of those findings.  (Questcor RJN, Ex. 10.)  The Court also takes judicial notice of Questcor's RJN, Exhibits 5, 11, and 16, as these documents are referenced in the CAC.  *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007).

Plaintiffs challenge the charts, prepared by counsel, contained in Exhibits 23 through 27 that summarize the Individual Defendants' stock transactions as reported in their SEC Forms 3 and 4, as well as charts of similar information contained in paragraphs 23 through 33 of the Gray Declaration.  As these charts are not necessary to the Court's analysis, the Court need not determine whether it may consider them.

In light of the foregoing, Plaintiffs' motion to strike is **DENIED**.  The documents are considered only to establish whether and when information was provided to the market, not to establish the truth of the matters asserted therein.  *See Wet Seal*, 518 F. Supp. 2d at 1158.

---

[3] Plaintiffs do not object to consideration of Individual Defs.' RJN Ex. 21, a table of stock price information from May 7, 2007 to September 30, 2012.  As this document was compiled from publicly available sources not subject to reasonable dispute, the Court may consider it.

CIVIL MINUTES—GENERAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | | Date | October 1, 2013 |
|---|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | | Page | 4 of 33 |
|---|---|---|---|---|

## III.
## FACTUAL BACKGROUND[4]

Defendant Questcor is a publicly traded biopharmaceutical company which produces and markets the product H.P. Acthar Gel, or Repository Corticotropin Injection ("Acthar" or "ACTH"). (CAC ¶ 3.) During the Class Period, Questcor employed between 150 and 200 individuals, over 70% of whom were engaged in sales and commercialization activities. (*Id.*) During the Class Period, the Individual Defendants served as officers and directors of Questcor in the following capacities: Chief Executive Officer (Bailey); Chief Financial Officer, Senior Vice President, General Counsel, Corporate Secretary (Mulroy); Chief Operating Officer, Chief Business Officer, Executive Vice President (Cartt)[5]; Chief Scientific Officer (Young); Chief Technical Officer, Executive Vice President (Medeiros)[6]; director (Blutt). (*Id.* ¶¶ 18-23.)

Plaintiffs are individuals who purchased stock between April 4, 2011 and September 21, 2012, inclusive ("the Class Period"). (CAC ¶ 1.) Lead Plaintiffs, West Virginia Investment Management Board and Plumbers & Pipefitters National Pension Fund, are pension plans that have the "largest financial interest in the relief sought by the class" as required under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). Both entities purchased Questcor securities during the Class Period and allege that they were damaged as a result of Defendants' wrongdoing. (CAC ¶¶ 14-15.)

Acthar is an injectable drug that is currently FDA-approved for a number of indications, including infantile spasms ("IS"), multiple sclerosis ("MS"), and the treatment of proteinuria in nephrotic syndrome ("NS"). (*Id.*) Sales of Acthar account for more than 99% of Questcor's annual revenue. (*Id.*) Acthar has been on the market for more than 60 years, and Questcor purchased it in 2001. (CAC ¶ 4.) At that time, Acthar was being used almost exclusively to treat IS, although it was not FDA-approved for that indication. (*Id.* ¶ 32; Individual Defs.' RJN, Ex. 7.) In 2007, Questcor applied for, and eventually was granted, "orphan status" for Acthar for the treatment of IS, which would provide Questcor with seven years of marketing exclusivity. (*Id.*) Questcor raised the price of Acthar from $1650 per vial to $23,000 per vial, making Acthar

---

[4] The Court assumes the truth of Plaintiffs' factual allegations solely for purposes of deciding Defendants' motions to dismiss.

[5] Cartt served as COO beginning in February 2012. He served in the other executive positions prior to that. (CAC ¶ 20.)

[6] Medeiros served as Executive Vice President beginning in February 2012. He previously served as Senior Vice President. (CAC ¶ 22.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 5 of 33 |
|---|---|---|---|

profitable for the first time in history in 2007. (*Id.*) Shortly after the 2007 price hike, Questcor embarked on an "aggressive strategy" to market Acthar for the treatment of MS and NS. (*Id.* ¶ 33.) Questcor markets Acthar as a "second line treatment" for MS patients who are not responsive to steroids. (*Id.*) It markets Acthar as a first line treatment for proteinuria in NS. (*Id.*)

A.    **Questcor-Sponsored Studies on Acthar**

As part of its new marketing strategy for Acthar, Questcor began "sponsoring" studies by treating physicians who were "paid large sums to act as 'consultants.'" (CAC ¶ 35.) Questcor used the results of these studies to encourage doctors to prescribe Acthar and to assist patients in obtaining insurance coverage for Acthar treatments. (*Id.*) According to Plaintiffs, "the so-called studies conducted at defendants' behest were conducted by physicians with undisclosed economic interests in supporting defendants' product and driving Acthar sales." (*Id.* ¶ 36.)

One such study was published by Dr. Andrew S. Bomback of Columbia University in 2010 ("Bomback Study"). (CAC ¶ 37; Questcor's RJN, Ex. 10.) The Study observed 21 NS patients who had been treated with Acthar and found that 9 of 11 patients with a certain type of NS "responded well to treatment." (CAC ¶ 37.) The Study concluded that "Acthar is a viable treatment option for" that specific type of NS. (Questcor's RJN, Ex. 10.) Questcor "hailed" the Study as "the first modern test of Acthar for kidney patients and presented its results to treating nephrologists and insurers" in support of its marketing efforts. (CAC ¶ 37.) The Study's abstract disclosed that it was funded, in part, by Questcor. (Questcor's RJN, Ex. 10.) On January 13, 2012, Bomback uploaded a video onto the website YouTube in which he stated that "Acthar may be a particularly promising therapy for idiopathic membranous nephropathy and in particular for idiopathic membranous nephropathy that is resistant to prior immunosuppressive therapy." (CAC ¶ 91.)

Questcor has also publicly touted the results of a 2011 study by Dr. Laurence H. Beck, which allegedly found that Acthar may have ameliorative effects for patients of idiopathic membranous NS. (Questcor's RJN, Ex. 17 at 10.)

Plaintiffs allege that the Bomback Study was "inherently flawed" in part because it used retrospective observation of only 21 patients rather than prospective double blind trials. (CAC ¶ 38.) In addition, as of 2010, Bomback had a contract with Questcor under which he received $50,000 per year for consulting services. (*Id.*; Questcor's RJN, Ex. 8.) In a press release issued on January 16, 2012, Questcor stated that it "has no current financial agreements with Dr. Bomback. As Questcor was learning about the nephrology field and beginning to speak with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|----------|---------------------------|------|-----------------|

| Title | *In re Questcor Securities Litigation* | Page | 6 of 33 |
|-------|----------------------------------------|------|---------|

nephrologists about Acthar, Dr. Bomback was a consultant to the Company with financial arrangements that were within industry norms." (CAC ¶ 92.) According to a *New York Times* article published on September 7, 2011, however, in January 2010, Bomback signed a five-year consulting deal with Questcor under which he would receive $50,000 per year for consulting services. (Questcor's RJN, Ex. 8.) That agreement was apparently changed in April 2010 to provide Bomback with only $10,000 per year. (*Id.*)

In 2011, Questcor reported that it had initiated a Phase IV randomized, double blind, dose-response trial to study Acthar in the treatment of NS, but the record does not indicate whether that trial has been completed or its results. (Questcor's RJN, Ex. 27.) In 2013, Questcor reported that there were 35 company-sponsored research projects on the use of Acthar in treating NS, among other conditions. (Individual Defs.' RJN, Ex. 20.) According to Plaintiffs, Questcor terminated studies when it was sponsoring when it became clear that the study would not yield positive results for Acthar. (CAC ¶ 39.) According to one unnamed nephrologist, Questcor allegedly stated that it was "O.K. with [the nephrologist] stopping the study because [they] weren't getting the results." (*Id.*) The CAC references a second study, analyzing Acthar's treatment of MS, which was terminated prior to publication. (*Id.*)

Another doctor, Dr. Stanley A. Brod, was among doctors who were allegedly compensated by Questcor to promote Acthar. (CAC ¶ 41.) Brod has been described as "the best salesperson that [Questcor] had." (*Id.*) Brod was paid $2500 each time he told another doctor about Acthar and allegedly earned over $100,000 a year under this arrangement. (*Id.*) According to Plaintiffs, Questcor's consulting arrangements did not comply with the PhRMA Code, a voluntary compliance program widely adopted throughout the pharmaceutical industry which sets limits on consulting fees. (*Id.* ¶ 42.)

Questcor also contracted with patients who had achieved favorable results from Acthar. (CAC ¶ 43.) These patients attended meetings with other MS patients to promote the drug. (*Id.*) Questcor trained these individuals, arranged the meetings, and compensated the patients for their work. (*Id.*)

According to the CAC and SEC filings, Questcor repeatedly referenced its investment in "research and development . . . to better understand the therapeutic benefit of Acthar in current and new therapeutic applications." (CAC ¶ 77.) Plaintiffs allege that these studies were "designed to and used to convince physicians to prescribe Acthar." (*Id.* ¶ 8.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 7 of 33 |
|---|---|---|---|

**B.      Insurance Reimbursements**

According to the CAC, insurance companies typically reimburse only for treatments that are "medically necessary."  (CAC ¶ 52.)  They tend not to provide coverage for services that are "experimental, investigational, unproven, or not medically necessary."  (*Id.* ¶ 52 (citing the policy of UnitedHealthcare as an example).)

As Questcor began marketing Acthar for MS and NS, it employed a staff of individuals whose job was to assist patients with obtaining insurance reimbursement.  (*Id.* ¶ 54.)  The Individual Defendants repeatedly referenced insurance coverage as a sign of Questcor's financial health in press releases, conference calls, and SEC filings.  (*See, e.g.*, *id.* ¶ 56.)  For example, on October 25, 2011, Cartt informed analysts that "overall our coverage remains very, very high across all of our key therapeutic areas."  (*Id.*)  On other occasions, he stated that "all indicators are that insurance coverage for Acthar . . . should remain very strong"; "everything looks positive from our standpoint.  The insurance coverage is good"; and "we see no indication that [coverage] is changing at all and are monitoring it closely."  (*Id.* ¶¶ 98, 99, 104.)  Bailey made a similar statement to investors regarding coverage for NS treatments on February 22, 2012.  (*Id.* ¶ 58.)  Questcor's SEC filings during the Class Period contained a generic warning to investors that the risk of decreased reimbursements could adversely affect the price of Questcor stock.  (*See, e.g.*, Questcor's RJN, Ex. 10 at 29.)

**C.      The Individual Defendants' Stock Sales During the Class Period**

The Individual Defendants attended monthly and quarterly meetings at which some or all of the Individual Defendants discussed Questcor's financial status, sales forecasts, and marketing strategies.  (CAC ¶¶ 46-48.)

With the exception of Mulroy, each of the Individual Defendants sold significant amounts of Questcor common stock during the Class Period at prices that were "artificially inflated" as a result of Questcor's aggressive marketing strategy and alleged misleading statements.  (CAC ¶ 61.)  The Individual Defendants' sales collectively totaled 2,890,251 shares sold and yielded proceeds of $101,521,867.  The Individual Defendants except Mulroy each earned between approximately $7 million and $35 million in sales of shares during the Class Period.  (*Id.*)  Bailey created a 10b5-1 Insider Trading Plan during the second quarter of 2011, and thereafter sold shares on a regular basis through the end of the Class Period.  (*See* CAC ¶ 61; Individual Defs. RJN, Ex. 12.)  In the 18 months preceding the Class Period, none of the Insider Defendants sold any Questcor stock, with the exception of a single sale by Young on November 2, 2010.  (*Id.* ¶ 63.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | **SA CV 12-01623 DMG (FMOx)** | | Date | October 1, 2013 |

| | | | | |
|---|---|---|---|---|
| Title | *In re Questcor Securities Litigation* | | Page | 8 of 33 |

Many of the Class Period sales occurred at times when Questcor was trading at or near historical highs. (CAC ¶ 64.)  For example, on October 25, 2011, Defendants announced record quarterly financial results, and the stock climbed by 21% the next day. (*Id.*)  Over the next two days, Defendants sold 450,000 shares for proceeds of almost $19 million. (*Id.*)  Nevertheless, the Individual Defendants also sold at prices significantly below the Class Period high of $57.64 per share. (*See id.* ¶ 107.)  For example, Medeiros and Cartt made sales in April and May of 2011 at between $20 and $23 per share. (*Id.*)  Overall, however, Questcor's share price increased from $14.92 on April 4, 2011 to $23.07 on May 31, 2011. (Individual Defs. RJN, Ex. 21.)

Allegedly in order to maintain the artificially inflated stock price, the Individual Defendants caused Questcor to repurchase approximately six million shares at a cost of more than $243 million during the Class Period. (CAC ¶ 65.)  These repurchases were pursuant to a stock repurchase plan that Questcor reportedly first approved in 2008. (Individual Defs.' RJN, Ex. 18.)  Questcor reportedly modified the repurchase plan in May 2009 and May 2012, each time increasing the repurchase authorization. (*Id.*)  Despite the existence of the repurchase plan, Questcor did not repurchase any shares of common stock in 2010. (Individual Defs.' RJN, Ex. 13.)  For example, in April and May 2012, four Individual Defendants sold over $10 million of their stock, and Questcor repurchased over 3.6 million shares at a cost of more than $153 million. (CAC ¶ 65.)  Plaintiffs allege that these buy-backs were "manipulated and suspiciously timed . . . to support [D]efendants' insider sales." (*Id.* ¶ 66.)

**D.      The Individual Defendants' Compensation**

In 2011, each of the Individual Defendants except Blutt earned between $342,147 and $584,875 in base salary. (CAC ¶ 44.)  In addition, they received Options Awards of between $375,545 and $2,628,815, and Non-Equity Incentive Plan Compensation of between $468,881 and $1,332,540. (*Id.*)  Their combined Incentive and Option Awards added between 240% and 677% of the Individual Defendants' base salary to their total earnings in 2011. (*Id.*)

**E.      Disclosures and the Decline in Questcor Stock**

On January 11, 2012, a website called *TheStreetSweeper.org* announced that it had initiated a "short position" on Questcor.[7]  (CAC ¶ 86.)  StreetSweeper reported that it had "discovered 'serious questions about the aggressive marketing practices that [Questcor] has used

---

[7] A short position is the sale of a borrowed security, commodity, or currency with the expectation that the asset will fall in value.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 9 of 33 |
|---|---|---|---|

to generate explosive—but potentially unsustainable—growth in prescriptions for its only drug.'" (*Id.*) The same day, Questcor issued a press release responding to StreetSweeper, stating its belief "that its marketing and business practices are consistent with regulatory requirements and industry standard practices." (*Id.* ¶ 89.) Following the StreetSweeper announcement, Questcor's stock fell $6.20 per share from $41.54 on January 10, 2012 to $35.34 on January 11, 2012. (CAC ¶ 87.) Bomback uploaded the YouTube video promoting Acthar on January 13, 2012. (*Id.* ¶ 90.) On January 16, 2012, Questcor issued another release responding to StreetSweeper's allegations in a question-and-answer format. (*See* Questcor's RJN, Ex. 5.) In that release, Questcor stated that it "does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar" and denied any "current" financial arrangement with Bomback. (*Id.* ¶ 92.) Questcor also referred to the "growing body of more recent scientific data supporting the use of Acthar to treat proteinuria in nephrotic syndrome." (*Id.*)

On July 9, 2012, Questcor's stock reached its all-time high, closing at $57.64 per share. (CAC ¶ 107.) On July 10, 2012, Citron Research issued a report entitled "Questcor: A Single Digit Stock in 18 Months or Less and Here's Why." (*Id.* ¶ 108.) The report addressed the lack of credible scientific data to support Questcor's aggressive marketing of Acthar for NS and MS treatment. (*Id.*) It also highlighted the unusually high resources that Questcor had been expending to market Acthar. (*Id.*) The Citron Report pointed out the substantial insider selling by the Individual Defendants and predicted that "insurers' scrutiny could soon be causing sales of Acthar Gel to top out." (*Id.*) Following the Citron Report, Questcor's stock fell $12.57 per share to close at $45.07 per share on July 10, 2012, a one-day decline of nearly 22%. (*Id.* ¶ 109.) In the days that followed, however, other analysts came to Questcor's defense and discredited the Citron Report as rehashing old arguments. (*Id.* ¶ 110.) Questcor's stock recovered slowly over the next month. (*See* Individual Defs.' RJN, Ex. 21.)

On September 14, 2012, Aetna, one of the nation's largest insurers, issued a clinical policy bulletin revising its policies concerning coverage for Acthar. (CAC ¶ 118.) Aetna reported that it considered Acthar medically necessary for IS but "not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications." (Questcor's RJN, Ex. 31.) It also stated that it considered Acthar to be "experimental and investigational" for all other indications. (*Id.*) On September 19, 2012, Citron issued a second report in response to the Aetna bulletin, criticizing analysts for continuing to defend Questcor despite its earlier warnings about Questcor's data and marketing practices. (*See* Questcor's RJN, Ex. 1.) Also on September 19, 2012, *Bloomberg* reported that, according to an Aetna spokesperson, Aetna made its decision "based on a lack of clinical evidence that the drug is more effective than steroids." (CAC ¶ 120.) Following the Aetna

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 10 of 33 |
|---|---|---|---|

bulletin, Questcor's stock plummeted $24.10 per share, to $26.35 per share on September 19, 2012. (*Id.* ¶ 121.)

On September 24, 2012, Questcor filed a Form 8K with the SEC in which it admitted that the United States government had initiated an investigation into its promotional practices. (CAC ¶ 122; Questcor's RJN, ¶ 32.) The same day, Questcor's stock dropped an additional $11.05 to a closing price of $19.08. The same week, analysts issued reports that Questcor was paying a "too-high honorarium" to prescribing doctors. (CAC ¶ 122.)

On December 28, 2012, the insurer Blue Cross Blue Shield of Michigan announced that it would not provide coverage for Acthar for any indication other than IS. (CAC ¶ 124.) On January 2, 2013, the public learned that UnitedHealthcare would begin requiring pre-treatment approval for Acthar coverage to determine the medical necessity of all prescriptions. (*Id.* ¶ 124.) Both of these announcements caused Questcor's stock to decline further in price.

Between the July 2012 Citron Report and the January 2013 UnitedHealthcare announcement, Questcor's stock decreased in value by 67% from the Class Period high. (CAC ¶ 125.)

**IV.**
**MOTIONS TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may seek dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A court may grant such a dismissal only where the plaintiff fails to present a cognizable legal theory or to allege sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("Rule 8 . . . does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal citation omitted). In evaluating the sufficiency of a complaint, courts must accept all factual allegations as true. Legal conclusions, in contrast, are not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A complaint should not be dismissed "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Employer-*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 11 of 33 |
|---|---|---|---|

*Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

Federal Rule 9(b) imposes a heightened pleading standard on a party alleging fraud. *See* Fed. R. Civ. P. 9(b) (requiring party to "state with particularity the circumstances constituting fraud or mistake"). Rule 9(b) requires that averments of fraud be specific enough to give defendants notice of the particular misconduct in order to allow defendants to defend against the charge and not just deny that they have done anything wrong. *See Vess v. CIBA-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.").

A.   <u>Section 10(b) and Rule 10b-5 Violations</u>

Under Section 10(b) of the Exchange Act, it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. SEC Rule 10b-5(b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5(b). Thus, to prevail on a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must prove:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, __U.S.__, 131 S. Ct. 1309, 1317, 179 L. Ed. 2d 398 (2011) (quoting *Stoneridge Invest. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008)).

Under the PSLRA, any private securities complaint alleging that the defendant made a false or misleading statement must:  "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S. Ct. 2499, 2508, 168 L. Ed. 2d 179 (2007). The parties do not address whether the CAC adequately pleads a connection between Defendants' alleged misrepresentations or omissions and the purchase or sale of a security, reliance on the part of Plaintiffs, or economic loss. Accordingly, the Court assumes for the purposes of the present motions to dismiss that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 12 of 33 |
|---|---|---|---|

those elements are satisfied, and it addresses only the remaining three elements:  (1) material misrepresentations or omissions; (2) scienter; and (3) loss causation.

## 1.    Material Misrepresentations

To establish a material misrepresentation, Plaintiff must show that Defendants made a statement that was "*misleading* as to a *material* fact." *Matrixx Initiatives*, 131 S. Ct. at 1318 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); emphasis in original).  A misrepresentation is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Id.* (quoting *Basic*, 485 U.S. at 231-32)).

Plaintiffs allege four types of false and misleading statements by Defendants during the Class Period:  (1) statements regarding the scientific basis for Acthar's indications; (2) statements regarding Questcor's compliance with regulatory standards and industry practice; (3) statements regarding insurance coverage for Acthar; and (4) statements regarding Questcor's financial status and financial forecasts.

### a.    Claims Against Medeiros and Blutt

As a preliminary matter, the Court must address the allegations against Medeiros, who served as Questcor's Chief Technical Officer, Executive Vice President, and Senior Vice President during the Class Period, and Blutt, an outside director.  (*See* CAC ¶ 22.)  Neither Medeiros nor Blutt is alleged to have made any misleading statements during the Class Period.

Plaintiffs submit that, under the "group pleading doctrine," Medeiros may be held liable for Questcor's published statements by virtue of his position as an officer of the company.  *See In re Omnivision Techn., Inc.*, Case No. 04-2297, 2005 WL 1867717, at *5 (N.D. Cal. July 29, 2005).  In *Janus Capital Gp., Inc. v. First Deriv. Traders*, __ U.S. __, 131 S. Ct. 2296, 2303, 180 L. Ed. 2d 166 (2011), the Supreme Court held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  The Ninth Circuit has yet to address whether the group pleading doctrine survives *Janus* and the more stringent pleading requirements of the PSLRA, but district courts in this circuit have largely concluded that the doctrine is incompatible with the PSLRA.  *See, e.g.*, *Am. Apparel, Inc. S'holder Litig.*, Case No. 10-06352, 2013 WL 174119, *25 (C.D. Cal. Jan. 16, 2013); *New Century*, 588 F. Supp. 2d at 1223-24 ("All of the Circuit courts that have expressly considered whether group pleading is compatible with PSLRA have concluded that it is not.");

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 13 of 33 |
|---|---|---|---|

*Petrie v. Elec. Game Card Inc.*, Case No. 10-00252, 2011 WL 165402, *3 (C.D. Cal. Jan. 12, 2011) (noting that "the majority of district courts within the Circuit to confront the group pleading doctrine post-*Tellabs* have decided that the doctrine did not survive"); *In re Hansen Natural Corp.*, 527 F. Supp. 2d 1142, 1153-54 (C.D. Cal. 2007) (noting that "the group pleading doctrine can no longer be used in pleading cases under the PSLRA").

Moreover, although Blutt is alleged to have sold, along with his private equity firm Consonance Capital, 706,255 shares during the Class Period, the CAC lacks any additional allegations linking his sales to knowledge of the company's operations and misleading practices. Blutt is not alleged to have made any of the misleading statements. The CAC also contains no facts to suggest that Blutt was involved in Questcor's internal operations—unlike the other Individual Defendants, there are no allegations that Blutt participated in the company's investor conference calls, was involved in creating the company's marketing strategy, or was compensated by Questcor. Without more, Blutt's trading alone is insufficient to plead liability for securities fraud under Section 10(b). *See In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995) (finding that outside directors were not liable for securities fraud absent allegations that they "participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times").

Accordingly, in the absence of specific allegations that they "made" any misrepresentations, the securities fraud claims against Medeiros and Blutt are **DISMISSED** with leave to amend. The Court next addresses the statements allegedly made by the remaining Individual Defendants: Bailey, Mulroy, Cartt, and Young.

### a.    The Scientific Basis for Acthar

Plaintiffs allege that the Individual Defendants, speaking on behalf of Questcor, mischaracterized the nature and results of scientific tests of Acthar in order to create the impression that Acthar was a successful and medically necessary method of treating MS and NS. Specifically, Questcor enlisted doctors like Bomback and Beck, who were paid substantial consulting fees, to conduct tests that would support Questcor's aggressive marketing strategy. According to Plaintiffs, the Bomback Study was inherently flawed because it was retrospective and only examined 21 patients, but Defendants touted this study as the centerpiece of their campaign. Defendants also allegedly terminated studies when it became clear that they would not yield favorable results for Acthar, resulting in a limited but positive body of published research on the drug. (CAC ¶ 39.) In one press release, Cartt stated, "Our emerging understanding of the apparent immune-modulating properties of Acthar encourages us to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 14 of 33 |
|---|---|---|---|

investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases." (*Id.* ¶ 79.)

In SEC filings throughout the Class Period signed by Bailey and Mulroy, Defendants stated that their "research and development" costs included "costs associated with the funding of medical research projects to better understand the therapeutic benefit of Acthar." (CAC ¶ 77.) Young repeatedly noted the company's research and development investment in Acthar, as well as the company's expectation that it would continue to expand research to support marketing efforts. (*Id.* ¶¶ 103, 114.) The CAC also alleges that Questcor compensated doctors and patients for endorsing Acthar. (*Id.* ¶¶ 41, 43.) Yet, in its response to the StreetSweeper report, Questcor stated that it "does not provide financial incentives to doctors or other healthcare practitioners to prescribe Acthar." It further stated that it had "no current financial arrangements with Dr. Bomback," although it admitted to having previously had a consulting relationship with Bomback. (*Id.* ¶ 92.) According to a *New York Times* article published on September 7, 2011, however, in January 2010, Bomback signed a five-year consulting deal with Questcor under which he would receive $50,000 per year for consulting services. (Questcor RJN, Ex. 8.) That agreement was apparently changed in April 2010 to provide Bomback with only $10,000 per year. (*Id.*)

Defendants first contend that Plaintiffs' allegations as to the Bomback study and other studies amount to a mere disagreement with the methodology of testing, which cannot constitute false or misleading statements under *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012). In *Rigel*, the plaintiffs challenged the interpretation of statistical data on a particular drug, not the data itself, and they argued that the defendant's doctors should have used the plaintiffs' methodology instead. 697 F.3d at 877. Thus, the allegations of falsity were essentially "two different judgments about the appropriate statistical methodology used by Defendants," which did not result in a false statement. *Id.* at 878. In contrast, here, Plaintiffs do not challenge Questcor's interpretation of data—they challenge the efficacy of the data itself due to bias and Questcor's intentional limitation of the availability of test results. Plaintiffs do not merely "disagree[] with the statistical methodology adopted by the doctors and scientists." *Id.* Rather, they assert that the tests were flawed because they were either conducted by doctors earning excessive compensation fees to yield certain results or that unfavorable tests were discontinued to conceal their results. Thus, the alleged misrepresentations in this case differ from those alleged in *Rigel*.

Defendants next argue that they were open about the "limited" data available and that the Bomback study publicly disclosed its own limitations, and that therefore they did not misrepresent the nature of their tests to the public. (*See* Questcor's RJN, Ex. 2 (noting the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 15 of 33 |
|---|---|---|---|

"limited data on the efficacy of Acthar in the treatment of [NS]"); Ex. 29 (analyst report noting that "Questcor acknowledges the limited modern clinical trial data . . . .").)  As the Ninth Circuit has acknowledged, however, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (quoting *In re Convergent Techn. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)).  Thus, although Questcor may have generally disclosed— albeit often separate and apart from statements lauding positive test results—the limitations of available evidence, it deliberately concealed adverse test results by terminating studies whose results would not benefit Questcor.[8]  (*See* CAC ¶ 39.)  Indeed, Rule 10b-5 forbids omissions of "material fact[s] necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).  By using the positive study results to tout Acthar's marketability, Defendants were "bound to do so in a manner that wouldn't mislead investors."[9]  *Berson v. Applied Signal Techn., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

The CAC adequately alleges that Defendants made misleading statements about the scientific basis for Acthar that may give rise to a securities fraud claim.

---

[8] Defendants overstate the PSLRA's requirement that the complaint "state with particularity all facts on which that belief is formed" including by naming the sources of the information alleged.  *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999)).  In *Rubke*, the complaint based an allegation of a particular executive conference "on information and belief."  *Id.*  Because of this, the allegation was not sufficiently specific absent information about how that belief was formed.  *Id.*  In this case, the Court finds that Plaintiffs' allegations are sufficiently detailed to satisfy the PSLRA's particularity requirements.  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("Naming sources is unnecessary so long as the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'") (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)).

[9] At oral argument, Defendants argued that under *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002), they are not required to disclose *everything* about their scientific research simply because they disclosed *some information* about that research.  In *Brody*, the Ninth Circuit noted that "[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts," and held that "an omission must . . . affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists" to be actionable under the securities laws.  *Id.* (citing *McCormick v. The Fund Am. Cos.*, 26 F.3d 869, 880 (9th Cir. 1994)).  In this case, the facts suggest that, by failing to publicize that it was cancelling studies that would not provide support for Acthar, Questcor created an impression of the scientific basis for Acthar prescriptions that did differ from the real state of affairs.

---

CIVIL MINUTES—GENERAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 16 of 33 |
|---|---|---|---|

> **b.** **Compliance with Regulatory Standards and Industry Practices**

Plaintiffs generally contend that Defendants' conduct misled investors about their compliance with regulations and industry practices, but the CAC fails to identify any such standards or practices that were violated. In their Opposition, Plaintiffs rehash their allegations about Defendants' scheme of overpaying doctors and patients to promote the drug and manipulating test results to create a misleading image of Acthar in the market. (Opp'n at 12-13.) Neither the CAC nor the opposition identifies any specific standards or regulations that Defendants violated by engaging in the acts described.

The only potential "industry standard" mentioned in the CAC is the PhRMA Code on Interactions with Healthcare Professionals. It is true that, during the Class Period, Defendants repeatedly made statements indicating their belief that Questcor was acting in full compliance with regulations and industry standards, including the PhRMA Code. (*See, e.g.*, CAC ¶ 89 ("The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices."); ¶ 92 ("Questcor has a standard compliance program. . . . We are in substantial compliance with the PhRMA Code on Interactions with Healthcare Professionals."). Both parties acknowledge, however, that the PhRMA Code does not have the force of law and, in any case, the CAC does not identify the specific standards set by the PhRMA Code which Defendants allegedly violated. (*See id.* ¶ 42.) At oral argument, Plaintiffs conceded that neither the CAC nor the Opposition identifies the specific standards or how Defendant's research and development efforts failed to meet those standards. Plaintiffs argue that pleading any violation of a regulation or industry standard would have been a legal conclusion. The Court disagrees. In the context of the allegation that Defendants made misleading statements about their compliance with regulations and industry standards, facts describing the specific regulations and standards and how Defendants' actions violated those regulations and standards are a necessary foundation for the ultimate conclusion—without those facts, the Court is unable to determine if the conduct alleged ran afoul of industry norms.

Even if the CAC did adequately plead that Defendants deviated from regulatory or industry standards, the allegedly misleading statements about compliance are statements of opinion or belief. The Ninth Circuit requires that misleading opinions are actionable only "if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading." *Rubke*, 551 F.3d at 1162 (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991)). The CAC fails to plead with specificity that the Individual Defendants reassured the public of Questcor's regulatory compliance with subjective knowledge that their reassurances were false. Accordingly, as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 17 of 33 |
|---|---|---|---|

currently pleaded, the statements about Questcor's regulatory compliance and industry standards cannot provide a basis for a claim under Section 10(b).

### c. <u>Insurance Coverage for Acthar</u>

Plaintiffs also allege that Defendants made false and misleading statements about the availability of insurance coverage for Acthar. Questcor maintained an office of up to 30 people whose sole responsibility was to assist patients with obtaining insurance reimbursement. (CAC ¶ 54.) When asked about insurance coverage throughout the Class Period, several Individual Defendants repeatedly reassured investors that coverage for Acthar was high and stable. (*See, e.g.*, *id.* ¶¶ 56, 81 (on an October 25, 2011 analyst call, Cartt told investors, ""[I]ts kind of a draw between us and the payers and we expect that will be the case going forward . . . overall our coverage remains very, very high across all of our key therapeutic areas"); ¶ 57 (on a February 22, 2012 conference call, Bailey told investors that "coverage of Acthar for [NS] continues to be above 85%"); ¶ 58 (on July 10, 2012, Questcor publicly stated that insurance reimbursement continued to be "very good" and was "around 90%"); ¶ 98 (on a February 22, 2012 conference call, Cartt stated that "insurance coverage for Acthar and [NS] should remain very strong"); ¶ 113 (on July 24, 2012 conference call, Cartt stated, "[W]e're seeing no indication there's any slow down in coverage whatsoever there").)

Plaintiffs do not allege that the statements were false when made, i.e., that insurance coverage was *actually lower* than Defendants represented. Instead, Plaintiffs contend that coverage was only high because of Defendants' aggressive and misleading marketing campaign, and that Defendants' optimistic reassurances were designed to conceal the very real risk that coverage would decline if insurers determined Acthar was not medically necessary. Thus, Defendants' optimistic statements about coverage were misleading in light of their failure to disclose the true nature of their marketing efforts and the scientific studies on Acthar.

Defendants argue that they regularly disclosed the risk that coverage would change in filings with the SEC, and that the market understood these disclosures. (*See, e.g.*, Questcor's RJN, Ex. 20 (10Q quarterly report, filed July 29, 2011, containing boilerplate list of risk factors including Questcor's "ability to receive high reimbursement levels from third party payers"); Ex. 27 (8K current report, filed April 24, 2012, containing same risk disclosures); Ex. 30 (10Q quarterly report, filed April 27, 2011, containing same risk disclosures).) As previously noted, however, "an issuer's public statements cannot be analyzed in complete isolation, and "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller*, 519 F.3d at 886. Thus, that Questcor's SEC filings contained boilerplate disclosures about the potential risk of decreased insurance

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 18 of 33 |
|---|---|---|---|

reimbursement does not render immaterial the Individual Defendants' enthusiastic reassurances that coverage was and would remain high.  *See, e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (under PSLRA's safe harbor provision for forward-looking statements, "boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning").

The CAC adequately alleges that Defendants made misleading statements about the availability of insurance reimbursement that may give rise to a securities fraud claim.

**d.      Questcor's Sales Figures and Financial Forecasts**

As Questcor's share prices rose throughout the Class Period, Defendants reported annual revenues and earnings that were almost entirely based on the sale of Acthar.  (CAC ¶ 3.)  Again, Plaintiffs do not contend that the statements themselves were false when made, but rather that they were misleading because Defendants concealed the true causes of the increased sales and financial success.  (*See, e.g.*, *id.* ¶ 67 (noting Acthar's "strong performance . . . in the fourth quarter of 2010"); ¶ 69 (highlighting the "120% year-over-year increase in the number of new paid prescriptions of [Acthar]" in early 2011); ¶ 74 (highlighting the "147% year-over-year increase in the number of paid [Acthar] prescriptions" and the fact that "Questcor had a terrific quarter" in the second quarter of 2011).

Defendants again argue that these statements are not independently actionable because they depend entirely on allegedly misleading statements about scientific support for Acthar and Questcor's marketing efforts.  But, as noted above, by touting Acthar's success in the market, Defendants were "bound to do so in a manner that wouldn't mislead investors."  *Berson v. Applied Signal Techn., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (explaining that once a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information").  Thus, to the extent Plaintiffs have adequately pleaded that Questcor's statements about the scientific support for Acthar were misleading, so too were its statements about the company's financial success arising out of Acthar's sales.

The Court finds that the CAC adequately alleges that Defendants made misleading statements about Questcor's financial success that may give rise to a securities fraud claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 19 of 33 |
|---|---|---|---|

### 2.       Scienter

To establish scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).   In the Ninth Circuit, the required state of mind is one of "deliberate or conscious recklessness." *Employer-Teamster*, 320 F.3d at 931 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999)).   In short, the question is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."   The Court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.   To qualify as "strong," an inference of scienter must be "as compelling as any opposing inference of nonfraudulent intent."   *Id.*   The Court's "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."   *Id.* at 326.

### a.       Insider Selling

Unusual or suspicious insider stock sales may support a finding of scienter when the sales are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."   *Employer-Teamster*, 320 F.3d at 938 (quoting *Silicon Graphics*, 183 F.3d at 986).   In determining whether insider stock sales are suspicious, courts consider:   (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) consistency with prior trading history.[10]   *Id.*   Defendants Bailey, Cartt, Young, Medeiros, and Blutt (together, the "Trading Defendants") traded during the Class Period.   Defendant Mulroy did not trade during the Class Period.   As the Court has already determined, the CAC fails to plead a securities fraud claim against Blutt or Medeiros because they are not alleged to have made any misleading statements.   Accordingly, the Court need only examine whether the trading of Bailey, Cartt, and Young supports a strong inference of scienter.

### i.       Amount and Percentage of Shares Sold

Over the course of the Class Period, the Trading Defendants together sold over 2.8 million shares of Questcor stock earning proceeds of over $101 million.   (CAC ¶¶ 61-62.)   Even without the sales by Blutt and Medeiros, the remaining Trading Defendants sold a total of

---

[10] The fact that Mulroy did not trade during the Class Period does not defeat an inference of scienter.   *See Employer-Teamster*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 20 of 33 |
|---|---|---|---|

$40,981,195 worth of shares.  (*Id.* ¶ 61.)  During the Class Period, Bailey sold 14 times and realized profits of over $17 million; Cartt sold nine times and realized profits of over $16 million; and Young sold five times and realized profits of over $7 million.

Plaintiffs allege that these sales constituted a substantial, and thus suspicious, proportion of their shares during the Class Period.[11]  (CAC ¶ 62 (alleging that Bailey sold 30.84% of his shares; Cartt sold 60.44%; and Young sold 50.54%.)  Defendants respond that the Class Period, at approximately 18 months, is "unusually long" and therefore allows Plaintiffs to "sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002).  In *Vantive*, the court held that the 63-week class period undercut the suspicious nature of the sales in part because the allegations did not support an inference of fraud throughout the class period.[12]  *Id.*  In contrast, as discussed above, the CAC adequately alleges misleading statements made as early as April 2011, the beginning of the Class Period.  (*See* CAC ¶¶ 67-69.)  Thus, the length of the Class Period in this case suggests not that Plaintiffs are grasping at straws to build their case, but rather that Defendants were able to ride the wave of their misleading marketing for the entire Class Period.  *See Batwin v. Occam Networks, Inc.*, Case No. CV 07-2750, 2008 WL 2676364, at *14 (C.D. Cal. Jul. 1, 2008) (finding that suspicious stock sales supported inference of scienter for nearly 3.5-year Class Period).

Plaintiff's calculations of stock sales, however, do not take into account the Trading Defendants' stock *options* that vested during the Class Period.  The Ninth Circuit has held that actual stock shares plus exercisable stock options are a more accurate measure of an owner's trading potential than the stock shares alone.  *Vantive*, 283 F.3d at 1092 n.12; *Silicon Graphics*, 183 F.3d at 986-87.  Taking these additional vested options into account, the percentages of each Trading Defendant's holdings sold during the Class Period decreases significantly.  (Individual Defs.' RJN, Exs. 22-27 (demonstrating that 100% of Bailey and Cartt's sales and 97% of Young's sales were vested stock options).)  At the end of the Class Period, Cartt retained 46% of

---

[11] Courts consider both the amount and percentage of shares sold.  *See Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199 n.10 (C.D. Cal. 2004).  Still, neither measure is dispositive of the scienter issue, and there is no brightline rule for how much or what percentage of shares sold is necessary to support an inference of scienter.  *Compare Employer-Teamster*, 320 F.3d at 939 (finding sales were suspicious where most defendants sold 100% of their shares, but proceeds totaled only $12 million) *with Nursing Home Pension Fund*, 380 F.3d at 1232 (finding sales were suspicious where defendant sold only 2.1% of holdings but earned $900 million).

[12] In *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008), the Ninth Circuit suggested that, in light of *Tellabs*, the standards for scienter set forth in *Vantive* and *Silicon Graphics* were "too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright."  Thus, although the Court considers the scienter analyses in those cases, it need not apply such an exacting standard.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |

| Title | *In re Questcor Securities Litigation* | Page | 21 of 33 |

his pre-Class Period holdings. (*See id.* Exs. 25-27.) Thus, although the total value of the Class Period sales is substantial, the percentage of shares sold cuts against a strong inference of scienter. *See, e.g., In re Immersion Corp. Sec. Litig.*, Case No. 09-04073, 2011 WL 871650, at *7 (N.D. Cal. Mar. 11, 2011) (finding no scienter where the defendants retained 79.11% and 90.28% of their holdings including exercisable options). Nevertheless, courts have still found that insider sales can support such an inference where the profits realized from Class Period sales are substantial. *See Johnson*, 394 F. Supp. 2d at 1199 (sale of only 18% of defendant's shares were found suspicious where proceeds exceeded $661.6 million); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (noting that sale of 20% of insider's shares may constitute a "suspicious amount," "especially where the dollar amounts involved are high").

Defendants next argue that Bailey's Class Period sales are irrelevant to the scienter question because they were made pursuant to a 10b5-1 trading plan. Indeed, the Ninth Circuit has held that trades made pursuant to trading plans "do not by themselves support an inference of scienter." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 n.2 (citing *Silicon Graphics*, 183 F.3d at 986); *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) ("sales according to pre-determined plans '*may* rebut [] an inference of scienter'") (emphasis added) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994)). Bailey is just one of the five Individual Defendants who sold stock during the Class Period, however, and the only one who did so pursuant to such a plan. Moreover, the fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (finding that existence of 10b5-1 trading plan was affirmative defense and did not prevent plaintiffs from pleading suspiciously timed securities sales).

Here, Bailey created his trading plan during the second quarter of 2011, around the beginning of the Class Period, and thereafter sold shares on a regular basis through the end of the Class Period. (CAC ¶ 61; *see* Individual Defs.' RJN, Ex. 12.) Although the plan was scheduled to terminate in July 2012, Bailey made two additional sales of 40,000—more than his usual 30,000 sales, in August and September 2012. (CAC ¶ 61.) While it is conceivable that Bailey created the plan for purely innocent reasons, it is equally as plausible that, after observing the success of Questcor's aggressive and misleading marketing strategies, he set up the plan to avoid the appearance of improper sales. Thus, Bailey's trading plan alone does not negate the suspicious nature of the sales as a whole.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | | Date | October 1, 2013 |
|---|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | | Page | 22 of 33 |
|---|---|---|---|---|

### ii.    The Timing of Stock Sales

The timing of the sales also raises suspicions.  The Trading Defendants sold shares repeatedly throughout the period, as many as 14 times.  (CAC ¶ 61.)  Moreover, many of the sales occurred after significant jumps in Questcor's stock price, which Plaintiffs allege were prompted by false and misleading statements.  (*See* CAC ¶¶ 82-83.)  For example, on October 25, 2011, Questcor announced record quarterly financial results and the Individual Defendants held a conference call with investors at which they touted the success of Acthar.  (*Id.* ¶ 64.)  Over the next several days, Questcor's price rose more than $7 per share, and Defendants Cartt and Young sold a combined 244,010 shares for proceeds of over $10 million in the next two trading days.  (*See id.* ¶¶ 61, 64.)  All five of the Trading Defendants made over 45% of their Class Period sales between October 10, 2011 and January 11, 2012, the day when StreetSweeper first raised red flags about Questcor's marketing prices.  (*See id.* ¶¶ 61-62, 86.)   A decline in stock prices followed in early 2012, and Bailey, who sold under a trading plan, is the only Individual Defendant who sold during that decline.

Defendants first argue that the timing of the sales does not raise suspicion because more than 80% of the total sales occurred more than 10 months before the end of the Class Period, when the fraud was allegedly revealed.  *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384-85 (E.D.N.Y. 2003) (court found no scienter where sales occurred one year prior to corrective disclosures).  Plaintiffs acknowledge that a long lag time between sales and disclosure of the fraud may weaken the inference of scienter, but they argue that it does not "negate" that inference.  (Opp'n at 23 n.15.)  In this case, only Bailey made any sales between May and September 2012, the last four months of the Class Period.  (CAC ¶ 61.)  Cartt made his last sale in November 2011, and Young's last sale was in April, 2012.  (*Id.*)  Although the delay between the last sales and the disclosures is a factor that may weigh against a finding of scienter, under the facts of this case, it does not negate the inference of scienter.  The CAC alleges that Questcor's stock began to falter in July 2012 after Citron's first report issued criticizing Questcor's marketing practices.  (*See* CAC ¶ 108.)  It is therefore reasonable to infer that, as the price began to decline rather than rise, the Individual Defendants opted not to sell in the hope that the stock would rebound.

Defendants also point out that, although the Class Period high reached $57.64 on July 9, 2012, most of the sales were made at much lower prices, and in fact no Defendant sold in the days immediately following the Class Period high.  (*See* CAC ¶¶ 61, 107.)  Defendant argues that "[w]hen insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know."  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).  But the Ninth Circuit does not require that insiders sell at the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | | Date | October 1, 2013 |
|---|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | | Page | 23 of 33 |
|---|---|---|---|---|

absolute highest point to raise a strong inference of scienter—it is enough that the insiders traded in such a way as to indicate they took advantage of their false statements. *See Daou*, 411 F.3d at 1024 (insider sales were probative of scienter even though defendants sold at just $22.68, where class period high reached over $34). Here, but for the extended decline in early 2012, the stock price rose steadily throughout the Class Period—under these circumstances, the fact that Defendants did not wait until the last possible moment to sell does not negate an inference of scienter.

### iii.    Consistency With Prior Trading History

In *Apple Computer*, the Ninth Circuit compared the 10-month class period to the 10 months immediately preceding the class period to determine whether the class period sales were inconsistent with the defendants' prior trading history. *See* 886 F.2d at 1117; *see also Employer-Teamster*, 320 F.3d at 941 (accepting the *Apple Computer* comparison as appropriate). In this case, only one of the Individual Defendants, Defendant Young, sold *any* shares *at all* in the 18 months prior to the Class Period, the length of time of the Class Period itself, compared with a total of over $101 million in sales during the Class Period. (CAC ¶ 63 n.6.) Defendants submit that this lack of pre-Class Period sales was due to a "blackout" period during which they could not trade for significant periods prior to the Class Period. (*See* Individual Defs.' RJN, Exs. 22-27.) At this stage, the record is insufficient to demonstrate the circumstances and duration of this blackout period, but in any event, Young's sale in November 2010 suggests that the Individual Defendants were not prevented from any trading activity during the 18 months before the Class Period. (*See* CAC ¶ 61.) Given that the Individual Defendants sold over $101 million worth of Questcor shares during the Class Period compared with almost no shares in the prior 18 months, the Complaint adequately pleads that the Class Period sales are dramatically inconsistent with prior trading history.

### b.    Questcor's Repurchase of Shares

Plaintiffs next contend that Questcor's repurchase of approximately 6 million shares during the Class Period, at a cost of more than $243 million, also supports a strong inference of scienter. (*See* CAC ¶ 65.) Defendants respond that these repurchases were made pursuant to a stock repurchase plan that Questcor first approved in 2008 and modified on May 29 and September 28, 2012. (Individual Defs. RJN, Ex. 18.) Contrary to Plaintiffs' contention, stock repurchase programs are irrelevant to the scienter analysis, and in some cases "actually *negate* a finding of scienter." *In re Tibco Software, Inc.*, Case No. 05-2146, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006); *see also In re Cisco Sys. Inc. Sec. Litig.*, Case No. 11-1568, 2013 WL 1402788, at *8 (finding that repurchase plan initiated before the class period undermined

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | | Date | October 1, 2013 |
|---|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | | Page | 24 of 33 |
|---|---|---|---|---|

inference of scienter because it was illogical that the defendant "would have been repurchasing its shares had it been aware of facts that would indicate the price would fall"); *Plumbers and Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718 (S.D. In. 2009) (quoting *Tibco*); *In re Silicon Storage Techn., Inc.*, Case No. 05-0295, 2006 WL 648683, at *19 (plaintiffs failed to allege why stock repurchase program supported a strong inference of scienter).

In this case, the Court is not persuaded that the existence of the stock repurchase plan wholly negates the inference of scienter that is otherwise plausible in light of the other factors. Questcor increased the amount of purchases authorized under the plan in May 2012, just two months before the Class Period high in July 2012. (Individual Defs.' RJN, Ex. 18; CAC ¶ 107.) The company's repurchase on September 28, 2012, shortly after the end of the Class Period, may have been an attempt to help the company recover after the disclosure of the SEC investigation. (*See id.*, Ex. 17.) Thus, the Court finds that the repurchasing plan weighs neither in favor of nor against an inference of scienter in this case.

### c.    <u>Motive</u>

Although motive alone is insufficient to establish scienter, courts consider the defendants' motive to commit fraud as one factor that may support a strong inference of scienter. *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009); *Silicon Graphics*, 183 F.3d at 974. Plaintiffs allege that Defendants' incentive compensation plans, which allowed them to earn up to 677% of their base salary in 2011, provide additional support for the inference they were at least recklessly indifferent in misleading the public because they stood to earn substantially more if the company succeeded. (*See* CAC ¶ 44.) Because incentive compensation packages are common, however, this fact alone cannot raise an inference of scienter. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) (joining several other circuits in holding that "evidence of a personal profit motive on the part of officers and directors . . . is insufficient to raise a strong inference of scienter"); *In re Cornerstone Propane Partners, LP*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("Compensation plans which reward executives for performance similarly should not serve as a basis for allegations of fraud."). In the context of the other facts alleged, however, the Court finds that the significant increase in the Individual Defendants' compensation during the Class Period, and the knowledge that they could earn even more in the future, provides additional support for an inference of scienter. (*See, e.g.*, Individual Defs.' RJN, Ex. 19.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 25 of 33 |
|---|---|---|---|

### d.     Core Operations

Plaintiffs also argue that the Individual Defendants' involvement in Questcor's day-to-day operations adds additional support for a strong inference of scienter because it demonstrates their knowledge of the misleading manner in which Questcor was operating. "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP*, 542 F.3d at 784. Thus, although generally a plaintiff may not rely *only* on the core-operations inference to plead scienter, it is one factor that the Court may consider as part of its "holistic" assessment of the pleadings. *Id.* (citing *Tellabs*, 551 U.S. at 326); *see also Metzler*, 540 F.3d at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.").

Bailey, Cartt, Young, and Mulroy were among the most senior executives at Questcor, a relatively small company, during the Class Period. (CAC ¶¶ 18-23.) Questcor earned nearly all of its revenue from sales of Acthar, and 70% of Questcor's employees were engaged in "sales and commercialization activities" during the Class Period. (*Id.* ¶¶ 3, 45.) Questcor's SEC filings show that the Individual Defendants regularly participated in conference calls in which they touted Questcor's marketing efforts, the resulting success of Acthar sales, and reimbursement issues. (*See, e.g.*, CAC ¶ 55 (noting that Individual Defendants admitted that they were "monitoring [insurance reimbursements] closely"); ¶ 71 (noting that, in an April 26, 2011 conference call, Cartt stated, "[W]e know that the studies have been progressing and what we hear from the investigators . . . .").) In addition, the CAC alleges that the Individual Defendants, by virtue of their executive positions, received regular reports on Acthar sales and reimbursements. (*Id.* ¶ 25.) These allegations, although not alone sufficient to establish scienter, lend additional support for a strong inference of scienter. The Individual Defendants' active involvement in and public statements regarding Acthar's success suggest that they were aware of the shortcomings of the research and marketing strategies but misled the public in order to advance Questcor's sales efforts.

### e.     A Holistic Assessment of the Facts Raises a Strong Inference of Scienter as to Bailey, Cartt, Young, and Mulroy

A complaint raises a strong inference of scienter where the allegations, accepted as true and taken collectively, would allow a reasonable person to deem the inference of scienter "at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326. Here, the Court finds that the allegations, when viewed holistically, support a strong inference of scienter as to Defendants Bailey, Young, and Cartt. The trading activity of these Individual Defendants was dramatically

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 26 of 33 |
|---|---|---|---|

inconsistent to their pre-Class Period sales and yielded substantial proceeds.   While the
Individual Defendants retained much of their holdings at the end of the Class Period, this fact
does not negate the inference of scienter in this case.   Given the nature of Defendants'
misrepresentations, which caused the company's stock value to rise steadily for an extended
period, it is reasonable that the Individual Defendants retained shares with the expectation that
the price would continue to rise as long as the truth about Acthar's scientific basis and
reimbursement remained obscured.   Moreover, although Bailey's trading plan and the timing of
stock sales weigh somewhat against scienter, viewing all of the allegations holistically, the Court
finds that the inference of scienter is at least as strong as any opposing inference.   Although
discovery may ultimately shift the balance, the CAC adequately pleads scienter as to Bailey,
Young, and Cartt.

Mulroy, however, sold no shares during the Class Period, and therefore the Court must
determine whether the other factors are sufficient to raise a strong inference of scienter as to him.
"Scienter can be established even if the officers who made the misleading statements did not sell
stock during the class period."   *Employer-Teamster*, 320 F.3d at 944 (quoting *Hanon v.
Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir. 1992)).   Mulroy served as Chief Financial Officer,
Senior Vice President, General Counsel, Corporate Secretary, and Chief Compliance Officer
during the Class Period.   (CAC ¶ 19.)   He not only personally made many of the misleading
statements alleged in the CAC, but he also signed and caused to be filed frequent SEC
documents containing additional misleading statements throughout the Class Period.   (*Id.* ¶¶ 19,
77, 84, 92, 100, 104, 105, 115.)   In light of Mulroy's sizeable incentive compensation package
(over 400% of his base salary), his close involvement in the day-to-day operations of the
business, and his alleged knowledge of the Trading Defendants' sales activities, the CAC alleges
facts sufficient to raise a strong inference of scienter.

### 3.      Loss Causation

Loss causation is "the causal connection between [the defendant's] material
misrepresentation and the [plaintiff's] loss."   *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharms.,
Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005); alterations
in original).   In other words, a complaint must "allege that the defendant's 'share price fell
significantly after the truth became known.'"   *Metzler*, 540 F.3d at 1062 (quoting *Dura*, 544 U.S.
at 347).   "A plaintiff is not required to show 'that a misrepresentation was the *sole* reason for the
investment's decline in value,'" but it must set forth facts that "'if assumed true, are sufficient to
provide [the defendant] with some indication that the drop in [defendant's] stock price was
causally related to [the defendant's] financial misstatement[s].'"   *Daou*, 411 F.3d at 1025-26
(quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997); emphasis and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 27 of 33 |
|---|---|---|---|

alterations in original). As long as a complaint alleges facts that plausibly establish causation, dismissal under Rule 12(b)(6) is inappropriate. *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). The defendants' alleged fraud need not be revealed through a single relevation—a plaintiff may plead loss causation through a "series of disclosures." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1200 (C.D. Cal. 2008) (citing *Gilead*, 536 F.3d at 1055).

### a.      Corrective Disclosures

Plaintiffs allege that the Aetna bulletin and September 19, 2012 Citron Report and the September 24, 2012 disclosure of investigation by the United States Attorney's Office were "corrective disclosures" of Defendants' false and misleading statements that caused the price of Questcor's stock to plummet.

### i.      The Aetna Bulletin and Citron Report

On September 19, 2012, Citron reported the results of a bulletin issued by Aetna. (CAC ¶ 119; Questcor RJN, Exs. 1, 32.) In the bulletin, Aetna announced four policy points: (1) Acthar is "medically necessary" for IS; (2) Acthar is "not medically necessary" for diagnostic testing of adrenocortical function because "it has not been shown to be superior to cosyntropin"; (3) Acthar is "not medically necessary" for corticosteroid-responsive conditions, such as MS, because it has "not been proven to be more effective than corticosteroids"; and (4) Acthar is "experimental and investigational for all other functions" because of the lack of evidence to support such treatments. (Questcor RJN, Ex. 32.) Citron reported that Aetna "finds no proof of efficacy to substantiate reimbursement for Acthar, except for [IS]." (*Id.* ¶ 118; Questcor RJN, Ex. 1.)

In essence, the Aetna bulletin announced Aetna's position that it would only reimburse for Acthar prescribed to treat IS—it considered Acthar not medically necessary for MS because it is not more effective than steroids, and not medically necessary for NS because it is merely "experimental and investigational" for that indication. (Questcor's RJN, Ex. 32.) The Citron Report issued the same day stated that "[t]he sales ramp of Acthar has been nothing more than an exploit of inefficiency in the healthcare system, and is not backed by any clinical data to prove its merits beyond the original study supporting its use for [IS]." (*Id.*, Ex. 1.)

Defendants argue that the Citron Report and Aetna Bulletin are not a corrective disclosure because they are statements of opinion, the basis for which was information already available on the market. *See Metzler*, 540 F.3d at 1062. In *Meyer v. Greene*, the Eleventh

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 28 of 33 |
|---|---|---|---|

Circuit held that the opinion of a financial analyst that a company's stock would sink was not a corrective disclosure because it did not reveal any new facts or information. 710 F.3d 1189, 1199 (11th Cir. 2013). The court explained that "if the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released *is the opinion itself*, and such an opinion, standing alone, cannot 'reveal[] to the market the falsity'" of prior misrepresentations. *Id.* (internal citation omitted).

At oral argument, Defendants highlighted that Questcor always marketed Acthar as a "second line" treatment for MS patients, and therefore the Aetna bulletin did not disclose any new information about its marketing practices with respect to Acthar. While this may be true, Aetna's announcement contained the additional conclusion that Acthar was not only not medically necessary but was "experimental and investigational" for "all other indications," including proteinuria in NS, which had become the focus of Questcor's marketing by the end of the Class Period. (*See, e.g.*, CAC ¶¶ 91, 98.) This finding was directly in conflict with Defendants' repeated statements that coverage for Acthar, and in particular for NS, was strong and expected to remain high—Defendants concealed the fact that high reimbursement rates were the direct result of misleading use of scientific evidence and aggressive marketing strategies. In short, the Aetna bulletin revealed "more than a 'risk' or 'potential' for widespread fraudulent conduct." *In re Int'l Rectifier Corp. Sec. Litig.*, Case No. 07-02544, 2008 WL 9453468, at *9 (C.D. Cal. Dec. 31, 2008) (quoting *Metzler*, 540 F.3d at 1064). Rather, the bulletin revealed to the market the misleading nature of Questcor's marketing of Acthar for NS and the effect that campaign was having on reimbursement rates. This relevation is borne out in the Citron Report, which highlighted statements made by the Individual Defendants regarding "favorable" insurance coverage in the summer of 2012. (Questcor's RJN, Ex. 1.)

### ii.     The Federal Investigation

The second corrective disclosure allegedly occurred on September 24, 2012, when Defendants filed a Form 8K disclosing that the federal government had initiated an investigation into Questcor's promotional practices. (CAC ¶ 122; Questcor's RJN, Ex. 32.) The disclosure states only that Questcor "became aware of a U.S. government investigation involving the Company's promotional practices. The Company intends to cooperate with the government in its investigation." (Questcor RJN, Ex. 32.)

As discussed above, a disclosure which reveals "a 'risk' or 'potential' for widespread fraudulent conduct" does not establish loss causation. *Metzler*, 540 F.3d at 1064. In *Metzler*, the initiation of a government investigation into one of many of the defendant's schools did not constitute a corrective disclosure because it revealed only a *risk* of fraudulent conduct at *one* of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | SA CV 12-01623 DMG (FMOx) | | Date | October 1, 2013 |
|---|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | | Page | 29 of 33 |
|---|---|---|---|---|

the schools, not all of them. *Id.* at 1063-64. Because the defendant managed 88 schools, only one of which was the subject of investigation, the announcement did not reveal "company-wide manipulation" of the school's enrollment statistics. *Id.* at 1063. As the *Metzler* court noted, "neither *Daou* nor *Dura* support the notion that loss causation is pled where a defendant's disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct." *Id.* at 1064.

Several courts in this circuit have interpreted *Metzler* to foreclose the finding that an investigation can *ever* constitute a corrective disclosure, reasoning that an investigation is neither an admission nor a finding of actual fraud. For example, in *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1046 (N.D. Cal. 2009), the court concluded that the defendant's disclosures regarding compliance with an SEC investigation, subpoenas, and the formation of its own investigative committee did not reveal the alleged fraud. The court acknowledged that "[a] reasonable investor may view these disclosures as indicators of risk . . . but they do not themselves indicate anything more than a 'risk' or 'potential'" for fraud. *Id.* at 1047. Similarly, in *Hansen*, 527 F. Supp. 2d at 1162, a pre-*Metzler* case, the court found that an SEC investigation announcement was not a corrective disclosure because it did not reveal any wrongdoing. (Citing *City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc.*, 388 F. Supp. 2d 932, 942 (S.D. In. 2005) ("[T]he mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management.").

But a bright line rule prohibiting courts from finding the announcement of an investigation as a corrective disclosure would "be to preclude any type of action . . . where there has been no conclusive finding of fraud by a government agency, or a criminal charge initiated, or a formal corrective disclosure by the defendant." *In re Gentiva Sec. Litig.*, 10-5064, 2013 WL 1200334, at *31 (E.D.N.Y. Mar. 25, 2013). In the Court's view, this cannot be the rule, particularly where Plaintiffs have pleaded other plausible allegations and in light of the Ninth Circuit's less stringent pleading standard for loss causation. *See Gilead*, 536 F.3d at 1057. To require, in all circumstances, a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit.

Indeed, several district courts in this circuit have found that, in certain circumstances, investigations may constitute corrective disclosures. In *In re Apollo Gp., Inc. Sec. Litig.*, Case No. 10-1735, 2011 WL 5101787, at *17 (D. Ariz. Oct. 27, 2011), the court concluded that certain announcements revealing the SEC's investigation into the company's practices were corrective disclosures sufficient to plead loss causation. The court noted, "at this stage in the litigation, if Plaintiffs were able to adequately allege underlying facts and scienter of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 30 of 33 |
|---|---|---|---|

misrepresentations or omissions that eventually led to [the investigation], the allegations related to the [investigation] would be sufficient to establish loss causation." *Id.*

In *In re New Century*, 588 F. Supp. 2d 1206, 1237 (C.D. Cal. 2008), the defendant announced that it would "reevaluate" certain of its financial statements from prior periods. The court concluded that, because the announcement occurred in the context of other information about the defendant's financial state, the allegations together were sufficient to plead loss causation. *Id.* Notably, the court acknowledged that the connection between the misleading statements and the disclosure may ultimately "be found too attenuated," but it declined to reach that factual determination at the Rule 12(b)(6) stage. *Id.* at 1238. Similarly, in *Rudolph v. UTStarcom*, Case No. 07-4578, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008), the court found that a press release announcing an investigation was a corrective disclosure because it announced, for the first time, that disclosures of fraud "might be forthcoming." *Id.* The court relied on *Gilead*'s cautionary language that "loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage." *Id.*

Although each disclosure in isolation may not be sufficient to plead loss causation, the Court finds that, when viewed together and in the context of the other allegations in the CAC, they are sufficient to "plead facts giving rise to a reasonable inference that the market became aware of the misrepresentations." *New Century*, 588 F. Supp. 2d at 1236. The investigation announcement says little about the nature of the investigation other than its subject matter—Questcor's "promotional practices"—but it came on the heels of the Aetna bulletin and Citron Report, which called into question the efficacy of scientific support for Acthar. Moreover, both alleged disclosures followed Citron's July report, which also questioned Questcor's marketing practices and the stability of reimbursement rates for Acthar. In addition, the same week of the investigation announcement, analysts issued reports that Questcor was essentially paying "kickbacks" to doctors who prescribed Acthar. (CAC ¶ 122.) Thus, the disclosures together raise at least a reasonable inference that Questcor had been misleading about the clinical support for its product and the stability of insurance reimbursement rates. This is sufficient under *Gilead*. 536 F.3d at 1057.

2.      **Effect on Questcor's Stock Price**

The CAC sufficiently alleges that the disclosures caused the price of Questcor shares to decline, causing loss to shareholders who had purchased during the Class Period. On September 19, 2012, the same day as the Citron Report, Questcor's share price dropped $24.17 per share to close at $26.35, a one-day decline of nearly 48%. (CAC ¶ 121.) On September 24, 2012, the day of the federal investigation disclosure, Questcor's stock dropped another $11.05 per share to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 31 of 33 |
|---|---|---|---|

close at $19.08 per share. (*Id.* ¶ 123.) Defendants do not offer any other explanation for these declines in price. Accordingly, the Court concludes that Plaintiffs have adequately pleaded loss causation.

The CAC adequately pleads a securities fraud claim against Questcor, Bailey, Mulroy, Cartt, and Young based on the alleged misrepresentations as to the scientific basis for Acthar, insurance reimbursement, and Questcor's financial status, but not as to statements made about Questcor's compliance with regulations and industry standards.[13] As noted above, however, the CAC fails to plead a securities fraud claim against Medeiros and Blutt.

**B.      Section 20(a) Control Person Liability as to the Individual Defendants Bailey, Mulroy, Cartt, Medeiros, and Young**

Under Section 20(a),

> Every person who, directly or indirectly, controls any person liable under any provision of [the SEA] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Thus, to establish control person liability under Section 20(a), a plaintiff must plead: (1) a primary violation of securities laws and (2) the defendants exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Whether a defendant "is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994).

Defendants do not contest the merits of Plaintiffs' 20(a) claims other than to argue that Plaintiffs have not pleaded a predicate offense. Accordingly, to the extent they have successfully pleaded a predicate offense, Plaintiffs appear to have pleaded a claim under Section 20(a) as to Defendants Bailey, Mulroy, Cartt, and Young. Because the CAC fails to plead a securities fraud

---

[13] The CAC also appears to raise a claim of insider trading against the Individual Defendants. (*See* CAC ¶ 138.) The Motions to Dismiss, however, do not address this potential basis for liability. Accordingly, the Court need not address the issue at this stage.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
|---|---|---|---|

| Title | *In re Questcor Securities Litigation* | Page | 32 of 33 |
|---|---|---|---|

claim against Medeiros, the claim under Section 20(a) is **DISMISSED** with leave to amend as to Medeiros.

**D.      Section 20A Liability as to Individual Defendants Bailey and Blutt**

Under Section 20A,

[a]ny person who violates any provision of [the Exchange Act] by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C.A. § 78t-1.  To establish a Section 20A violation, a plaintiff must plead:  (1) a predicate violation of securities laws and (2) facts showing that the trading activity of plaintiffs and defendants occurred contemporaneously.  *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1074 (C.D. Cal. 2008) (citing *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993)).

Again, Defendants do not contest the merits of this claim beyond their argument that Plaintiffs have failed to plead a predicate offense.  Accordingly, Plaintiffs appear to have pleaded a claim under Section 20A against Defendant Bailey.  Because the CAC fails to adequately plead a predicate Section 10(b) violation against Blutt, the claim under Section 20A against Blutt is **DISMISSED** with leave to amend.

**V.**
**CONCLUSION**

In light of the foregoing, the Court orders the following:

(1)      Plaintiffs' Motion to Strike the Declaration of Andrew R. Gray is **DENIED**;

(2)      Count I for violation of Section 10(b) of the Exchange Act is **DISMISSED** with leave to amend as to Medeiros and Blutt;

(3)      Count I is **DISMISSED** with leave to amend insofar as it relies on Defendants' misstatements as to Questcor's compliance with regulations and industry standards;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SA CV 12-01623 DMG (FMOx)** | Date | October 1, 2013 |
| --- | --- | --- | --- |

| Title | *In re Questcor Securities Litigation* | Page | 33 of 33 |
| --- | --- | --- | --- |

(4)     Count II for violation of Section 20(a) of the Exchange Act is **DISMISSED** with leave to amend as to Medeiros;

(5)     Count III for violation of Section 20A of the Exchange Act is **DISMISSED** with leave to amend as to Blutt;

(6)     The Motions to Dismiss are **DENIED** in all other respects;

(7)     By no later than 21 days from the date of this Order, Plaintiffs shall file any amended complaint or notify Defendants that they intend to proceed on the CAC; and

(8)     Defendants shall file their response within 21 days from the date of service of any amended complaint or notice that Plaintiffs do not intend to amend the CAC.

**IT IS SO ORDERED.**